**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

| | : | |
|---|---|---|
| In re | : | Chapter 11 |
| | : | |
| RADIOSHACK CORPORATION, *et al.*,[1] | : | Case No. 15-_____ (____) |
| | : | |
| Debtors. | : | (Joint Administration Requested) |
| | : | |

**MOTION FOR AN ORDER (I) APPROVING
THE CONTINUED USE OF THE DEBTORS' CASH
MANAGEMENT SYSTEM AND (II) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (collectively, the "Debtors") move the Court for the entry of an interim order (the "Interim Order") substantially in the form attached hereto as Exhibit C and a final order (the "Final Order") substantially in the form attached hereto as Exhibit D pursuant to sections 345, 363 and 503(b)(1) of the Bankruptcy Code: (i) approving the Debtors' continued use of (a) their current cash management system (the "Cash Management System"), and (b) the Debtors' existing bank accounts (the "Bank Accounts") and business forms, including authorizing the Debtors to open and close bank accounts; (ii) granting the Debtors a 45-day extension to comply with the requirements of section 345(b) of the Bankruptcy Code and interim approval of the Debtors' current investment and deposit guidelines; (iii) approving the continuation of certain ordinary course intercompany transactions with the Non-Debtor Affiliates; (iv) according administrative

---

[1] The Debtors are the following eighteen entities (the last four digits of their respective taxpayer identification numbers follow in parentheses): RadioShack Corporation (7710); Atlantic Retail Ventures, Inc. (6816); Ignition L.P. (3231); ITC Services, Inc. (1930); Merchandising Support Services, Inc. (4887); RadioShack Customer Service LLC (8866); RadioShack Global Sourcing Corporation (0233); RadioShack Global Sourcing Limited Partnership (8723); RadioShack Global Sourcing, Inc. (3960); RS Ig Holdings Incorporated (8924); RSIgnite, LLC (0543); SCK, Inc. (9220); Tandy Finance Corporation (5470); Tandy Holdings, Inc. (1789); Tandy International Corporation (9940); TE Electronics LP (9965); Trade and Save LLC (3850); and TRS Quality, Inc. (5417). The address of each of the Debtors is 300 RadioShack Circle, Fort Worth, Texas 76102.

expense priority to all postpetition intercompany claims held by a Debtor or one of the Non-Debtor Affiliates (as defined below) against one or more of the Debtors; and (v) authorizing all banks participating in the cash management system to honor certain transfers and charge bank fees and certain other amounts.  In support of this motion, the Debtors respectfully represent as follows:

**Background**

1.	On the date hereof (the "Petition Date"), each of the Debtors commenced a case by filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code.[2]  The Debtors are continuing in possession of their properties and are managing their businesses, as debtors in possession, pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

2.	RadioShack Corporation owns directly or indirectly each of the Debtors and eight non-debtor affiliates (collectively, "RadioShack").  RadioShack, an international electronics retailer, operates more than 4,100 company-operated stores under the RadioShack brand throughout the United States and Mexico.  RadioShack stores are located in strip centers and major shopping malls across America.  RadioShack also includes a network of more than 1,100 RadioShack dealer-franchise outlets, which are located throughout the United States and in select international markets.  RadioShack generated approximately $3.4 billion in revenue for the twelve-month period ending December 31, 2013 and $2.1 billion in revenue for the thirty-nine week period ending on November 1, 2014.

3.	Additional information regarding the Debtors and these cases, including the Debtors' businesses, corporate structure, financial condition, and the reasons for and

---

[2]	This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue for this matter is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

objectives of these cases, is set forth in the Declaration of Carlin Adrianopoli in Support of First Day Pleadings (the "First Day Declaration"), filed contemporaneously herewith and fully incorporated herein by reference.

*The Debtors' Cash Management System*

4. The Cash Management System is an integrated system involving approximately 261 Bank Accounts that provide well-established mechanisms for the collection, concentration, management and disbursement of funds used in RadioShack's business.

5. The principal components of the Cash Management System and the flow of funds through that system are described below:[3]

(a) **Cash Collection and Concentration**.

The Debtors maintain a concentration account at Bank of America (Account 6508) (the "Concentration Account"). Virtually all the Debtors' cash receipts ultimately flow into the Concentration Account, and the funds for almost all disbursements, other than funds received from the Debtors' first lien lenders, originate from the Concentration Account. Funds in excess of $200,000 that remain in the Concentration Account after disbursements are transferred nightly via wire into certain investments consistent with the guidelines described in this motion. The Debtors' procedures for cash collections and concentration are described in further detail below.

(i) Collections from the Debtors' retail operations (other than credit card collections)[4] are received and deposited into approximately 205 depository bank accounts (the "Local Accounts"), each with a bank branch located near a RadioShack retail location. Cash receipts from the Local Accounts are swept into a sub-collection account at Citizens Bank (Operating Account (0991)) to be wired into the Concentration Account.

(ii) The Debtors maintain five additional collection accounts at Bank of America to receive payments from non-retail operations. These non-retail operations include (i) payments from domestic (Account 4765) and

---

[3] A chart summarizing the Cash Management System, as it exists on the Petition Date, and a schedule of prepetition Bank Accounts are attached hereto as Exhibits A and B, respectively, and incorporated herein by reference.

[4] Funds from credit card transactions are deposited directly into the Concentration Account on a daily basis.

foreign franchisees (Account 2881), (ii) payments from the Debtors' online operations (Account 7003), (iii) payments from commercial sales (Lockbox Sweep Account 4945), and (iv) minor payments from miscellaneous sources (Account 5688). Cash received in these accounts is swept daily into the Concentration Account.

The Debtors maintain one additional account (Account 5933) that retains certain residual funds pursuant to their loan agreement with Salus Capital Partners, LLC.

(b) **Disbursement Accounts**.  In order to fund operations, the Debtors transfer funds from their Concentration Account into a sub-operating account held at Bank of America (Account 6398) (the "Sub-Operating Account").[5]  The Debtors then transfer funds from the Sub-Operating Account into the following disbursement accounts to make payments as set forth below:

(i)    Payroll (Account 0962).  The Debtors maintain an account at Citizens Bank for the payment of employees and related expenses.

(ii)   Domestic Accounts Payable (Account 0970).  The Debtors maintain an account at Citizens Bank primarily for the payment of domestic vendors and other third parties.

(iii)  Sales and Use Taxes (Account 1017). The Debtors maintain a Direct Debit account at Citizens Bank for the payment of sales and use taxes.

(iv)   Customs (Account 2696).  The Debtors maintain an account at Bank of America to make customs payments associated with items purchased in foreign jurisdictions.

(v)    Foreign Operations.  The Debtors maintain two accounts used in connection with the payment of foreign vendors and the funding of foreign operations.  These accounts are maintained at Citizens Bank (Account 1068) and Wells Fargo (Account 1076).

(vi)   Short Term Investments.  The Debtors transfer funds overnight from the Sub-Operating Account by wire into short term investments, in accordance with the Debtors' corporate cash investment policy (the "Investment Policy").[6]

---

[5]   Funds received from the Debtors' senior lenders are also deposited into the Sub-Operating Account to fund operations.

[6]   Pursuant to the Investment Policy, such short term investments may include euro time deposits ($30,000,000 maximum investment per day), money markets funds ($50,000,000 per fund family; fund must have a 3 year history, be available within 24 hours, have a stable NAV and a AAA rating) and money market demand assets (funds deposited for offset of monthly analysis fees).

(vii) <u>Other Miscellaneous Accounts</u>.  The Debtors maintain 41 other accounts for miscellaneous payments including merchandising and support services and inter-company tax transfers.

## Basis for Relief Requested

*The Continued Use of the Cash Management System,*
*Bank Accounts and Business Forms is Essential to the Debtors' Ongoing*
*Business and is in the Best Interests of the Debtors' Respective Estates and Creditors*

*Cash Management System*

6. The Debtors' ability to continue their Cash Management System in the ordinary course of their business is essential to their operations.  Absent the ability to maintain their Cash Management System, the Debtors would have to significantly alter their business operations to comply with United States Trustee established guidelines (the "<u>UST Guidelines</u>").[7] The Cash Management System provides benefits to the Debtors, such as enabling them to: (i) control and monitor corporate funds; (ii) ensure cash availability; and (iii) reduce costs and administrative expenses by facilitating the movement of funds.  These benefits are especially important here given the significant volume of cash transactions, aggregating more than $8 billion annually, managed through the Cash Management System.

7. In light of the substantial size and complexity of the Debtors' operations, any disruption in the Debtors' cash management procedures will hamper the Debtors' efforts to preserve and enhance the value of their estates.  Altering the Cash Management System could disrupt payments to employees and key vendors.  Therefore, it is essential that the Debtors be permitted to continue to use their Cash Management System in accordance with their existing cash management procedures.

---

[7] Among other requirements, the UST Guidelines with respect to a debtor's cash management system include: (i) closing all existing bank accounts and opening new debtor in possession accounts; and (ii) maintaining separate debtor in possession accounts for various items.

8. The Debtors further seek authority to implement ordinary course changes to their Cash Management System that the Debtors determine are beneficial to their business. As part of these potential ordinary course changes, the Debtors request authority to open and close bank accounts. The Debtors request that banks be authorized to honor the Debtors' requests to open or close any bank accounts, <u>provided</u>, <u>however</u>; that any new domestic account must be established at a bank insured with the Federal Deposit Insurance Corporation (the "<u>FDIC</u>") and organized under the laws of the United States or any State therein, or in the case of accounts that may carry a balance exceeding the insurance limitations set thereby, on the list of authorized bank depositories for the District of Delaware.

9. Bankruptcy courts, including courts in this district, routinely permit chapter 11 debtors to maintain their existing cash management systems, generally treating requests for such relief as a relatively "simple matter." <u>In re Baldwin-United Corp.</u>, 79 B.R. 321, 327 (Bankr. S.D. Ohio 1987); <u>In re Columbia Gas Sys.</u>, 997 F.2d 1039, 1061 (3d Cir. 1993) (recognizing that a requirement to maintain all accounts separately "would be a huge administrative burden and economically inefficient"); <u>Charter Co. v. Prudential Ins. Co. of Am. (In re Charter Co.)</u>, 778 F.2d 617, 621 (11th Cir. 1985) (holding that allowing the debtors to use their prepetition "routine cash management system" was entirely consistent with applicable provisions of the Bankruptcy Code), <u>see</u> <u>also</u> <u>In re Old FENM Inc.</u>, Case No. 13-12569 (KJC) (Bankr. D. Del. Oct. 1, 2013) ("<u>Old FENM Order</u>"); <u>In re MSD Performance, Inc.</u>, Case No. 13-12286 (PJW) (Bankr. D. Del. Sept. 9, 2013) ("<u>MSD Order</u>"); <u>In re OnCure Holdings, Inc.</u>, Case No. 13-11540 (KG) (Bankr. D. Del. Jun. 18, 2013) ("<u>OnCure Order</u>"); <u>In re AFA Investment Inc.</u>, Case No. 12-11127 (MFW) (Bankr. D. Del. Apr. 3, 2012) ("<u>AFA Investment Order</u>"); <u>In re Harry & David Holdings, Inc.</u>, Case No. 11-10884 (MFW) (Bankr. D. Del. Mar. 29, 2011)

("Harry & David Order").

10. The Debtors respectfully submit that under the circumstances the maintenance of the Cash Management System, as it may be modified in the ordinary course of business, is in the best interests of the Debtors' estates and creditors. Preserving a "business as usual" atmosphere and avoiding the unnecessary distractions that inevitably would be associated with any substantial changes to the Cash Management System will facilitate the Debtors' stabilization of their postpetition business operations and assist the Debtors with the objectives in these cases.

*Bank Accounts*

11. As set forth above, the Debtors' Cash Management System utilizes a number of Bank Accounts on a regular basis. The Debtors maintain each of their respective Bank Accounts at financial institutions insured by the FDIC. To avoid substantial disruption to the normal operation of their business and to preserve a "business as usual" atmosphere, the Debtors hereby request that they be permitted to continue to use their Bank Accounts with the same account numbers. The Debtors further request that their banks and financial institutions (collectively, the "Banks") be authorized to continue to service and administer the Bank Accounts as accounts of the applicable Debtor as debtor in possession without interruption. Absent this relief, the UST Guidelines would require the Debtors to close all of their prepetition Bank Accounts and open new accounts. Authorizing the Debtors to continue using their prepetition Bank Accounts will eliminate disruption and assist the Debtors in achieving a smooth transition of their operations.

12. To protect against the possible inadvertent payment of prepetition claims, the Debtors will immediately advise their banks not to honor checks issued prior to the Petition Date, except as otherwise expressly permitted by an order of the Court and directed by the

Debtors. Importantly, the Debtors possess the capacity to draw the necessary distinctions between prepetition and postpetition obligations and payments without closing the Bank Accounts and opening new ones.

13.  Authority to continue the use of bank accounts has been granted in numerous other chapter 11 cases. See, e.g., Old FENM Order; MSD Order; OnCure Order; AFA Investment Order; Harry & David Order.

*Business Forms*

14.  In the ordinary course of their businesses, the Debtors use a multitude of checks and other business forms. By virtue of the nature and scope of the Debtors' business operations and the large number of suppliers of goods and services with whom the Debtors deal on a regular basis, it is important that the Debtors be permitted to continue using their existing checks and other business forms without alteration or change. Pursuant to Rule 2015-2(a) of the Local Rules for the Bankruptcy Court for the District of Delaware (the "Local Rules"), and to avoid disruption of the Cash Management System and unnecessary expense, the Debtors request that they not be required to include the legend "D.I.P." and the corresponding bankruptcy case number on any existing business forms or checks.

15.  Because parties that presently conduct business with the Debtors likely will be aware of the Debtors' status as debtors in possession, the alteration of the Debtors' checks and business forms would be unnecessary and unduly burdensome. Further, this Court has allowed the Debtors to use their prepetition business and check forms without the "D.I.P." label in numerous other large cases. See, e.g., Old FENM Order; MSD Order; OnCure Order; AFA Investment Order; Harry & David Order.

***Request for Interim and Final Waiver of***
***Section 345(b) Investment and Deposit Guidelines***

16. The Debtors' funds, with the exception of funds invested pursuant to the Investment Policy, are maintained in domestic bank accounts insured by the United States through the FDIC (collectively, the "Deposit Guidelines"). Many of the Banks have executed a Uniform Deposit Agreement ("UDA") with the United States Trustee for the District of Delaware (the "U.S. Trustee"). Accordingly, the Debtors believe that the Deposit Guidelines substantially comply with the approved investment guidelines identified in section 345(b) of the Bankruptcy Code. Nevertheless, out of an abundance of caution, the Debtors seek, pursuant to Local Rule 2015-2(b), a 45-day waiver of the requirements of section 345(b) in order to confer with the U.S. Trustee to determine whether any modifications to the Deposit Guidelines are required.

17. Local Rule 2015-2(b) provides that if a motion for a waiver under section 345 of the Bankruptcy Code is filed on the first day of the case, and there are more than 200 creditors, the court may grant an interim waiver. As this motion is being filed on the first day of the Debtors' chapter 11 cases and the Debtors have in excess of 200 creditors, by this motion the Debtors request that the Court enter an order approving, on an interim basis, the Deposit Guidelines.

18. Pursuant to section 345(b) of the Bankruptcy Code, any deposit or other investment made by a debtor, except those insured or guaranteed by the United States or by a department, agency, or instrumentality of the United States or backed by the full faith and credit of the United States, must be secured by either a bond in favor of the United States that is secured by the undertaking of a corporate surety approved by the U.S. Trustee for the relevant district or the deposit of securities of the kind specified in 31 U.S.C. § 9303. As noted above, the

Debtors believe the Deposit Guidelines comport with these requirements, but, even if they do not, section 345(b) also provides that a bankruptcy court may allow the use of alternatives to these approved investment guidelines "for cause." See 11 U.S.C. § 345(b); In re Serv. Merch. Co., 240 B.R. 894, 896 (Bankr. M.D. Tenn. 1999).

19. In the Service Merchandise case, the court identified the following factors as a guide for determining whether cause exists to waive the requirements of section 345(b) of the Bankruptcy Code:

    (a)    the sophistication of the debtor's business;

    (b)    the size of the debtor's business operations;

    (c)    the amount of investments involved;

    (d)    the bank ratings of the financial institutions where the debtor's funds are held;

    (e)    the safeguards in place within the debtor's own business for insuring the safety of the funds;

    (f)    the debtor's ability to reorganize in the face of a failure of one or more of the financial institutions;

    (g)    the benefit to the debtor of current practices;

    (h)    the harm, if any, to the estate; and

    (i)    the reasonableness of the debtor's request for relief from the section 345(b) requirements in light of the overall circumstances of the case.

Id. Examining these factors, the Service Merchandise court concluded that "cause" existed in that case because the debtors were "large, sophisticated [companies] with a complex cash management system" that had the ability to shift money as needed to ensure the safety of their funds. Id. Moreover, the benefits to the debtor of waiving the section 345(b) requirements far outweighed any potential harm to the estate, and the failure to waive the requirements "would needlessly handcuff these debtors' reorganization efforts." Id. at 896-97.

20. As in <u>Service Merchandise</u> and the other chapter 11 cases in which courts in this District have granted requests for approval of the continued use of investment and deposit guidelines that did not strictly comply with section 345 of the Bankruptcy Code, the Debtors are large, sophisticated companies with a complex Cash Management System that provides the Debtors the ability to efficiently transfer funds to ensure their safety.  In light of these factors and the safety of the Debtors' Bank Accounts, the Debtors respectfully request that, to the extent the Deposit Guidelines do not comply with the requirements of section 345(b), the Court extend the Debtors' time to comply with section 345(b) of the Bankruptcy Code for 45 days, without prejudice to the Debtors' ability to seek a final waiver of those requirements.  During the extension period, the Debtors will engage in discussions with the U.S. Trustee and any statutory committee appointed in these chapter 11 cases to determine whether modifications to the Deposit Guidelines are appropriate under the circumstances.

21. Courts in this District have permitted similar and longer extensions in other comparable chapter 11 cases.  <u>See</u>, <u>e.g.</u>, <u>MSD Order</u> (granting 45-day extension); <u>OnCure Order</u> (granting 30-day extension); <u>AFA Investment Order</u> (granting 45-day extension); <u>Harry & David Order</u> (same); <u>In re Simmons Bedding Co.</u>, Case No. 09-14037 (MFW) (Bankr. D. Del. Nov. 17, 2009) (granting 60-day extension).

22. As explained above, the Debtors invest certain funds in accordance with the Investment Policy.  Given the safety and short term nature of the investment vehicles the Debtors utilize to invest idle cash pursuant to the Investment Policy, the Debtors respectfully request, consistent with the objectives of section 345(b) that, (a) they be authorized to invest and deposit funds in a safe and prudent manner in accordance with the Investment Policy, notwithstanding that such guidelines may not strictly comply in all respects with the approved

investment guidelines set forth in section 345 of the Bankruptcy Code and (b) all applicable institutions be authorized and directed to accept and hold or invest such funds in accordance with the Investment Policy.

***The Court Should Authorize Banks Participating
in the Cash Management System to Honor Certain
Transfers and Charge Bank Fees and Certain Other Amounts***

23. Contemporaneously with the filing of this motion, the Debtors have filed various motions for authorization to pay certain prepetition obligations. With respect to some of these obligations, prior to the Petition Date, the Debtors issued checks that have yet to clear the banking system. With respect to other obligations, the Debtors intend to issue checks postpetition on account of such prepetition debt once the Court enters an order permitting the Debtors to take such action. The Debtors intend to inform the Banks which prepetition checks the Banks should honor pursuant to orders of the Court authorizing such payment.

24. As a result of the foregoing, the Debtors request that the Banks be authorized to accept and honor all representations from the Debtors regarding which checks, drafts, wires or ACH transfers should be honored or dishonored consistent with any order of this Court, whether such checks, drafts, wires or ACH transfers are dated prior to, on or subsequent to the Petition Date. Pursuant to the relief requested in this motion, the Banks will not be liable to any party on account of (i) following the Debtors' instructions or representations as to any order of this Court, (ii) honoring any prepetition check or item in a good faith belief that the Court has authorized such prepetition check or item to be honored or (iii) an innocent mistake made despite implementation of reasonable item-handling procedures. Such relief is reasonable and appropriate because the Banks are not in a position to independently verify or audit whether a particular item may be paid in accordance with a Court order or otherwise.

25. Finally, the Debtors request authority for the Banks to charge and the

Debtors to pay both prepetition and postpetition service and other fees, costs, charges and expenses to which the Banks may be entitled under the terms of and in accordance with their contractual arrangements with the Debtors (collectively, the "Bank Fees"). The Debtors further request that the Banks be authorized to charge back returned items to the Bank Accounts in the normal course of business.

26. Granting this relief will minimize or eliminate any disruption to the Cash Management System and the Bank Accounts and assist the Debtors in accomplishing a smooth transition with respect to these cases. Authority for debtors to pay bank fees and banks to charge back returned items has been routinely granted in other chapter 11 cases. See, e.g., Old FENM Order; MSD Order; OnCure Order; AFA Investment Order; Harry & David Order.

***Permitting Continued Intercompany Funding and Intercompany
Transactions with Non-Debtor Affiliates and Granting
Administrative Expense Status to Intercompany Obligations is Appropriate***

27. As described above, under the Cash Management System, funds generated by the business operations of each participating Debtor ultimately flow into the Concentration Account. As individual Debtors participating in the Cash Management System require funds to meet current obligations, cash is transferred from the Concentration Account, to the Sub-Operating Account, and into the appropriate disbursement account. In addition, cash is transferred between the Sub-Operating Account and accounts maintained the non-debtor affiliates (the "Non-Debtor Affiliates"). These transfers include payments to fund certain operational expenses of the Non-Debtor Affiliates.

28. Accordingly, at any given time, there may be balances, which are treated as extensions of intercompany credit, that are due and owing from one Debtor to another Debtor and between certain Debtors and their Non-Debtor Affiliates. The continuation of the ordinary course intercompany transactions and related transfers will permit the Debtors to conduct

business as usual and avoid any disruption to the detriment of the Debtors and their Non-Debtor Affiliates. Accordingly, the Debtors submit that the continuation of these transactions is in the best interests of the Debtors' estates and creditors.

29. The Debtors maintain strict records of transfers of cash and can readily ascertain, trace and account for all intercompany transactions. The Debtors will continue to maintain such records, including records of all current intercompany accounts receivable and payable.

30. Because the Debtors will be effectively lending and borrowing cash on a postpetition basis, the Debtors respectfully request that, pursuant to section 503(b)(1) of the Bankruptcy Code, the Court accord administrative expense status to all intercompany claims against a Debtor by another Debtor or a Non-Debtor Affiliate arising after the Petition Date as a result of intercompany transactions through the Cash Management System (collectively, "Intercompany Claims"). This relief has been granted in many cases. See, e.g., MSD Order; OnCure Order; AFA Investment Order; Harry & David Order.

**Requests for Immediate Relief and Waiver of Stay**

31. Pursuant to Rules 6003(b) and 6004(h) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), the Debtors seek immediate entry of an order granting the Debtors (i) the authority to continue to pay Bank Fees and (ii) a waiver of any stay of the effectiveness of such an order.

32. Bankruptcy Rule 6003(b) provides, in relevant part, that "[e]xcept to the extent that relief is necessary to avoid immediate and irreparable harm, the court shall not, within 21 days after the filing of the petition, grant relief regarding . . . a motion to pay all or part of a claim that arose before the filing of the petition." Accordingly, where the failure to grant any such requested relief would result in immediate and irreparable harm to the Debtors' estates, the

Court may allow the Debtors to pay all or part of a claim that arose before the Petition Date prior to the twenty-first day following the Petition Date.  Bankruptcy Rule 6004(h) provides that "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."

33.     The continued use of the Bank Accounts, Cash Management System and business forms and the payment of Bank Fees are necessary to prevent immediate and irreparable damage to the Debtors' operations.  Accordingly, the Debtors submit that ample cause exists to justify:  (i) the immediate entry of the Interim Order granting the relief sought herein on an interim basis pursuant to Bankruptcy Rule 6003(b); (ii) a waiver of the fourteen-day stay imposed by Bankruptcy Rule 6004(h), and (iii) after a Final Hearing, entry of the Final Order.

**Consent to Jurisdiction**

34.     Pursuant to Local Rule 9013-1(f), the Debtors consent to the entry of a final judgment or order with respect to this motion if it is determined that the Court would lack Article III jurisdiction to enter such final order or judgment absent consent of the parties.

**Notice**

35.     Notice of this motion will be provided to:  (a) the Office of the United States Trustee for the District of Delaware; (b) the Debtors' largest unsecured creditors on a consolidated basis, as identified in their chapter 11 petitions; (c) counsel to Cantor Fitzgerald Securities LLC, in its capacity as prepetition and postpetition administrative agent for certain senior secured lenders; (d) counsel to Salus Capital Partners, LLC, in its capacity as administrative and collateral agent for certain senior secured lenders; (e) counsel to Wilmington Trust, N.A., in its capacity as the trustee under the indenture governing the unsecured notes; and (f) all parties entitled to notice pursuant to Local Rule 9013-1(m).  Due to the nature of the relief requested herein, the Debtors respectfully submit that no further notice of this motion is

necessary.

## No Prior Request

36.     No prior request for the relief sought herein has been made to this Court or any other court.

WHEREFORE, the Debtors respectfully request that the Court enter the Interim Order and the Final Order and grant such other relief as the Court deems just and proper.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

Dated:  February 5, 2015
        Wilmington, Delaware

Respectfully submitted,

 /s/ David M. Fournier
David M. Fournier (DE 2812)
Evelyn J. Meltzer (DE 4581)
John H. Schanne, II (DE 5260)
PEPPER HAMILTON LLP
Hercules Plaza, Suite 5100
1313 N. Market Street
P.O. Box 1709
Wilmington, Delaware 19899-1709
Telephone:  (302) 777-6500
Facsimile:  (302) 421-8390

        -and-

David G. Heiman (OH 0038271)
JONES DAY
901 Lakeside Avenue
Cleveland, Ohio 44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212

Gregory M. Gordon (TX 08435300)
JONES DAY
2727 N. Harwood Street
Dallas, Texas  75201
Telephone:  (214) 220-3939
Facsimile:  (214) 969-5100

Thomas A. Howley (TX 24010115)
Paul M. Green (TX 24059854)
JONES DAY
717 Texas Suite 3300
Houston, Texas 77002
Telephone:  (832) 239-3939
Facsimile:  (832) 239-3600

PROPOSED ATTORNEYS FOR DEBTORS
AND DEBTORS IN POSSESSION