## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re | : | Chapter 11 |
|  | : |  |
| RADIOSHACK CORPORATION, *et al.*,[1] | : | Case No. 15-_____ (____) |
|  | : |  |
| Debtors. | : | (Joint Administration Requested) |

## DECLARATION OF CARLIN ADRIANOPOLI
## IN SUPPORT OF FIRST DAY PLEADINGS

Carlin Adrianopoli, being first duly sworn, deposes and states as follows:

1.     Although employed by FTI Consulting, Inc. ("FTI"), I have been engaged by RadioShack Corporation, one of the debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "Debtors"), to serve as interim Chief Financial Officer.  I have held this position since December 15, 2014.  In performing my role as Chief Financial Officer, I have become familiar with the Debtors' history, day-to-day operations, business and financial affairs, and books and records, as well as the Debtors' turnaround and restructuring efforts.

2.     I joined FTI in 2002 and have been a senior managing director in FTI's Corporate Finance/Restructuring practice since 2010.  I have more than 16 years of experience serving as financial advisor and providing interim management and performance improvement services to corporations, various creditor classes, equity owners, and directors of underperforming companies.

---

[1]     The Debtors are the following eighteen entities (the last four digits of their respective taxpayer identification numbers follow in parentheses):  RadioShack Corporation (7710); Atlantic Retail Ventures, Inc. (6816); Ignition L.P. (3231); ITC Services, Inc. (1930); Merchandising Support Services, Inc. (4887); RadioShack Customer Service LLC (8866); RadioShack Global Sourcing Corporation (0233); RadioShack Global Sourcing Limited Partnership (8723); RadioShack Global Sourcing, Inc. (3960); RS Ig Holdings Incorporated (8924); RSIgnite, LLC (0543); SCK, Inc. (9220); Tandy Finance Corporation (5470); Tandy Holdings, Inc. (1789); Tandy International Corporation (9940); TE Electronics LP (9965); Trade and Save LLC (3850); and TRS Quality, Inc. (5417).  The address of each of the Debtors is 300 RadioShack Circle, Fort Worth, Texas 76102.

3.      On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition with this Court for relief under chapter 11 the Bankruptcy Code.

4.      To minimize the adverse effects of filing for chapter 11 protection while at the same time maximizing value for the benefit of stakeholders, the Debtors have filed a number of pleadings requesting various kinds of "first day" relief (collectively, the "First Day Pleadings") concurrently with the filing of this declaration (this "Declaration"). I am familiar with the contents of each First Day Pleading (including the exhibits and other attachments to such motions) and, to the best of my knowledge, after reasonable inquiry, believe the relief sought in each First Day Pleading: (a) is necessary to enable the Debtors to operate in chapter 11 with minimal disruption; (b) is critical to the Debtors' efforts to preserve value and maximize recoveries; and (c) best serves the Debtors' estates and creditors' interests. Further, it is my belief that the relief sought in the First Day Pleadings is narrowly tailored and necessary to achieve the goals of these chapter 11 cases.

5.      I submit this Declaration in support of the eighteen Debtors' petitions for relief under chapter 11 of the Bankruptcy Code and the First Day Pleadings. Except as otherwise indicated, all statements set forth in this Declaration are based upon: (a) my personal knowledge; (b) information supplied to me by other members of the Debtors' management or the Debtors' professionals that I believe in good faith to be reliable; (c) my review of relevant documents; or (d) my opinion based upon my experience and knowledge of the Debtors' operations and financial condition. If called upon to testify, I could and would testify to the facts set forth in this Declaration. I am authorized by the Debtors to submit this Declaration.

6.      Part I of this Declaration provides an overview of the Debtors' corporate structure, business, and prepetition indebtedness. Part II describes the circumstances

surrounding the commencement of these chapter 11 cases.  Part III sets forth relevant facts in support of certain key motions and the First Day Pleadings.

## I.
## THE DEBTORS' BUSINESS

A.     History

7.     RadioShack Corporation ("RadioShack") has been a significant part of the American retail landscape for over 90 years.  Its name, borrowed from the small wooden structure on ships that housed the radio equipment, is an iconic brand that is widely recognized by consumers around the world.

8.     RadioShack's roots trace back to two companies started in 1919 and 1921, respectively.  The Hinckley-Tandy Leather Company ("Tandy"), a supplier of leather shoe parts to shoe repair shops, which was founded in Fort Worth, Texas in 1919, and RadioShack, a retail store and mail-order operation that served the needs of radio officers aboard ships, which was founded in Boston, Massachusetts in 1921.  Both companies expanded and prospered in the decades thereafter, and Tandy, later renamed Tandy Corporation, acquired RadioShack in 1963.  Tandy ultimately changed its name to RadioShack Corporation in 2000.

9.     RadioShack has remained an enduring brand since its founding in 1921.  RadioShack sold its first all-electronic calculator in 1972, it sold the first mass-marketed fully assembled personal computer with an operating system created by Bill Gates in 1977, it sold the computer industry's first laptop in 1983, and it sold its first mobile phone in 1984.

10.     Today, RadioShack has more than 21,000 employees and a vast retail network that includes more than 4,400 company-operated stores across the United States, Mexico and Asia, and more than 1,100 dealer/franchise stores worldwide.

11.     RadioShack is headquartered in Fort Worth, Texas.

B.     Corporate Structure

12.     RadioShack is the ultimate parent company for the Debtors and seven non-debtor affiliates (the "Non-Debtor Affiliates," and collectively with the Debtors, the "Company"). A chart depicting the corporate organizational structure of the Company is attached hereto as Exhibit A.

13.     As of January 1, 2015, approximately 100 million shares of RadioShack common stock were issued and outstanding. Due to declines in the trading values of its shares, RadioShack disclosed in 2014 that its shares could cease to be traded on The New York Stock Exchange (the "NYSE"). On February 2, 2015, the NYSE suspended trading in RadioShack's common stock and began actions to delist the shares.

B.     Retail Operations

14.     U.S. Company-Operated Stores. As of December 31, 2014, RadioShack operated more than 4,100 company-operated stores under the RadioShack brand throughout the United States, as well as Puerto Rico and the U.S. Virgin Islands. These stores are located in strip centers and major shopping malls, as well as individual storefronts. Each location carries a broad assortment of third party branded and private label products.

15.     Dealer Outlets. In addition to its company-operated locations, RadioShack also has a network of more than 1,100 RadioShack dealer-franchise outlets, which are located throughout the United States, Mexico and Asia. The North American outlets offer branded and private label products and services, typically to smaller communities. These independent dealers are often engaged in other retail operations and augment their businesses with RadioShack's product and service offerings.

16.    <u>RadioShack de Mexico</u>. RadioShack's retail operations in Mexico include more than 250 company-owned stores and five dealer outlets. RadioShack's Mexico operations are run through Non-Debtor Affiliates that are wholly owned by RadioShack.

17.    <u>Businesses</u>. RadioShack's principal operations consist of two platforms: mobility and retail.    The mobility platform includes wireless handsets, e-readers, and tablet devices, together with associated wireless service plans. The Company's retail platform includes other consumer electronics product categories and related accessories, batteries, other power products, and technical products.

18.    <u>Radioshack.com</u>. In addition to its retail store locations, RadioShack sells products and provides information to its customers through its website at http://www.radioshack.com. Online customers can purchase, return, and exchange certain products through its website, and customers may pick up, exchange, and return items purchased through the website at RadioShack stores.

C.    <u>Support Operations</u>

19.    <u>Distribution Centers</u>. RadioShack owns three distribution centers that ship products to U.S. retail locations and dealer outlets. These distribution centers are located in Fort Worth, Texas; Woodland, California; and Hagerstown, Maryland. In addition to supporting U.S. retail stores, RadioShack's Fort Worth distribution center serves as a fulfillment center for online customers and a distribution center for fixtures to U.S. and Mexico company-operated stores. RadioShack is currently in the process of closing and selling its distribution center in Woodland, California.

20.    <u>Global Sourcing</u>. RadioShack operates a centralized product development and sourcing organization that includes three offices in Asia, located in Taiwan, Hong Kong, and

Shenzhen, China. The global sourcing group's activities include private brand strategy, product management, cost negotiation, vendor management, production monitoring, quality control, on time delivery and compliance. The group's operations in Asia are owned by certain Non-Debtor Affiliates.

        D.      Employees

        21.     As of the Petition Date, the Debtors have approximately 21,000 full and part-time hourly and salaried employees, most of whom are located in the United States and Puerto Rico. The Debtors' employees are not subject to any collective bargaining agreements.

        E.      RadioShack Properties

        22.     The Debtors' headquarters and retail stores are leased while the distribution centers are owned. The aggregate monthly rent due under the leases (the "Leases") is approximately $21 million.

        23.     The Debtors' retail store Leases generally have initial terms ranging from one to 10 years with varying options to extend. As of the Petition Date, the average unexpired term under the Debtors' existing store Leases in the United States was 2.3 years prior to the exercise of any renewal or extension options. As of the Petition Date, the Debtors owe approximately $30 million in unpaid current lease obligations.

        24.     The challenges confronted by the Debtors are explained in Section II below. As part of the Debtors' myriad efforts to improve their results of operations and financial condition in the face of these challenges, the Debtors developed a number of substantial store footprint rationalization plans, in addition to taking other measures described in Section II. Under the Debtors' credit facilities, the Debtors were only permitted to close up to 200 stores per fiscal year without lender consent. Over the course of 2014 and continuing into 2015, the Debtors sought lender consent on several occasions to close a substantial number of stores above

the 200 store limit, but that consent could not be obtained.  As discussed more fully below, one of the primary objectives of this chapter 11 filing is to promptly reduce costs by closing up to 2,100 underperforming stores in addition to the approximately 400 stores that were closed during the last year.

      F.     Significant Prepetition Indebtedness[2]

      25.     2013 Credit Agreement.  In light of substantial losses that the Debtors incurred beginning in 2012, in mid-2013 RadioShack retained AlixPartners LLP ("AlixPartners") and Peter J. Solomon Company ("PJS") to assist in developing a turnaround plan and arrange replacement and additional financing.  Following an extensive process involving soliciting proposals from many potential financing sources, in December 2013, RadioShack entered into a five-year, $585 million asset-based credit agreement (the "2013 Credit Agreement") with a group of lenders, including General Electric Capital Corporation ("GE Capital") as administrative and collateral agent.  The 2013 Credit Agreement originally consisted of a $535 million asset-based revolving credit line and a $50 million asset-based term loan.  The 2013 Credit Agreement matures by its terms in December 2018.

      26.     On October 3, 2014, the lenders under the 2013 Credit Agreement sold all their interests therein to General Retail Holdings L.P. ("GRH") and General Retail Funding LLC ("GRF").  It is my understanding that GRH's general partner is an affiliate of Standard General L.P. ("Standard General").  It is also my understanding that GRF is GRH's finance subsidiary and is managed by another Standard General affiliate.  Further, it is my understanding that Litespeed Master Fund, a fund sponsored by Litespeed Management LLC and not connected to Standard General, is a limited partner of GRH.

---

[2]     This summary is qualified in its entirety by reference to the operative documents, agreements, schedules, and exhibits.

27.    GRH does not, to my knowledge, own any shares of RadioShack common stock.  Section 13D filings for Standard General and Litespeed Master Fund indicate that as of November 26, 2014 Standard General held approximately 10 million shares of RadioShack common stock and that as of October 3, 2014 Litespeed Master Fund owned approximately nine million shares of RadioShack common stock.

28.    On the same date that the sale of the lenders' interests in the 2013 Credit Agreement occurred, the Debtors entered into a First Amendment to the 2013 Credit Agreement with the new lenders and Cantor Fitzgerald Securities LLC as successor to GE Capital as administrative and collateral agent.  The First Amendment subdivided the $535 million revolving credit line into (a) a facility of outstanding revolving loans that were converted into term loans in an aggregate principal amount of up to $275 million; (b) a letter of credit facility in an aggregate principal amount of up to $120 million; and (c) a facility available solely for revolving loans in an aggregate principal amount of up to $140 million.  The First Amendment also included an agreement among the parties to release certain discretionary borrowing base reserves and restore the methods used to calculate the borrowing base to those used in December 2013.  These changes together improved the Debtors' liquidity by approximately $140 million.

29.    Obligations under the 2013 Credit Agreement are guaranteed by all of RadioShack's wholly owned domestic subsidiaries other than Trade and Save LLC, RS Ig Holdings Incorporated, and RSIgnite, LLC (the "Debtor Guarantors").  The 2013 Credit Agreement is secured by a lien on substantially all the assets of RadioShack and the Debtor Guarantors, including a first priority lien on current assets, and a second priority lien on fixed assets, intellectual property and the equity interests of certain direct and indirect subsidiaries.

30.     As of the Petition Date, there is approximately $250 million in aggregate principal amount outstanding under the 2013 Credit Agreement.

31.     <u>2013 Term Loan</u>.  Contemporaneously with the entry into the 2013 Credit Agreement in December 2013, RadioShack borrowed $250 million, due in December 2018, under a term loan agreement (the "<u>2013 Term Loan</u>") with certain funds managed by Salus Capital Partners, LLC ("<u>Salus</u>") and Cerberus Capital Management ("<u>Cerberus</u>"), with Salus in the capacity of administrative and collateral agent.  Obligations under the 2013 Term Loan are guaranteed by RadioShack and the Debtor Guarantors.  The 2013 Term Loan is secured on a second priority basis by current assets and by a first priority lien on fixed assets, intellectual property and equity interests of certain direct and indirect subsidiaries.  As of the Petition Date, there is approximately $250 million in aggregate principal amount outstanding under the 2013 Term Loan.

32.     <u>2019 Notes</u>.  On May 3, 2011, RadioShack sold $325 million aggregate principal amount of 6.75% senior unsecured notes due May 15, 2019.  The obligation to pay principal and interest on the 2019 Notes is jointly and severally guaranteed on a full and unconditional basis by all of RadioShack's wholly owned domestic subsidiaries, except Trade and Save LLC.  Interest at a fixed rate of 6.75% per year is payable semiannually, in arrears, on May 15 and November 15 of each year.  As of the Petition Date, there is approximately $330 million in aggregate principal and interest outstanding under the 2019 Notes.

33.     <u>Trade Debt</u>.  As a retailer with more than 4,100 stores in the United States, the Debtors purchase inventory from thousands of vendors located throughout the world.  The Debtors purchase merchandise and inventory under normal purchase commitments in the ordinary course of business.  The Debtors' commitments for purchasing merchandise generally

do not extend beyond six months and may be cancelable several weeks prior to the vendor shipping the merchandise.  As of the retail month end December 2014, the Debtors estimate that they owe approximately $124 million for merchandise and other unsecured obligations for goods and services.

## II.
## RECENT FINANCIAL PERFORMANCE AND EVENTS LEADING TO THE COMMENCEMENT OF THE CHAPTER 11 CASES

    A.    The Company's Recent Performance.

    34.    Over the past three years, the Company's revenues have been steadily declining.  The Company has faced increasing competition in the consumer electronics industry, including stiff competition by on-line retailers, and fundamental changes in its mobility business.  For the fiscal year ending December 31, 2013, the Company generated revenues of approximately $3.4 billion but incurred net operating losses of approximately $344 million compared to revenues of $3.8 billion and a net operating loss of $25 million the prior year.

    35.    Despite numerous initiatives and extensive work by management and RadioShack's financial advisors, the Company's performance continued to suffer in 2014.  The main drivers of this declining performance have been changes in the consumer electronics industry, particularly changes in the postpaid mobility business.  For example, while total sales for the third quarter of 2014 declined 16.1% year over year, including a comparable store sales decline of 13.4%, the Company's retail business—the non-mobility portion of the Company that represents approximately half of RadioShack's revenues—was down only 2% for the 13 week period ending November 1, 2014 on a comparable store basis.

    B.    The Company's Pre-Filing Turnaround and Restructuring Efforts.

    36.    In order to improve the Company's profitability, RadioShack has focused on three overarching operational imperatives:  (a) reducing costs; (b) driving growth and

-10-

profitability through RadioShack's retail platform; and (c) stabilizing and ultimately returning RadioShack's mobility business to profitability.

37.     To address the first objective, reducing costs, the Company implemented a number of cost reduction initiatives designed to save more than $400 million annually. These initiatives included a range of cost reductions related to RadioShack's headquarters, field stores, and store support to improve operational efficiency, as well as targeted store closures. To this end, over the past year, the Company has closed approximately 400 stores and reduced staffing by approximately 19% for the fiscal year ended January 31, 2015. In addition, the Company curtailed delivery of and consolidated inventory over the past few months in preparation for the closure of additional stores. As I previously discussed, the Debtors were unable to close a substantial number of additional stores above the annual 200 store closure limit because of an inability to reach agreement with certain lenders.

38.     In order to address the second objective, driving growth and profitability through RadioShack's retail platform, the Company has made improvements to certain of its U.S. company-owned stores. This includes the creation of approximately 100 concept and brand statement stores, which feature bright, completely redesigned interiors and new exterior signage featuring the Company's new look, and incorporate interactive areas designed to help shoppers improve their technology profile. The Company also completed a major reset of 2,000 locations with brighter, updated interiors including new paint and merchandising. All stores completed a product refresh during the same period, creating a cleaner shopping environment and expanded room for must-have products.

39.     Finally, in order to address the third objective, returning the mobility business to profitability, RadioShack has engaged in discussions to restructure its relationships

with wireless carriers.  Among other efforts, in the third quarter of 2014, the Company engaged

in discussions with a major wireless carrier to recapitalize and revitalize the Company.  While

these discussions did not lead to an agreement, RadioShack later initiated negotiations with

Sprint, which are reflected in an agreement that at present remains subject to completion of

definitive documentation and is anticipated to provide significant value.  Specifically, it is

contemplated that Sprint would establish co-branded stores for the sale of retail products,

warranties, services, and accessories of the type currently sold by the Debtors, together with

Sprint mobile devices, including mobile handsets, tablets, and mobile broadband devices.  The

Debtors believe this new partnership with Sprint will substantially improve the mobility side of

the business and provide a sustainable mobility business into the future.

       40.     Throughout the time these efforts to improve the Debtors' operations were

underway, the Company, including with the active assistance of independent financial advisors,

also solicited potential strategic or financial transactions with a variety of parties, as well as

possible financing or refinancing transactions.  These efforts continued on a substantially

continuous basis from the second half of 2013 through September 2014.  Among the possible

transactions pursued were investments and other financial transactions, joint ventures, mergers or

sales of the Company (or portions of it), discussions with existing creditors relating to possible

recapitalizations, including but not limited to Standard General, and, as described above, major

store closure programs.  These efforts intensified in the second and third calendar quarters of

2014, and ultimately resulted in the transaction announced on October 3, 2014 involving

Standard General and other parties.

     C.     Recapitalization and Investment Agreement.

       41.     As described above, on October 3, 2014, GRH and GRF, affiliates of

Standard General, purchased the interests of the then-existing lenders under the 2013 Credit

Agreement and entered into the First Amendment to the 2013 Credit Agreement with the Company that improved the Company's liquidity. At the same time, the Company entered into a Recapitalization and Investment Agreement with GRH, which provided for a rights offering to RadioShack's shareholders and the issuance of equity to GRH, primarily in exchange for the right to receive $120 million of cash collateral posted by GRH to secure letters of credit issued under the 2013 Credit Agreement (the "equity conversion"). The rights offering and the equity conversion were scheduled to occur in the first quarter of 2015 provided that certain conditions were satisfied. Those conditions were ultimately not met, however.

      D.     Events Leading to the Filing of the Chapter 11 Cases.

      42.     Despite the Company's multi-faceted prepetition efforts to improve operations, reduce costs, close underperforming stores, improve liquidity, lower debt, and recapitalize, the Company's liquidity continued to deteriorate. The continuing loss of liquidity was largely the result of (a) an erosion in vendor confidence; (b) an inability to fully implement a large-scale store closure program; (c) the fundamental changes in the mobility market; and (d) the Company's 2014 holiday season results.

      43.     As RadioShack is required to file reports with the Securities and Exchange Commission, RadioShack's operating losses have been well documented, which has caused many vendors to alter their relationships with the Company to the Company's detriment. Specifically, merchandise vendors reduced or declined to extend trade credit and/or offered less favorable payment terms. In many instances, the Company has been required to provide letters of credit or pay cash in advance. These developments made it more difficult to sustain adequate product inventory and other store supply levels.

      44.     In addition, credit available under the 2013 Credit Agreement has been severely constrained. First, in order to pay vendors, the Company has been forced to make

payments, in part, through borrowings under the 2013 Credit Agreement.  Second, due to the loss

of trade credit and the proliferation of unfavorable payment terms, the Company has been unable

to purchase the same levels of inventory, which ultimately reduced the borrowing base under the

2013 Credit Agreement.  Third, as discussed above, the Company has been unable to implement

a comprehensive store closure program to stem operating losses generated by underperforming

stores.

45.    Finally, changes in the mobility side of RadioShack's business have

created significant challenges for the Company over the past several years.  First, because the

post-paid mobility market is saturated, growth in new wireless subscribers has stalled, resulting

in increased competition among wireless providers for existing subscribers.  This increased

competition has resulted in price wars among carriers that ultimately reduced margins for third

party retailers, including RadioShack.  Second, wireless carriers have expanded their own retail

footprints, which directly compete with RadioShack.  These wireless providers often offer the

most current plans and offers exclusively in their own retail stores, which has hampered

RadioShack's ability to compete on equal footing in the market.

46.    Based on all these factors, which led to the Debtors' failure to satisfy the

conditions in the Recapitalization and Investment Agreement, the Debtors ultimately reached the

point where they had no alternative but to seek chapter 11 protection.  To prepare for that, the

Debtors in recent weeks have engaged in extensive negotiations with their lenders, potential

purchasers including Standard General, and their mobility carriers to develop a consensual path

forward in these cases that will minimize costs and maximize value for the benefit of all

stakeholders.  Although those negotiations continued literally up to the eve of these chapter 11

filings, they were ultimately successful in large part.  As a result, the Debtors have an agreement

with their lenders under the 2013 Credit Agreement, Salus, and Standard General on a timeline

and objectives for these cases that include the following key elements:

> (a)     An approximate $285 million debtor in possession financing facility provided by the existing lenders under the 2013 Credit Agreement, with Cantor Fitzgerald Securities LLC acting as the administrative and collateral agent, that is intended to provide sufficient liquidity to fund a parallel liquidation and expedited going concern sale process;

> (b)     Prompt closure and liquidation of up to 2,100 underperforming stores, which liquidation will be conducted with the assistance of Hilco Merchant Resources, LLC ("Hilco"), Gordon Brothers Retail Partners, LLC ("Gordon Brothers"), and Tiger Capital Group, LLC ("Tiger");

> (c)     A process, to move forward in parallel with the store closings, to market and sell the balance of the Debtors' business and assets through an approximate 45-day section 363 asset sale process, which process will include a stalking horse going concern bid from an affiliate of Standard General for approximately 1,500-2,400 stores and other assets but not the entirety of the Debtors' assets; and

> (d)     A new commercial agreement in principle with Sprint, available to any bidder acceptable to Sprint, that, as discussed above, will assure a sustainable mobility platform for the business into the future.

47.     The Debtors believe that these agreements on debtor in possession

financing, a parallel store closure and sale process, a stalking horse asset purchase, and a new

store-within-a-store commercial arrangement with Sprint will maximize value to the greatest

extent possible and generate the highest possible recoveries in an efficient and expeditious

manner.

E.     Key Relief Related to Timeline and Objectives.

48.     In order to obtain necessary financing, promptly close underperforming

stores, liquidate assets associated with the store closures, and pursue a sale or sales of their

remaining business and assets, including with a new Sprint agreement, the Debtors are, among

other requests, seeking the following relief, all of which is critical to implement agreements and

a process designed to maximize value for the benefit of creditors: (a) approval of debtor in

possession financing to ensure a smooth transition into chapter 11 and completion of the

proposed process to maximize creditor recoveries; (b) authorization to close, and liquidate assets

at, approximately 2,100 underperforming stores and retain Hilco, Gordon Brothers, and Tiger to

assist with the liquidation; (c) authorization to reject unnecessary unexpired leases of

non-residential real property in connection with the store closing sales; and (d) approval of a sale

process for the Debtors' remaining assets, which includes a stalking horse bid for certain of the

assets and the availability of a new commercial agreement with Sprint for bidders acceptable to

Sprint.

### *Debtor in Possession Financing*

49.    As discussed above, the Debtors (other than Trade and Save LLC, RS Ig

Holdings Incorporated, RSIgnite, LLC, and Atlantic Retail Ventures, Inc.) are seeking authority

to enter into a debtor-in-possession credit agreement that will provide postpetition financing in a

total amount of up to approximately $285 million in the form of (a) new money revolving loans

in an amount not to exceed $20 million; and (b) a roll-up (to be sought only on a final basis) of

loans and letter of credit obligations in an aggregate amount up to approximately $250 million

outstanding under the 2013 Credit Agreement. The facility will also provide for a letter of credit

subfacility for the issuance of new letters of credit in an aggregate face amount not to exceed

$15 million. Further, the facility will provide the Debtors with access to the use of certain cash

collateral of the debtor in possession lenders.

50.    The Debtors have an immediate and critical need to obtain financing and

use cash collateral for, among other things, working capital purposes and to pay expenses

incurred in these chapter 11 cases in accordance with a proposed budget approved by the lenders. Without immediate access to the financing and use of cash collateral, the Debtors would be unable to meet payroll and otherwise operate their business, and the Debtors' ability to preserve and maximize the value of their assets and operations would be irreparably harmed.

51.     The use of cash collateral alone would be insufficient to meet the Debtors' postpetition liquidity needs. The Debtors have been unable to obtain unsecured credit allowable as an administrative expense. The Debtors have also been unable to obtain credit: (a) having priority over that of administrative expenses; (b) secured solely by a lien on property of the Debtors and their estates that is not otherwise subject to a lien; or (c) secured solely by a junior lien on property of the Debtors and their estates that is subject to a lien. The Debtors require both the additional financing provided by the debtor in possession credit facility and the continued use of cash collateral. Financing on a postpetition basis is not otherwise available and is not available on terms more favorable than the terms contained in the proposed financing facility.

***Authorization to Close Underperforming Stores and Reject Related Leases***

52.     <u>Proposed Store Closings</u>. As described above, the Debtors closed approximately 400 stores in the one-year period prior to the Petition Date. In these cases, the Debtors are seeking to close and liquidate the inventory and other assets of up to 2,100 additional stores.

53.     To assure that the Debtors obtain the highest possible recovery from the liquidation of these stores, the Debtors and FTI contacted five national liquidation firms that specialize in the large scale liquidation of assets of the type and scale owned by the Debtors. After detailed discussions with the liquidation firms, the Debtors determined to execute a consulting agreement (the "<u>Consulting Agreement</u>") with Hilco, Gordon Brothers, and Tiger.

The Consulting Agreement will enable the Debtors to efficiently run the store closing sales, minimize costs, and maximize the value to be received from each closing store's assets. Additional facts and details on the store closure process are contained in the contemporaneously filed Declaration of Steve Coulombe in Support of the Emergency Motion for Interim and Final Orders (I) Authorizing the Debtors to Assume the Consulting Agreement; (II) Authorizing and Approving the Conduct of Store Closing or Similar Themed Sales, with Such Sales to be Free and Clear of All Liens, Claims and Encumbrances; (III) Authorizing Customary Bonuses to Store-Level Employees of Closing Business Locations; and (IV) Granting Related Relief.

54.    <u>Lease Rejection Procedures</u>.  In order to effectuate the cost savings associated with the store closures described above, the Debtors are also seeking the approval of certain lease rejection procedures that will allow the Debtors to surrender the closed locations to landlords and reject the applicable leases by mailing a lease rejection notice.  In addition, because the Debtors anticipate that approximately 200 of their stores will have already been surrendered to landlords as of the Petition Date, the lease rejection procedures will also permit the Debtors to reject certain leases retroactively as of the Petition Date.

55.    <u>Proposed Timeline</u>.  An expeditious store closure and lease rejection process is critical to the Debtors' ability to reduce costs and maximize recoveries for creditors. The Debtors are requesting that the Court hold a hearing on the Debtors' proposed store closure and lease rejection procedures motions within 14 days of the Petition Date, and are further seeking interim relief at the first day hearing to begin the store closure process.  This expedited timeline is necessary because, among other things:

(a)   Many of the stores have minimal inventory and the Debtors anticipate that such stores can be closed before end of February, which will prevent the Debtors from incurring significant March rent obligations;

(b)  The stores to be closed do not provide value to the Debtors, and the Debtors continue to accrue obligations related to such locations;

(c)  The store closure sales will maximize recoveries to the Debtors' estates because they are the most viable method currently available to monetize the Debtors' assets located at the closing stores;

(d)  The store closure process is a continuation of store closure efforts that have been pursued over the past year, and many of the stores at issue would have already been closed but for limitations in the Debtors' lending agreements; and

(e)  The debtor in possession financing facility requires that an order approving the store closure process be entered no later than 15 days after the Petition Date.

### *Authority To Establish Bidding Procedures and Sell the Debtors' Remaining Assets*

56.  In addition to the store closure process described above, the Debtors have determined that, in order to preserve and maximize value to the greatest extent possible, it is in best interests of their estates to conduct an expedited auction sale process for all their remaining assets.  In this regard, the Debtors have entered into an agreement (the "Stalking Horse Agreement") with General Wireless Inc. (the "Stalking Horse Purchaser"), an acquisition entity formed by Standard General, pursuant to which the Stalking Horse Purchaser has agreed to act as a stalking horse bidder for the purchase of between 1,500 and 2,400 stores and certain other assets (collectively, the "Acquired Assets").  The Debtors' remaining assets that are not subject to the Stalking Horse Agreement, including their intellectual property, owned real estate and equity interests in subsidiaries (collectively, the "Other Assets") will also be available for purchase.

57.  The Debtors have filed contemporaneously herewith a motion seeking approval of (a) bidding and sale procedures; (b) the sale of their remaining assets; and (c) certain related relief.  The proposed bidding procedures are designed to permit the Debtors to pursue both going concern and liquidation transactions to maximize the value of the Debtors' assets for the benefit of their estates.  With the assistance of Lazard Frères & Co. LLC ("Lazard"), their

investment banker, the Debtors have already commenced a comprehensive marketing process. That process will continue postpetition and the Debtors will at the same time seek bids for the sale or liquidation of all the remaining assets.

58.    Prepetition Sale and Marketing Efforts.  This proposed sale process is the culmination of a nearly year-long process.  Since early 2014, the Debtors have been exploring a possible sale or other transaction with a variety of financial and strategic buyers.  As previously explained, in April 2014 the Debtors retained PJS to advise the Company on potential strategic opportunities.  The Debtors and PJS developed a list of potentially interested parties and engaged in initial communications regarding a potential transaction.  The Debtors and PJS set a deadline of June 30, 2014 for parties to provide the Debtors with non-binding preliminary indications of interest.  PJS contacted each party to discuss the opportunity.  Six of the parties affirmatively declined to engage in sale negotiations with the Debtors and one party failed to respond.  Three parties, however, executed nondisclosure agreements and were granted access to an electronic data room assembled by the Debtors.  Ultimately, none of these parties made an offer with respect to any kind of transaction.

59.    PJS continued to pursue and evaluate potential transactions and, as discussed above, an agreement on a partial recapitalization transaction with Standard General was ultimately reached.  In connection with the recapitalization transaction, RadioShack publicly indicated that it would receive and review competing proposals from third parties for a period of 45 days following its entry into the recapitalization agreement.  No third parties ever submitted any such competing proposals, however.

60.    On December 1, 2014, the Debtors engaged Lazard to serve as their investment banker.  Lazard has also pursued a sale or other strategic transaction process.  To that

end, Lazard has contacted or otherwise communicated with over 45 strategic and financial buyers. These parties were invited to sign nondisclosure agreements so that they could receive access to the Debtors' electronic data room. As of the Petition Date, over 10 parties have signed nondisclosure agreements and have accessed the data room. During the course of these cases, Lazard will supervise the sale process, market the assets, contact all potential bidders and generally be available to respond to information requests from potential buyers. The Debtors believe this coordinated and comprehensive sale process, spurred by the Stalking Horse Agreement and the new commercial arrangement with Sprint, will produce the highest available bid and maximize value for the Debtors' stakeholders.

61.     Proposed Timeline. The Debtors are proposing an expedited sale process that contemplates the entry of a sale order within 45 days. The Debtors are requesting that the Court hold a hearing on the Debtors' proposed bidding procedures motion within 14 days of the Petition Date. An expedited hearing on the proposed bidding procedures is necessary because, among other things, both the Stalking Horse Agreement and the DIP Credit Agreement require the Debtors to obtain entry of an order approving the proposed bidding procedures within 14 days of the Petition Date.

### III.
### FIRST DAY PLEADINGS

62.     Concurrently with the filing of these chapter 11 cases, the Debtors filed the First Day Pleadings requesting various forms of relief. Generally, the Debtors narrowly tailored the First Day Pleadings to enable the Debtors to meet their goals of: (a) continuing their operations in chapter 11 with as little disruption as possible; (b) maintaining the confidence and support of their employees, vendors, and service providers during these chapter 11 cases; and (c) establishing procedures for the smooth and efficient administration of these chapter 11 cases.

63.     Given the importance of the relief sought in the First Day Pleadings to the Debtors' ability to preserve value as they pursue a sale or sales of substantially all of their assets, the Debtors will move for entry of an order scheduling an expedited hearing on the First Day Pleadings.  The Debtors anticipate that the Court will conduct a hearing soon after the commencement of their chapter 11 cases (the "First Day Hearing") at which the Court will hear and consider certain First Day Pleadings.  Those First Day Pleadings that the Debtors anticipate will be heard at the First Day Hearing are described below.[3]

64.     I have reviewed each of the First Day Pleadings filed contemporaneously herewith.  To the best of my knowledge, I believe that the facts set forth in the First Day Pleadings are true and correct.  If I were called upon to testify, I could and would, based on the foregoing, testify competently to the facts set forth in each of the First Day Pleadings.

65.     Further, as a result of my personal knowledge, information supplied to me by other members of the Debtors' management, my review of relevant documents, or upon my opinion based upon my experience, discussions with the Debtors' advisors, and knowledge of the Debtors' operations and financial condition, I believe the relief sought in the First Day Pleadings is necessary for the Debtors to effectuate a smooth transition into chapter 11 bankruptcy, is necessary to avoid irreparable harm to their businesses and estates and will maximize value and recoveries for the benefit of the Debtors' creditors.

66.     It is my further belief that, with respect to those First Day Pleadings requesting authority to pay discrete prepetition claims or continue selected prepetition programs (e.g., those First Day Pleadings seeking relief related to the Debtors' obligations to their employees, customers, taxing authorities, warehouseman, and insurers), the relief requested is

---

[3]     Capitalized terms used below in the descriptions of the First Day Pleadings and not otherwise defined have the meanings given to them in the applicable First Day Pleadings.

essential to the Debtors' operations and necessary to avoid immediate and irreparable harm to the Debtors, their estates, employees, creditors, and other parties-in-interest. Specifically, the success of these cases depends in large part on the continuing operation of the Debtors' business in as normal course as possible. Impairment of the Company's operations at the early stages of these cases would imperil the Debtors' ability to carry out a successful sale process and potentially damage the value of the Debtors' estates.

67.     I respectfully request that all the relief requested in the First Day Pleadings, and such other further relief as may be just and proper, be granted.

A.     Administrative Motions

68.     The Debtors will file three "administrative" motions, which (a) request a First Day Hearing to consider the relief requested in each of the First Day Motions; (b) seek to have the Debtors' bankruptcy cases jointly administered; and (c) seek approval to retain Prime Clerk as claims and noticing agent.

B.     Filing Consolidated Lists of Creditors and Related Relief

69.     Given the affiliated nature of the Debtors and the fact that they share a number of creditors in common, the Debtors will move for entry of an order authorizing them to file a single consolidated list of the Debtors' fifty largest unsecured creditors in these chapter 11 cases in lieu of filing separate lists of the twenty largest unsecured creditors for each of the Debtors. Such authority will facilitate the U.S. Trustee's review of creditors' claims and the appointment of a single creditors' committee in these cases. The Debtors will also seek a waiver of the requirement that each debtor file a list of creditors containing the name and address of each entity included or to be included on a debtor's schedules of liabilities as such information will be provided to the Debtors' claims and noticing agent. The Debtors will seek approval of the form and manner of notice of commencement of these chapter 11 cases and of the meeting of

creditors to be held pursuant to section 341 of the Bankruptcy Code.  Finally, the Debtors will

seek to implement certain e-mail noticing procedures to reduce costs in connection with

providing notice to the core service group in these cases.

C.      Employee Wages and Benefits

70.      As noted above, the Debtors currently have approximately 21,000

employees.  The continued and uninterrupted support of the employees is essential to the

Debtors' success.  The employees perform a variety of critical functions in the Debtors' retail

locations, distribution centers, and corporate headquarters.  The skills and experience of the

employees, their relationships with key parties to the Debtors' business, such as customers and

vendors, and their knowledge of the Debtors' products, infrastructure, and business are essential

to the preservation of the value of the Debtors' estates and, thus, the ability of the Debtors to

maximize their value in connection with a going concern sale.  Any interruptions in payment of

prepetition employee-related obligations will impose hardship on the employees and is certain to

jeopardize their continued performance during this critical time.

71.      To minimize the personal hardship that employees will suffer if

prepetition employee-related obligations are not paid when due, and to maintain the employees'

morale during this critical time, it is important to pay and/or perform, as applicable,

employee-related obligations, including the following:  (a) pay and honor owed wages, salaries,

overtime pay, bonuses, sick pay, vacation pay, and other accrued compensation; (b) reimburse

certain prepetition business expenses; (c) pay amounts deducted from employee paychecks on

behalf of the employees for or with respect to, among other things, the Debtors' employee benefit

programs, loan repayments, and garnishments or amounts due third parties and on account of

various federal, state or local income, FICA, Medicare, state disability, workers' compensation,

and other taxes to the appropriate parties; (d) pay prepetition contributions to, and benefits under,

employee benefit plans, including certain severance payments, as described below; and (e) pay

all costs and expenses incident to the foregoing payments and contributions, including

payroll-related taxes and related processing and administration costs.

72.     The Debtors are also seeking authority to continue their severance

program as to certain employees on a postpetition basis, all as more fully described in the

employee motion.  The payment and continuation of certain severance benefits is critical to

maintaining employee morale at a critical juncture for the Company.  In addition, the proposed

payments are modest in amount, and the Debtors have agreed to cap the payments at an amount

equal to the lesser of calculated severance, two weeks' wages and $12,475.

D.     Motions for Payment of Other Prepetition Claims

73.     Customer Obligations.  In the ordinary course of their business, the

Debtors maintain numerous programs for the benefit of their respective customers, including:

exchange policies, sales promotions, coupon and rebate programs, a gift card program, a private

label credit card, warranties, and pre-and post-paid bill payment services (collectively, the

"Customer Programs").  Because the Debtors were in the midst of providing goods and services

to their customers on the Petition Date, the Debtors have certain outstanding prepetition

obligations to their customers under the Customer Programs which otherwise would be honored

in the ordinary course of the Debtors' business (collectively the "Customer Obligations").

74.     Given the critical nature of the Debtors' relationship with their customers

and the importance of these relationships to the Debtors' business, the Debtors will seek the entry

of an order authorizing them to pay Customer Obligations, and the goods they represent, in the

ordinary course of the Debtors' business.  Subject to certain limitations set forth in the Customer

Obligations motion, the Debtors seek to treat all Customer Obligations in the same manner and

on the same terms and conditions as such obligations were treated prior to the Petition Date, including paying, or providing credits or similar items, for prepetition Customer Obligations.

75.    Taxes.  The Debtors, in the ordinary course of their business, incur various tax liabilities, including, among others, sales and use taxes, property taxes, franchise taxes, business license fees, annual report taxes, and import taxes (collectively, the "Prepetition Taxes") owed to certain taxing authorities (the "Taxing Authorities").  Prior to the Petition Date, the Debtors generally paid their tax obligations as they became due.

76.    The Debtors will seek the entry of an order allowing them to pay the Prepetition Taxes to the Taxing Authorities, including all Prepetition Taxes subsequently determined upon audit to be owed for periods prior to the Petition Date.  The Debtors have ample business justification to pay the Prepetition Taxes because it is my understanding that:  (a) most, if not all, of the Prepetition Taxes would be priority claims under the Bankruptcy Code that would be paid in full under a chapter 11 plan; (b) certain of the Prepetition Taxes may not constitute property of the Debtors' chapter 11 estates; (c) the Debtors are required to pay the Prepetition Taxes to maintain their good standing in the jurisdictions in which they do business; (d) a failure to pay certain of the Prepetition Taxes could give rise to liens on certain of the Debtors' real and personal property; and (e) the Debtors' directors and officers may face personal liability if certain of the Prepetition Taxes are not paid.  Therefore, to prevent immediate and irreparable harm that would result from such disruptions and distractions, the Debtors seek authority to pay these claims on a first day basis.

77.    Warehouse and Freight Charges.  In connection with the day-to-day operation of their business, the Debtors rely on several freight, air transportation, and vessel companies operated by third parties (collectively, the "Freight Carriers") to transport finished

products on land, by air, and by water from the Debtors' suppliers to their domestic distribution facilities and retail locations. Additionally, certain products are stored in third-party warehouses prior to shipment. As a result, the warehouse owner (the "Warehouseman") and the Freight Carriers have possession of certain of the Debtors' products in the ordinary course of business.

78.    It is essential to the Debtors' business that they maintain a reliable and efficient supply of products for sale to customers through their retail operations. If the Debtors fail to pay the claims of the Freight Carriers and Warehouseman (collectively, the "Warehouse and Freight-Related Claims"), the Debtors believe that many of the Freight Carriers or the Warehouseman may stop providing essential services to the Debtors. Delays in receiving products would cause major disruptions to the Debtors' operations, damaging the Debtors' business reputation and undermining the Debtors' ability to generate ongoing operating revenue. Even if suitable alternatives for warehouse and freight-related services were available, the time necessary to identify these replacements and integrate them into the Debtors' operations likely would cause a significant disruption to the Debtors' retail operations.

79.    As a result of the foregoing, the Debtors will seek entry of an order authorizing them to pay the undisputed amounts owed by the Debtors on account of outstanding Warehouse and Freight-Related Claims, and to discharge the liens that the Warehousemen or Freight Carries may have on the Debtors' property. Since the amounts owed to Warehousemen and Freight Carriers who have lien rights likely are far less than the value of any property securing their claims, such parties are likely fully secured creditors and the payment of their prepetition claims will give them no more than that to which they will likely be entitled to receive in the Debtors' bankruptcy cases.

80.    Insurance, Including Workers' Compensation Insurance.  In the ordinary course of their business, the Debtors maintains various insurance policies (the "Insurance Policies").  Maintenance of insurance coverage under the various Insurance Policies is essential to the operation of the Debtors' business and is required under the U.S. Trustee's Operating Guidelines for Chapter 11 Cases, the laws of the various states in which the Debtors operate and the Debtors' various financial agreements.  In connection with the Insurance Policies, the Company utilizes the services of third-party service providers, including brokers and claims' consultants.  Certain third parties may be owed amounts as of the Petition Date.  Failure to pay such amounts could result in loss of services, which would drastically impact the Debtors' ability to renew coverage and process claims.

81.    The Debtors also maintain workers' compensation insurance in each of the states in which they do business and provide employees with workers' compensation coverage for claims arising in any jurisdiction from or related to their employment by the Debtors.  Because the Debtors are required under the laws of most states to maintain workers' compensation coverage, with drastic remedies if the Debtors fail to comply with those laws, the Debtors are also seeking authorization to allow them to continue the workers' compensation programs in all applicable states.  In connection therewith, the Debtors will request that the order authorize them to pay all prepetition premiums, fees and expenses arising under, or related to, the workers' compensation programs.

82.    Utilities.  The Debtors utilize various utility services provided by numerous utility companies (collectively, the "Utility Companies").  Because the Utility Companies provide essential services to the Debtors and their retail operations, any interruption in utility services could prove devastating.  In fact, the temporary or permanent discontinuation

of utilities services at any of the Debtors' locations could irreparably disrupt business operations, and, as a result, fundamentally undermine the Debtors' restructuring efforts.

83.    The Debtors will propose procedures to protect the rights of Utility Companies, while protecting the Debtors' need for continuous and uninterrupted utility services. The Debtors further intend to pay all obligations owed to Utility Companies in a timely manner and I believe that the Debtors have, or will continue to have, sufficient funds from operations and their proposed postpetition financing to satisfy such obligations.

E.    Procedures for Trading in Equity Securities

84.    As a result of past losses from the operation of their businesses, the Debtors have estimated that their available net operating losses as of the Petition Date are approximately $834 million (collectively, the "NOLs"), which amounts could be higher when the Debtors emerge from chapter 11. These NOLs are valuable tax attributes, and to preserve the NOLs the Debtors will seek the entry of interim and final orders (a) establishing notice and objection procedures regarding certain transfers of beneficial interests in equity securities in RadioShack Corporation; [(b) establishing a record date for notice and potential sell-down procedures for trading in claims against the Debtors;] and (c) granting related relief. The relief sought will enable the Debtors to closely monitor certain transfers of equity securities, and thereby preserve the Debtors' ability to seek the necessary relief at the appropriate time if it appears that such transfers may jeopardize the Debtors' use of their NOLs. [In addition, establishing a record date with respect to trading in claims against the Debtors will ensure that claimholders receive sufficient notice that any claims purchased after such date may ultimately be subject to certain sell-down procedures in the event an order approving such procedures is sought by the Debtors and entered by the Court in order to preserve the Debtors' ability to use their NOLs.]

F.      Cash Management

85.     The Debtors and Non-Debtor Affiliates utilize an integrated, centralized cash management system (the "Cash Management System") to collect, manage, invest, and disburse funds throughout the Company.  The Cash Management System involves approximately 261 bank accounts and has been in place for years.  The Debtors maintain current and accurate accounting of all of the Debtors' transactions through the Cash Management System.  The Cash Management System includes the necessary accounting controls to enable the Debtors, as well as creditors and the Court, to trace funds through the system and ensure that all transactions are adequately documented and readily ascertainable.

86.     In connection with its Cash Management System and the Company's overall operations, the Company established various banking and business practices, including use of numerous business forms and investment practices.  These practices are tailored to the Company's day-to-day and longer-term needs and, as such, were specifically designed and implemented for the Company.

87.     Finally, in the ordinary course of business, the Company conducts transactions among the Debtors and the Non-Debtor Affiliates.  These transactions relate to, among other things, intercompany loans and intercompany services.  The Company engages in these intercompany transactions for a variety of reasons, not the least of which include tax benefits and reduced costs.  The Debtors will account for all of their postpetition intercompany transactions and are asking that such transactions be afforded administrative priority status to ensure that each individual Debtor will not, at the expense of its creditors, fund the operations of another entity.

G.   Motions to Schedule Hearings on Shortened Notice

88.   As previously discussed, the Debtors' success in these cases depends upon (a) reducing costs by closing underperforming stores; and (b) pursuing a sale of the Debtors' remaining business and assets on an expedited basis.  Accordingly, the Debtors are requesting that the Court schedule expedited hearings on the Store Closure and Lease Rejection Motions and on the Bid Procedures, including the Stalking Horse Agreement.

89.   These expedited hearings are required to comply with the terms of the Stalking Horse Agreement and the debtor in possession financing, and to enable the Debtors to efficiently and expeditiously sell their assets in order to maximize creditor recoveries.

## CONCLUSION

90.   For all the reasons described herein and in the First Day Pleadings, I respectfully request that the Court grant the relief requested in each of the First Day Pleadings.

[remainder of page intentionally left blank; signature page follows]

Dated:  February 5, 2015

_____

Carlin Adrianopoli

DLI-266511564v7