## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

| | | |
|---|---|---|
| | : | |
| In re | : | Chapter 11 |
| | : | |
| RADIOSHACK CORPORATION, *et al.*,[1] | : | Case No. 15-10197 (KJC) |
| | : | |
| Debtors. | : | (Joint Administration Requested) |
| | : | |

### DEBTORS' COMBINED MOTION FOR ENTRY OF ORDERS:
### (I) ESTABLISHING BIDDING AND SALE PROCEDURES; (II) APPROVING
### THE SALE OF ASSETS; AND (III) GRANTING RELATED RELIEF

The above-captioned debtors and debtors in possession (collectively,

the "Debtors") move the Court, pursuant to sections 105, 363, 365, 503 and 507 of the

Bankruptcy Code, Rules 2002 and 6004 of the Federal Rules of Bankruptcy Procedure

(the "Bankruptcy Rules") and Rules 2002-1 and 6004-1 of the Local Rules for the United States

Bankruptcy Court for the District of Delaware (the "Local Rules"), for the entry of:

(i)        an order (the "Bidding Procedures Order"), substantially in the form

attached hereto as Exhibit A:

(a)        approving proposed auction and bid procedures (the "Bidding

Procedures"), as well as proposed bidder protections, in connection with the sale (the "Sale") of

certain of the Debtors' assets (collectively, the "Assets");

---

[1]        The Debtors are the following eighteen entities (the last four digits of their respective taxpayer identification numbers follow in parentheses):  RadioShack Corporation (7710); Atlantic Retail Ventures, Inc. (6816); Ignition L.P. (3231); ITC Services, Inc. (1930); Merchandising Support Services, Inc. (4887); RadioShack Customer Service LLC (8866); RadioShack Global Sourcing Corporation (0233); RadioShack Global Sourcing Limited Partnership (8723); RadioShack Global Sourcing, Inc. (3960); RS Ig Holdings Incorporated (8924); RSIgnite, LLC (0543); SCK, Inc. (9220); Tandy Finance Corporation (5470); Tandy Holdings, Inc. (1789); Tandy International Corporation (9940); TE Electronics LP (9965); Trade and Save LLC (3850); and TRS Quality, Inc. (5417).  The address of each of the Debtors is 300 RadioShack Circle, Fort Worth, Texas 76102.

(b)    scheduling an auction (the "Auction") and a final sale hearing (the "Sale Hearing") in connection with the  Sale;

(c)    establishing procedures for the assumption and assignment of executory contracts and unexpired leases, including notice of proposed cure amounts (the "Assumption and Assignment Procedures"), and approving the form and manner of notice of the proposed assumption and assignment of executory contracts and unexpired leases in the form attached hereto as Exhibit B (the "Assumption and Assignment Notice"); and

(d)    approving the form and manner of notice of the Auction and the Sale Hearing, including the form and manner of notice (the "Auction and Hearing Notice") attached hereto as Exhibit C; and

(ii) an order (the "Sale Order"), substantially in the form attached hereto Exhibit D:

(a)    authorizing the Sale to the Stalking Horse Bidder (as defined below) and/or such other parties that are the successful bidders at the Auction, free and clear of all liens, claims and encumbrances, except for certain assumed liabilities;

(b)    authorizing the assumption and assignment of certain executory contracts and unexpired leases in connection with the Sale; and

(c)    granting certain related relief as described herein.

In support of this motion, the Debtors incorporate the statements contained in the Declaration of Carlin Adrianopoli in Support of First Day Pleadings (the "First Day Declaration") filed contemporaneously herewith and further respectfully represents as follows:

**Background**

1.      On the date hereof (the "Petition Date"), each of the Debtors commenced a case by filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code.[2]  The Debtors are continuing in possession of their properties and are managing their businesses, as debtors in possession, pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

2.      RadioShack Corporation owns directly or indirectly each of the Debtors and eight non-debtor affiliates (collectively, "RadioShack").  RadioShack, an international electronics retailer, operates more than 4,100 company-operated stores under the RadioShack brand throughout the United States and Mexico.  RadioShack stores are located in strip centers and major shopping malls across America.  RadioShack also includes a network of more than 1,100 RadioShack dealer-franchise outlets, which are located throughout the United States and in select international markets.  RadioShack generated approximately $3.4 billion in revenue for the twelve-month period ending December 31, 2013 and $2.1 billion in revenue for the thirty-nine week period ending on November 1, 2014.

3.      Additional information regarding the Debtors and these cases, including the Debtors' businesses, corporate structure, financial condition, and the reasons for and objectives of these cases, is set forth in the First Day Declaration.

***Events Leading to the Debtors' Bankruptcy Filing and the Proposed Sale***

4.      As described in the First Day Declaration, over the past three years, RadioShack's revenues have been steadily declining as it has faced increasing competition in the consumer electronics industry, including stiff competition by on-line retailers, and fundamental

---

[2]      This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue for this matter is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

#32440711 v1

changes in its mobility business.  For the fiscal year ending December 31, 2013, RadioShack

generated revenues of approximately $3.4 billion but incurred net operating losses of

approximately $344 million compared to revenues of $3.8 billion and a net operating loss of $25

million the prior year.

       5.       Despite numerous initiatives and extensive work by management,

RadioShack's performance continued to suffer in 2014.  Prior to the Petition Date, the Debtors,

including with the active assistance of independent financial advisors, solicited potential strategic

or financial transactions with a variety of parties, as well as possible financing or refinancing

transactions.  These efforts continued on a substantially continuous basis from 2013 through

September 2014.  Among the possible transactions pursued during this time were investments

and other financial transactions, joint ventures, mergers or sales of RadioShack (or portions of

it), discussions with existing creditors relating to possible recapitalizations, including but not

limited to Standard General L.P. ("Standard General"), and major store closure programs.  These

efforts intensified in the second and third quarters of 2014, and ultimately resulted in the

recapitalization and investment transaction announced on October 3, 2014 involving Standard

General and other parties

       6.       On October 3, 2014, General Retail Holdings L.P. ("GRH") and General

Retail Funding LLC ("GRF"), entities sponsored by Standard General, purchased the interests of

the then-existing lenders under the five-year, $585 million asset-based credit agreement

(the "2013 Credit Agreement") with a group of lenders, including General Electric Capital

Corporation ("GE Capital") as administrative and collateral agent, and entered into an

amendment to the 2013 Credit Agreement with RadioShack that improved RadioShack's

liquidity.  At the same time, RadioShack entered into a Recapitalization and Investment

- 4 -

Agreement with GRH, which provided for a rights offering to RadioShack's shareholders and the issuance of equity to GRH, primarily in exchange for the right to receive $120 million of cash collateral posted by GRH to secure letters of credit issued under the 2013 Credit Agreement (the "equity conversion").  The rights offering and the equity conversion were scheduled to occur in the first quarter of 2015 provided that certain conditions were satisfied.  Those conditions were ultimately not satisfied, however.

7.       Despite RadioShack's multi-faceted prepetition efforts to improve operations, reduce costs, close underperforming stores, improve liquidity, lower debt and recapitalize, RadioShack's liquidity continued to deteriorate.  The continuing loss of liquidity was largely the result of (a) an erosion in vendor confidence, (b) an inability to fully implement a large-scale store closure program, (c) the fundamental changes in the mobility market, and (d) RadioShack's 2014 holiday season results.

8.       The Debtors ultimately reached the point where they had no alternative but to seek chapter 11 protection.  To prepare for that, the Debtors in recent weeks have engaged in extensive negotiations with their lenders, potential purchasers including Standard General and their mobility carriers to develop a consensual path forward in these cases that will minimize costs and maximize value for the benefit of all stakeholders.  Although those negotiations continued literally up to the eve of these chapter 11 filings, they were ultimately successful in large part.  As a result, the Debtors have an agreement with their lenders under the 2013 Credit Agreement, Salus, and Standard General on a timeline and objectives for these cases.

9.       The Debtors' existing lenders under the 2013 Credit Agreement will provide a $285 million debtor in possession financing facility, with Cantor Fitzgerald Securities

acting as the administrative and collateral agent, that is intended to provide sufficient liquidity to fund a parallel liquidation and expedited going concern sale process.

10.    In addition, the Debtors will seek to promptly close and liquidate up to 2,100 underperforming stores, which liquidation will be conducted with the assistance of Hilco Merchant Resources, LLC, Gordon Brothers Retail Partners, LLC and Tiger Capital Group, LLC.

11.    By this motion, the Debtors seek approval of a process, to move forward in parallel with the store closings, to market and sell the balance of the Debtors' business and assets through an approximate 45-day section 363 asset sale process, which process will include a stalking horse going concern bid from an affiliate of Standard General for approximately 1,500 to 2,400 stores and other assets but not the entirety of the Debtors' assets.  In connection therewith, there is a new commercial agreement in principle with Sprint, available to any bidder acceptable to Sprint, that will assure a sustainable mobility platform for the business into the future.

### *Prepetition Sale and Marketing Efforts*

12.    This proposed sale process is the culmination of a nearly year-long process.  Since early 2014, the Debtors have been exploring a possible sale or other transaction with a variety of financial and strategic buyers.  In April 2014, the Debtors retained Peter J. Soloman Company ("PJS") to advise the company on potential strategic opportunities.  The Debtors and PJS developed a list of potentially interested parties and engaged in initial communications regarding a potential transaction.  The Debtors and PJS set a deadline of June 30, 2014 for parties to provide the Debtors with non-binding preliminary indications of interest.  PJS contacted each interested party to discuss the opportunity.  Six of the parties

affirmatively declined to engage in sale negotiations with the Debtors and one party failed to respond. Three parties, however, executed nondisclosure agreements and were granted access to an electronic data room assembled by the Debtors. Ultimately, none of these parties made an offer with respect to any kind of transaction.

13.     PJS continued to pursue and evaluate potential transactions and, as discussed above, an agreement on a partial recapitalization transaction with Standard General was ultimately reached. In connection with the recapitalization transaction, RadioShack publicly indicated that it would receive and review competing proposals from third parties for a period of 45 days following its entry into the recapitalization agreement. No third parties ever submitted any such competing proposals, however.

14.     On December 1, 2014, the Debtors engaged Lazard Frères & Co. LLC ("Lazard") to serve as their investment banker. Lazard has also pursued a sale or other strategic transaction process. To that end, Lazard has contacted or otherwise communicated with over 45 strategic and financial buyers. These parties were invited to sign nondisclosure agreements so that they could receive access to the Debtors' electronic data room. As of the Petition Date, over 10 parties have signed nondisclosure agreements and have accessed the data room. During the course of these cases, Lazard will supervise the sale process, market the assets, contact all potential bidders and generally be available to respond to information requests from potential buyers. The Debtors believe this coordinated and comprehensive sale process will produce the highest available bid and maximize value for the Debtors' stakeholders.

***Entry Into the Stalking Horse APA***

15.     The Debtors, together with their advisors, have negotiated the terms of an asset purchase agreement (the "Stalking Horse APA") with General Wireless Inc. (the "Stalking

Horse Purchaser"), an acquisition entity formed by Standard General, pursuant to which the

Stalking Horse Purchaser has agreed to act as a stalking horse bidder for the sale of some of the

Debtors' respective Assets (collectively, the "Acquired Assets").[3]    A copy of the Stalking Horse

APA is attached hereto as Exhibit E.

   16. The Stalking Horse APA includes certain protections for the Stalking

Horse Purchaser.  In particular, subject to Court approval as part of the Bidding Procedures

Order, the Debtors will be required to pay to the Stalking Horse Purchaser a fee (the "Break-Up

Fee") in the amount of $6,000,000 and reimburse the Stalking Horse Purchaser for its reasonable

and documented costs, fees and expenses incurred by the Stalking Horse Purchaser and its

affiliates in connection with the Stalking Horse APA (the "Expense Reimbursement") in certain

circumstances.  Subject to the delivery of a binding financing commitment to provide the

Stalking Horse Purchaser with financing, the Break-Up Fee will be payable in the event that the

Stalking Horse APA is terminated because (a) the Debtors file any stand-alone plan of

reorganization or liquidation or consummate an Alternative Transaction (as defined in the

Stalking Horse APA), (b) of the Debtors' breach thereof, (c) the Debtors agree to sell any portion

of the Acquired Assets to another party or (d) the Stalking Horse Purchaser is not the successful

bidder at the Auction; provided that in each case the Debtors consummate an Alternative

Transaction within nine months after such termination.  The Expense Reimbursement will be

payable in the event that the Stalking Horse APA is terminated because (a) this Court does not

approve the Stalking Horse APA, (b) the Debtors file any stand-alone plan of reorganization or

liquidation or consummate an Alternative Transaction, (c) the Debtors agree to sell any portion

of the Acquired Assets to another party, (d) the closing of the transactions contemplated by it

---

[3] The Stalking Horse Purchaser is not proposing to purchase, among other things, the Debtors' intellectual property, equity interests in subsidiaries, owned real estate and certain other assets.

does not occur by March 31, 2015, (e) of the Debtors' breach thereof or  (f) the Stalking Horse Purchaser is not the successful bidder at the auction.   The Break-Up Fee and the Expense Reimbursement will be allowed and paid as an administrative expense claim with priority over any and all administrative expenses of a kind specified in sections 503(b)(1) and 507(a)  of the Bankruptcy Code and senior to all other superpriority administrative expenses in these cases.  In no event shall the aggregate amount of the Break-Up Fee and the Expense Reimbursement Amount exceed $8,000,000.

17.     The Stalking Horse Purchaser has the right to terminate the Stalking Horse APA if the Bidding Procedures Order is not entered by February 19, 2015 and the Sale Order by March 22, 2015.  Further, the Debtors and the Stalking Horse Purchaser each have the right to terminate the Stalking Horse APA if the sale has not been consummated by March 31, 2015. The principal terms of the Stalking Horse APA are summarized below.

### *New Agreements With Sprint Solutions, Inc.*

18.     In an attempt to return their mobility business to profitability, the Debtors have engaged in discussions to restructure their relationships with wireless carriers.  Most recently, RadioShack has facilitated the negotiation of new agreements (collectively, the "Alliance Agreements") with Sprint Solutions, Inc. that are anticipated to generate significant value to the ultimate purchaser of the Debtors' business.  Specifically, Sprint and the buyer will establish co-branded stores for the sale of products, warranties, services and accessories of the type currently sold by RadioShack and Sprint mobile devices, including mobile handsets, tablets, and mobile broadband devices.  The Debtors believe this new partnership with Sprint will rectify many of the problems that they have faced on the mobility side of their business in recent years and provide any buyer of the RadioShack business with a sustainable mobility business into the future.

#32440711 v1

19.     The Alliance Agreements at present remain subject to completion of definitive documentation.  However, RadioShack and Sprint have entered into a detailed term sheet (the "Term Sheet") regarding the principal terms of the Alliance Agreements.[4]  Both the Stalking Horse Purchaser and Sprint have agreed to attempt to finalize the Alliance Agreements within 10 days of the Petition Date.   The Debtors will file copies of the execution versions of the Alliance Agreements with the Stalking Horse Purchaser if and as soon as they are available.[5]

20.     The Alliance Agreements with the Stalking Horse Purchaser would not be exclusive or prohibit other bidders from negotiating a similar arrangement with Sprint.  In point of fact, pursuant to the Term Sheet, Sprint has agreed to negotiate the terms of the Alliance Agreements with other potential bidders to which Sprint consents and to use its reasonable best efforts to conclude such negotiations and to prepare an execution version of the Alliance Agreements no later than the bid deadline.

21.     In light of Sprint's willingness to negotiate and finalize the terms of the Alliance Agreements with the Stalking Horse Purchaser as well as other potential bidders, the Debtors have agreed to reimburse Sprint's reasonable out-of-pocket expenses incurred in connection with the evaluation and negotiation of the Term Sheet and the Alliance Agreements (the "Sprint Expense Reimbursement") in certain circumstances.  If the closing of the sale pursuant to the Stalking Horse APA does not occur and the Stalking Horse Purchaser is entitled to the Expense Reimbursement under the Stalking Horse APA, then Sprint will be entitled to the Sprint Expense Reimbursement unless (a) Sprint enters into any agreement with another bidder

---

[4]     A copy of the Term Sheet (without the schedules thereto) is attached hereto as Exhibit F and incorporated herein by reference.

[5]     The obligations of the Stalking Horse Purchaser under the Stalking Horse APA are conditioned upon the Alliance Agreements having been entered into and any conditions to the effectiveness thereof having been satisfied or waived.

or RadioShack in connection with another bidder's proposed acquisition of a material portion of

the Debtors' stores and/or assets or (b) the failure of the sale pursuant to the Stalking Horse APA

to occur and the failure of Sprint to enter into such other agreement shall have resulted from (i)

Sprint's willful misconduct or failure to act in good faith and cooperate with the Debtor, the

Stalking Horse Purchaser and/or any other potential bidder or (ii) Sprint's  unreasonable refusal

to timely provide any required consent or to enter into an agreement with the Stalking Horse

Purchaser or any other potential bidder on terms substantially similar to, or better than, the terms

contemplated by the Term Sheet.

### ***The Proposed Sale Process***

22.    The Stalking Horse APA provides for the sale of the Acquired Assets free

and clear of liens, claims and encumbrances, as well as the assumption and assignment of certain

executory contracts and unexpired leases in connection therewith.  The Acquired Assets do not

include the Debtors' intellectual property, equity interests in subsidiaries, owned real estate and

certain other assets (collectively, the "Other Assets").

23.    The Debtors are conducting an auction sale process to provide an

opportunity for other parties to purchase any portion of the Debtors' Acquired Assets on terms

more favorable than those offered by the Stalking Horse Purchaser and to purchase some or all of

the Other Assets, in each case either as a going concern transaction or a liquidation transaction.

As outlined above, with the assistance of Lazard, their investment banker, the Debtors anticipate

engaging in a comprehensive marketing process.  The Debtors will seek to market a going

concern transaction pursuant to section 363 of the Bankruptcy Code with financial and strategic

buyers, many of whom have already been contacted.  At the same time, the Debtors will market

the liquidation of all of their stores.  The proposed Bidding Procedures are designed to permit the

Debtors to pursue both going concern and liquidation transactions to maximize the value of the

Debtors' assets for the benefit of their estates.

## Relief Requested and Basis Thereof

24.    By this motion, the Debtors seek entry of the Bidding Procedures Order:

a.    approving (i) the Debtors' proposed Bidding Procedures for marketing the Assets, which procedures are attached as Annex 1 to the Bidding Procedures Order; (ii) the Auction and Hearing Notice; and (iii) the Assumption and Assignment Notice;

b.    approving the Break-Up Fee, Expense Reimbursement and the Sprint Expense Reimbursement;

c.    approving procedures to determine cure amounts for the Debtors' executory contracts and unexpired leases that may be assumed and assigned in connection with the Sale;

d.    establishing Wednesday, March 11, 2015 at 4:00 p.m. (Eastern Time) as the deadline for the submission of bids (the "Bid Deadline");

e.    scheduling the Auction, if necessary, no later than Monday, March 16, 2015; and

f.    scheduling the Sale Hearing for Wednesday, March 18, 2015, subject to the Court's availability, to consider the sale of the Assets to the Buyer or such other party that is the successful bidder at the Auction.

25.    In addition, the Debtors respectfully request the entry of the Sale Order:

a.    approving the sale of (i) all or any of the Acquired Assets to the Stalking Horse Purchaser pursuant to the Stalking Horse APA or to such other party that is the successful bidder at the Auction and (ii) the Other Assets to such party or parties that are the successful bidders, free and clear of all liens, claims and encumbrances except for certain assumed liabilities;

b.    approving the assumption and assignment of executory contracts and unexpired leases in connection with the Sale;

c.    finding that the Stalking Horse Purchaser or such other party that is the successful bidder is a "good faith purchaser," as that term is defined in section 363(m) of the Bankruptcy Code, and has not violated section 363(n) of the Bankruptcy Code;

#32440711 v1

d.    waiving the 14 day stay requirements of Bankruptcy Rules 6004(h) and 6006(d); and

e.    granting certain related relief.

**The Proposed Bidding Procedures**

26.    The Debtors are requesting that the Court approve Bidding Procedures for the sale of the Assets with a final sale hearing to occur on March 18, 2015.[6]  The following is a summary of the Debtors' proposed Bidding Procedures.[7]

27.    Participation Requirements.  Unless otherwise ordered by the Court, to participate in the bidding process, each person or entity (each, an "Interested Party") will be required to deliver (unless previously delivered) the following materials to (a) RadioShack Corporation, RadioShack Circle, Fort Worth, Texas 76102 (Attn: Bob Donohoo), email: bob.donohoo@radioshack.com; (b) Jones Day, 2727 N. Harwood Street, Dallas, Texas 75201 (Attn:  Gregory M. Gordon, Esq.), email:  gmgordon@jonesday.com; (c) Pepper Hamilton LLP, Hercules Plaza, Suite 5100, 1313 N. Market Street, P.O. Box 1709, Wilmington, Delaware 19899-1709 (Attn: David M. Fournier, Esq.), email: fournierd@pepperlaw.com; (d) FTI Consulting, Inc., 227 West Monroe Street, Suite 900, Chicago, IL 60606 (Attn:  Carlin Adrianopoli), email: Carlin.Adrianopoli@FTIConsulting.com; and (e) Lazard Frères & Co. LLC, 190 S. LaSalle Street, 31st Floor, Chicago, IL  60603 (Attn:  David A. Kurtz), email: David.Kurtz@lazard.com, so as to be received no later than the Bid Deadline:  (a) an executed confidentiality agreement in form and substance satisfactory to the Debtors, which by its terms will inure to the benefit of the Successful Bidder(s); (b)  a statement and other factual support

---

[6]    The form of Bidding Procedures Order contains dates proposed by the Debtors.  These dates are subject to the availability of the Court and may change.

[7]    The summary describes each provision of the Bidding Procedures that Local Rule 6004-1 requires a debtor to highlight in a bidding procedures motion.

demonstrating to the Debtors' satisfaction a *bona fide* interest in purchasing or liquidating; (c) sufficient information, as determined by the Debtors, to allow the Debtors to determine that the Interested Party has the financial wherewithal, and any required internal corporate, legal or other authorizations to complete a Going Concern Transaction or Liquidation Transaction, as applicable (a "Sale Transaction"), including financial statements of the Interested Party (or such other form of financial disclosure acceptable to the Debtors in their discretion) and (d) the items comprising a bid.  A person or entity that has a *bona fide* interest in any of the Acquired Assets or Other Assets and deliveries the required information (other than the bid) to the Debtors is hereinafter referred to as a "Potential Bidder."  After a Potential Bidder delivers all of the materials required above (other than the bid), the Debtors will allow each such Potential Bidder access to the data room.

28.     Determination by the Debtors.  The Debtors will (a) determine, with the assistance of their advisors, whether any person or entity is a Qualified Bidder, (b) receive bids from Qualified Bidders, (c) evaluate and negotiate such bids, and (d) conduct the Auction. Neither the Debtors nor their representatives will be obligated to furnish any information relating to the Debtors to any person who is not a Potential Bidder.

29.     Due Diligence.  The Debtors will establish an electronic data room into which substantial information about the Debtors and their businesses will be deposited.  All Potential Bidders will be granted full access to the data room by Lazard, the Debtors' investment banker.  The Debtors, with the assistance of Lazard, will coordinate all reasonable requests for additional information and due diligence access from Potential Bidders.  In the event that any such due diligence material is in written form and has not previously been provided to the Stalking Horse Purchaser or any other Potential Bidder, the Debtors will simultaneously provide

access to such materials to (a) the Stalking Horse Purchaser, (b) all Potential Bidders, (c) the

professionals (the "Creditors' Committee Professionals") retained by the official committee of

unsecured creditors appointed in the Debtors' chapter 11 cases (the "Creditors' Committee") and

(d) counsel to Cantor Fitzgerald Securities, in its capacity as prepetition and postpetition

administrative agent for certain senior secured lenders and counsel to Salus Capital Partners,

LLC, in its capacity as administrative and collateral agent for certain senior secured lenders

(together, the "Agents").  Except as provided above with respect to access to the data room,

neither the Debtors nor their representatives will be obligated to furnish any information of any

kind whatsoever relating to the Acquired Assets or the Other Assets to any party.

        30.    Bid Deadline.  On or before the Bid Deadline, a Potential Bidder that

desires to make a bid is required to deliver written copies of its bid in both Portable Document

Format (.pdf) and Microsoft Word (.doc/.docx) format to representatives of the Debtors and the

Debtors' counsel, financial advisor and investment banker.

        31.    Bid Requirements.  All bids must:  (a) identify the legal name of the

Potential Bidder (including any equity holders or other financial backers, if the Potential Bidder

is an entity formed for the purpose of consummating the Sale Transaction; (b) with respect to

bids for a going concern transaction for any portion of the Acquired Assets, provides that the

Potential Bidder offers to purchase the assets at the purchase price and upon the terms and

conditions set forth in a copy of the Stalking Horse APA enclosed therewith, marked to show

any proposed amendments and modifications to it (the "Marked Agreement"); (c)  with respect to

bids that include an agreement with Sprint, includes a copy of the Alliance Agreement, marked

to show any proposed amendments and modifications to it (the "Marked Alliance Agreement");

(d) with respect to bids for a liquidation transaction, is based on a proposed agency agreement to

be provided by the Debtors to prospective liquidation transaction bidders and contains a copy of the Debtors' proposed agency agreement marked to show any proposed amendments and modifications to it (the "Marked Agency Agreement"); (e) states that all necessary filings under applicable regulatory, antitrust and other laws will be made (pursuant to the terms and conditions in the applicable bid documents) and that payment of the fees associated with such filings will be made by the Potential Bidder; (f) is formal, binding and unconditional (except for those conditions expressly set forth in the applicable bid documents), is not subject to any due diligence and is irrevocable until the earlier of March 31, 2015 and the first Business Day following the closing of the Sale Transaction; (g) includes a commitment to close the transactions contemplated by the bid no later than March 31, 2015; (h) does not entitle such Potential Bidder to a breakup fee, termination fee, expense reimbursement or similar type of payment or reimbursement and includes a waiver of any substantial contribution administrative expense claim under section 503(b) of the Bankruptcy Code related to bidding for the Acquired Assets or the Other Assets; (i) be accompanied by a cash deposit with an escrow agent selected by the Debtors equal to 15% of the gross consideration payable at closing pursuant to the applicable bid documents, as calculated in good faith by the Debtors; and (j) is received by the Bid Deadline.  In addition, with respect to bids for any portion of the Acquired Assets, the bid or bids must (a) be determined by the Debtors to be higher or better than the terms of the Stalking Horse APA, taking into account the Break-Up Fee and the sum of the maximum amount of (i) the Expense Reimbursement and (ii) the Sprint Expense Reimbursement (together, the "Expense Reimbursements"); and (b) include cash consideration sufficient to pay the Break-Up Fee and Expense Reimbursements.

32.     A Potential Bidder must accompany its bid with:  (a) written evidence of available cash, a commitment for financing (not subject to any conditions other than those expressly set forth in the applicable bid documents) or such other evidence of ability to consummate the transaction contemplated by the bid documents (and, as applicable, to provide adequate assurance of future performance of all obligations to be assumed in such Sale Transaction) as the Debtors may reasonably request; (b) a copy of a board resolution or similar document demonstrating the authority of the Potential Bidder to make a binding and irrevocable bid on the terms proposed; (c) a covenant to cooperate with the Debtors to provide pertinent factual information regarding the Potential Bidder's operations reasonably required to analyze issues arising with respect to any applicable antitrust laws and other applicable regulatory requirements; (d) if the purchase price includes non-cash consideration or fewer contingencies than are in the Stalking Horse APA, an analysis in reasonable detail of the value of the non-cash consideration and sufficient back-up documentation that demonstrates that the bid is a higher and/or better offer than the transaction contemplated by the Stalking Horse APA; and (e) if the Qualified Bid includes a Marked Agreement, Marked Alliance Agreement or Marked Agency Agreement that is not executed, a signed statement that such bid is irrevocable until the earlier of March 31, 2015 and the first Business Day following the closing of the Sale Transaction.  A bid received from a Potential Bidder for any portion of the Acquired Assets that is determined by the Debtors to meet the above requirements will be considered a "Qualified Bid" and each Potential Bidder that submits such a Qualified Bid will be considered a "Qualified Bidder."  The Stalking Horse APA is a Qualified Bid and the Stalking Horse Purchaser is a Qualified Bidder for all purposes and requirements pursuant to the Bidding Procedures.  The Debtors will, in their discretion, determine whether a bid received from a Potential Bidder for any of the Other Assets

#32440711 v1

that does not include any of the Acquired Assets is a Qualified Bid.  The Debtors may determine,

in their business judgment, which Qualified Bids are the highest and best offers for one or more

of the Other Assets.  Further, the Debtors may, in their discretion, with the consent of the Agents,

withdraw some or all of the Other Assets from the Auction or sale at any time before entry of an

order approving a sale of the Other Assets to a Qualified Bidder.

        33.      The Debtors may value a Qualified Bid based upon any and all factors that

the Debtors deem pertinent, including, among others:  (a) the purported amount of the Qualified

Bid, including non-cash consideration, if applicable; (b) the value to be provided to the Debtors

under the Qualified Bid, including the net economic effect upon the Debtors' estates after

payment of the Break-Up Fee and Expense Reimbursement Amounts, if applicable;

(c) contingencies with respect to the Sale Transaction and the ability to close the proposed Sale

Transaction on a basis acceptable to the Debtors, and any incremental costs to the Debtors in

closing delays; (d) the ability to obtain any and all necessary antitrust or other applicable

regulatory approvals for the proposed transaction; and (e) any other factors the Debtors may

deem relevant.

        34.      <u>Baseline Bids</u>.  Qualified Bidders that have submitted Qualified Bids are

eligible to participate in the Auction.  The Debtors will select what they determine to be the

highest and/or best Qualified Bid or combination of Qualified Bids for any portion of the

Acquired Assets and/or the Other Assets (the "<u>Baseline Bid(s)</u>") to serve as the starting point at

the Auction taking into account all relevant considerations, including payment of the Break-Up

Fee and Expense Reimbursement Amount, the financial condition of the applicable bidder and

certainty of closing.  As soon as reasonably practicable and not later than two days prior to the

Auction, the Debtors will identify the Baseline Bid(s) and provide to the Creditors' Committee

#32440711 v1

Professionals and counsel to the Agents copies of all Qualified Bids and to the Qualified Bidders

copies of all applicable Qualified Bids (with such distribution permissible by electronic means,

including posting to the Data Room).

35.     Auction.  If at least one Qualified Bid in respect of the Acquired Assets,

other than that of the Stalking Horse Purchaser, is received by the Bid Deadline, the Debtors will

conduct the Auction.  In addition, if at least two Qualified Bids in respect of the Other Assets is

received by the Bid Deadline, the Debtors will conduct the Auction.  The Auction will take place

at the offices of Pepper Hamilton LLP, Hercules Plaza, Suite 5100, 1313 N. Market Street,

Wilmington, Delaware 19801 on March 16, 2015, or such other time as the Debtors, in

consultation with the Stalking Horse Purchaser, as applicable, may notify Qualified Bidders who

have submitted Qualified Bids.  Only a Qualified Bidder that has submitted a Qualified Bid will

be eligible to participate at the Auction, subject to such limitations as the Debtors may impose.

A reasonable number (as determined by the Debtors) of representatives of the Qualified Bidders,

Creditors' Committee and the Agents will be permitted to attend and observe the Auction.  At the

Auction, participants will be permitted to increase their bids and improve their terms; provided

that any such increased or improved bid must be a Qualified Bid (except that the Bid Deadline

will not apply).  Bidding for any part of the Acquired Assets or the Other Assets will start at the

purchase price and terms proposed in the applicable Baseline Bid.  The Debtors will announce

the bidding increments for bids on one or more of the Acquired Assets or Other Assets at the

outset of the Auction (the "Minimum Overbid").  The Debtors may at any time adopt rules for

the Auction that the Debtors reasonably determine to be appropriate to promote the goals of the

Bidding Process and not in conflict with the Bidding Procedures, including one or more

adjournments of the Auction; provided that any Auction rules adopted by the Debtors with

respect to the Acquired Assets will not modify or conflict with any of the terms of the Stalking

Horse APA (as it may be consensually modified at the Auction) without the consent of the

Stalking Horse Purchaser.  Prior to the conclusion of the Auction, the Debtors will:  (a) review

and evaluate each bid made at the Auction on the basis of financial and contractual terms and

other factors relevant to the sale process, including those factors affecting the speed and certainty

of consummating the Sale Transaction; (b) in the exercise of their good faith business judgment

and consistent with the Bidding Procedures, identify the highest or otherwise best offer or

collection of offers in respect of the Acquired Assets and/or the Other Assets (the "Successful

Bid(s)"); (c) inform and consult with the professional advisors to the Creditors' Committee and

the Agents regarding the foregoing; and (d) notify all Qualified Bidders participating in the

Auction, prior to its adjournment, of the successful bidder or bidders (the "Successful Bidder(s)")

and the amount and other material terms of the Successful Bid(s).  Absent irregularities in the

conduct of the Auction or reasonable and material confusion during the bidding, each as

determined by the Bankruptcy Court, the Debtors will not consider bids made after the Auction

has been closed.  In the event the Stalking Horse Purchaser's bid is the only Qualified Bid for any

part of the Acquired Assets received by the Debtors by the Bid Deadline, no Auction will be

conducted for the Acquired Assets, the Stalking Horse APA will be the Successful Bid and the

Stalking Horse Purchaser will be the Successful Bidder.  After determining the Successful Bid(s)

for the Acquired Assets and the Other Assets, the Debtors may determine, in their reasonable

business judgment, in consultation with the professional advisors to the Creditors' Committee

and the Agents, which Qualified Bid(s) are the next best bids for the Acquired Assets and/or the

Other Assets  (the "Next Best Bid(s)").

36.    <u>Acceptance of Qualified Bids</u>.  The Debtors' selection and submission to this Court of the selected bid as the Successful Bid will not constitute the Debtors' acceptance of the bid.  The Debtors will have accepted a Qualified Bid only when a contract therefor has been executed and such Qualified Bid has been approved by the Court at the Sale Hearing.  If the Successful Bidder does not close the Sale by the date agreed to by the Debtors and the Successful Bidder, then the Debtors shall be authorized, but not required, to close with the party that submitted the Next Best Bid (the "<u>Next Best Bidder</u>"), without a further court order.

37.    <u>Modification of Bidding Procedures</u>.  The Debtors may amend the Bidding Procedures or the bidding process at any time and from time to time in any manner that they determine in good faith will best promote the goals of the process, including extending or modifying any of the dates described herein; <u>provided</u> that, with respect to the Stalking Horse Purchaser and the Stalking Horse APA, the terms of the Stalking Horse APA (as it may be consensually modified at the Auction).

38.    <u>Return of Good Faith Deposit</u>.  The Good Faith Deposits of all Qualified Bidders will  be held in escrow by the escrow agent and while held in escrow will not become property of the Debtors' bankruptcy estates unless released from escrow pursuant to terms of the applicable escrow agreement or pursuant to further order of the Court.  The Escrow Agent will retain the Good Faith Deposits of the Successful Bidder(s) until the closing of the Sale Transaction(s) unless otherwise ordered by the Bankruptcy Court.  The Good Faith Deposits of the other Qualified Bidders will be returned on the earlier of March 31, 2015 and the first Business Day following the closing of the Sale Transaction.  At the closing of the Sale Transaction contemplated by the Successful Bid, the Successful Bidder will be entitled to a

#32440711 v1

credit for the amount of its Good Faith Deposit.  Upon the return of the Good Faith Deposits,

their respective owners will receive any and all interest that has accrued thereon.

39.    The Debtors believe that the proposed Bidding Procedures provide an

appropriate framework for selling the Assets and will enable the Debtors to fully review, analyze

and compare all Bids received to determine which Bid is in the best interests of the Debtors'

estates.

**Proposed Bidding Protections**

40.    As part of the Bidding Procedures Order, the Debtors are also requesting

approval of the provisions of the Stalking Horse APA regarding the payment of the Break-Up

Fee and Expense Reimbursement on the terms and conditions set forth in the Stalking Horse

APA.  The Stalking Horse Purchaser conditioned its willingness to serve as a stalking horse

bidder on the inclusion of these provisions in the Stalking Horse APA.  If approved by this

Court, the Debtors would be required to pay the Stalking Horse Purchaser up to an aggregate

amount of $8,000,000, consisting of a $6,000,000 Break-Up Fee and up to $2,000,000 in

Expense Reimbursement in the event that the Break-Up Fee and the Expense Reimbursement are

payable under the terms of the Stalking Horse APA.  In addition, in certain circumstances, Sprint

will be entitled to the Sprint Expense Reimbursement.

41.    Approval of break-up fees and other forms of bid protections in

connection with the sale of significant assets pursuant to section 363 of the Bankruptcy Code is

an established practice in chapter 11 cases.  In the Third Circuit, termination or break-up fees are

considered administrative expenses and, therefore, the payment of such fees must provide a

postpetition benefit to the bankruptcy estate.  Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re

O'Brien Envtl. Energy, Inc.), 181 F.3d 527, 533 (3d Cir. 1999).  In O'Brien, the Third Circuit

provided two examples of a potential benefit accruing from the payment of a termination fee.  Id.

First, a benefit to the estate may arise if, "assurance of a break-up fee promoted [a] more competitive bidding [process], such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited." Id. at 537.  Second, a break up fee encourages potential bidders to evaluate thoroughly a debtor's value, thereby "increasing the likelihood that the price at which the debtor is sold will reflect its true worth." Id.

42.    By conducting due diligence, participating in negotiations for a potential transaction and entering into the Stalking Horse APA, the Stalking Horse Purchaser has established a bid standard, including a price floor, and initiated a legitimate sales process that should serve as a catalyst for other bidders.  In addition, by negotiating the Alliance Agreements with the Stalking Horse Purchaser and offering to negotiate the Alliance Agreements with other potential bidders, Sprint has enhanced the value of the Debtors' assets by providing potential buyers with a sustainable mobility business for the Debtors' operations into the future.  As a result, the Debtors are now in a favorable position to solicit competing bids that may be materially higher or otherwise more favorable than the Stalking Horse Purchaser's bid.  In short, the Stalking Horse Purchaser and Sprint should be compensated for the risk they are taking and the benefit they are providing to the Debtors' estates.

### Proposed Notice of the Sale Hearing

43.    Pursuant to Bankruptcy Rule 2002(a), the Debtors are required to provide their creditors with 21 days' notice of the Sale Hearing.  Pursuant to Bankruptcy Rule 2002(c), such notice must include the date, time, and place of the Auction and the Sale Hearing, and the deadline for filing any objections to the relief requested in the Sale Motion.  The Debtors propose that the deadline for objecting to approval of the proposed Sale be 4:00 p.m. (Eastern Time) on Wednesday, March 11, 2015.

44.     Within two business days after entry of the Bidding Procedures Order, the Debtors will serve the Auction and Hearing Notice by first-class mail, postage prepaid upon the following parties:  (a) the office of the United States Trustee for the District of Delaware (the "U.S. Trustee"); (b) counsel to the Creditors' Committee; (c) the Debtors' fifty largest unsecured creditors on a consolidated basis, as identified in the Debtors' chapter 11 petitions, (d) all parties who have asserted a lien or security interest against any of the Assets, (e) all parties to the Debtors' executory contracts and unexpired leases that may be assumed and assigned in connection with the Sale (the "Assumed and Assigned Agreements"); (f) applicable taxing authorities, including the Internal Revenue Service; (g) all state attorneys' general in which the Assets are located; (h) municipalities in which the Assets are located; (i) all parties known to the Debtors who have expressed an interest to the Debtors' Assets during the past six months; (j) the Debtors' current employees; (k) all parties requesting notice in these chapter 11 cases; and (l) all other known potential creditors in these chapter 11 cases.  The Auction and Hearing Notice shall indicate that copies of the Sale Motion, the Stalking Horse APA and the Alliance Agreements, if applicable, can be obtained on the website of the Debtors' claims and noticing agent, Prime Clerk, http://www.primeclerk.com.  In addition, the Debtors will serve this motion, including a copy of the Stalking Horse APA, on those persons in categories (a) through (d), above.  Further, within two business days after entry of the Bidding Procedures Order, or as soon as practicable thereafter, the Debtors will place a publication version of the Auction and Hearing Notice for one day in the national edition of *The Wall Street Journal*.

45.     The Auction and Hearing Notice will include, among other things, the date, time and place of the Auction and the Sale Hearing and the deadline for filing any objections to the relief requested in the Sale Motion once they are set by the Court, and, will

- 24 -

therefore, comply with Bankruptcy Rule 2002(c).  The Debtors submit that the methods of notice described herein comply fully with Bankruptcy Rule 2002 and constitute good and adequate notice of the proposed sale of the Assets.  Therefore, the Debtors respectfully request that this Court approve the notice procedures proposed above.

### Proposed Assumption and Assignment Procedures

46.      Additionally, the Debtors, as part of the Sale, may assume and assign Assumed and Assigned Agreements.  By no later than two business days after entry of the Bidding Procedures Order, the Debtors will file a schedule of cure obligations (the "Cure Schedule") for the Assumed and Assigned Agreements.  The Cure Schedule will include a description of each Assumed and Assigned Agreement potentially to be assumed and assigned by a potential buyer and the amount, if any, the Debtors believe is necessary to cure such agreements pursuant to section 365 of the Bankruptcy Code (the "Cure Costs").  A copy of the Cure Schedule, together with the Assumption and Assignment Notice, will be served on each of the nondebtor parties listed on the Cure Schedule by first class mail on the date that the Cure Schedule is filed with the Court.  The Debtors propose that any objections to the assumption and assignment of any executory contract or unexpired lease identified on the Cure Schedule, including, but not limited to, objections relating to adequate assurance of future performance or to the Cure Costs set forth on such schedule, must be in writing, filed with the Court, and be actually received on or before March 6, 2015 by (a) *the Debtors,* c/o RadioShack Corporation, RadioShack Circle, Fort Worth, Texas 76102 (Attn: Bob Donohoo, Esq.); (b) *Debtors' counsel,* (i) Jones Day, 2727 N. Harwood Street, Dallas, Texas 75201 (Attn:  Gregory M. Gordon, Esq.), and (ii) Pepper Hamilton LLP, Hercules Plaza, Suite 5100, 1313 N. Market Street, Wilmington, Delaware 19801 (Attn: David M. Fournier, Esq.); (c) *the Stalking Horse Purchaser's counsel,*

(i) Debevoise & Plimpton LLP, 919 Third Avenue, New York, New York 10022 (Attn: Richard

Hahn, Esq.), (ii) Morris, Nichols, Arsht & Tunnell LLP, 1201 N. Market St., 16th Floor,

Wilmington, Delaware 19801 (Attn: Gregory Werkheiser, Esq.), and (iii) DLA Piper, LLP (US),

1251 Avenue of the Americas, New York, New York 10020 (Attn: Gregg Galardi, Esq.); (d) the

U.S. Trustee, 844 King Street, Suite 2207, Lockbox 35, Wilmington, Delaware 19801; and

(e) once it is formed, counsel to the official committee of unsecured creditors (the "Committee"

and, collectively, the "Notice Parties"); *provided*, *however*, that in the event the Auction results

in a Successful Bidder other than the Stalking Horse Purchaser, the Debtors shall file a notice

identifying such Successful Bidder, and serve such notice upon each party identified in the Cure

Schedules, and the deadline for objecting to the assignment of the Assumed and Assigned

Agreements to such Successful Bidder on the basis of adequate assurance of future performance

will be the commencement of the Sale Hearing. Any such objection shall set forth a specific

default in any Assumed and Assigned Agreements and claim a specific monetary amount that

differs from the amount (if any) specified by the Debtors in the Cure Schedule.

   47. If no objections are received, then the Cure Costs set forth in the Cure

Schedule will be binding upon the nondebtor parties to the Assumed and Assigned Agreements

for all purposes in these chapter 11 cases and will constitute a final determination of the total

Cure Costs required to be paid by the Debtors in connection with the assumption and assignment

of the Assumed and Assigned Agreements. In addition, all counterparties to the Assumed and

Assigned Agreements will (a) be forever barred from asserting any additional cure or other

amounts with respect to the Assumed and Assigned Agreements, and the Debtors and the

Successful Bidder will be entitled to rely solely upon the Cure Costs set forth in the Assumption

and Assignment Notice; (b) be deemed to have consented to the assumption and assignment, and

(c) be forever barred and estopped from asserting or claiming against the Debtors or the

Successful Bidder that any additional amounts are due or other defaults exist, that conditions to

assignment must be satisfied under such Assumed and Assigned Agreements or that there is any

objection or defense to the assumption and assignment of such Assumed and Assigned

Agreements.

48.    Where a nondebtor counterparty to an Assumed and Assigned Agreement

files an objection asserting a cure amount higher than the proposed Cure Costs (the "Disputed

Cure Amount"), then (a) to the extent that the parties are able to consensually resolve the

Disputed Cure Amount prior to the Sale Hearing, and subject to the Successful Bidder's consent

to such consensual resolution, the Debtors shall promptly provide the Committee and the

Successful Bidder notice and opportunity to object to such proposed resolution or (b) to the

extent the parties are unable to consensually resolve the dispute prior to the Sale Hearing, the

amount to be paid under section 365 of the Bankruptcy Code with respect to such Disputed Cure

Amount will be determined at the Sale Hearing or at such other date and time as may be fixed by

this Court.  All other objections to the proposed assumption and assignment of an Assumed and

Assigned Agreement will be heard at the Sale Hearing.  The Debtors intend to cooperate with

counterparties to Assumed and Assigned Agreements to attempt to reconcile any differences

with respect to a particular cure amount.

49.    The Debtors request that any party failing to object to the proposed

transactions be deemed to consent to the treatment of its executory contract and/or unexpired

lease under section 365 of the Bankruptcy Code.  See Hargrave v. Twp. of Pemberton (In re

Tabone, Inc.), 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (by not objecting to sale motion, creditor

deemed to consent); Pelican Homestead v. Wooten (In re Gabeel), 61 B.R. 661, 667 (Bankr.

W.D. La. 1985) (same).  Moreover, the Debtors request that each such party be deemed to consent to the assumption and assignment of its executory contract and/or unexpired lease notwithstanding any anti-alienation provision or other restriction on assignment.  See 11 U.S.C. §§ 365(c)(1)(B), (e)(2)(A)(ii), and (f).

### The Primary Terms of the Stalking Horse APA

50.    Local Rule 6004-1(b)(iv) provides, among other things, that a sale motion "must highlight material terms" of the proposed Stalking Horse APA and Sale Order.  The Debtors submit that the description of the material terms of the Stalking Horse APA and Sale Order set forth herein complies with Local Rule 6004-1(b)(iv).  By way of summary, the primary terms of the Stalking Horse APA are set forth below:[8]

51.    Pursuant to the Stalking Horse APA, the Stalking Horse Purchaser will acquire the Acquired Assets, which include up to 2,400 retail stores, all inventory and equipment located at any acquired stores, petty cash at those stores, all claims (other than returns or merchandise for warranty claims) to the extent arising out of, or relating to, any acquired store or asset and certain executory contracts and unexpired leases.  Assets that will not be purchased (the "Excluded Assets") include:  (a) all cash other than petty cash; (b) certain books and records; (c) avoidance actions of the Debtors' estates under chapter 5 of the Bankruptcy Code and any other applicable provisions of the Bankruptcy Code other than avoidance actions against any current or former supplier, vendor or landlord of the Debtors or their business who is a party to an Assigned Agreement; (d) all leases and contracts that are not being assumed and assigned to the Stalking Horse Purchaser; (e) equity interests in the Debtors or any of their affiliates; (f) all

---

[8]    Capitalized terms not otherwise defined herein shall have the meanings assigned to them in the Stalking Horse APA or the Sale Order, as the case may be.  The description of the material terms of the Stalking Horse APA set forth herein is for summary purposes only and the terms of the Stalking Horse APA shall control in all circumstances.

#32440711 v1

insurance policies and binders and related claims, refunds and credits; (g) all real property owned by any Debtor; (h) except to the extent listed on Schedule 2.1(k), inventory and equipment located at any  retail stores not being purchased by the Stalking Horse Purchaser and distribution centers; and all the Debtors' employees.

52.    Local Rule 6004-1(b)(iv)(K) requires that a debtor disclose if it intends to sell any avoidance actions as part of any sale transaction.  The Acquired Assets include those avoidance actions against any current or former supplier, vendor or landlord of the Debtors or their business who is a party to any contracts that will be assumed and assigned as part of the Sale.  The Stalking Horse Purchaser required these provisions of the Stalking Horse APA to, among other things, enable it to maintain landlord, supplier and vendor relationships after the consummation of the Sale.  Maintaining these relationships will enhance the Debtors' business and help ensure that the Stalking Horse Purchaser receives necessary goods and services in the future on reasonable payment terms.  Accordingly, the Debtors submit that this aspect of the Stalking Horse APA is reasonable and necessary to consummate the Sale.

53.    The Stalking Horse APA provides for the assumption by the Debtors and the assignment to the Stalking Horse Purchaser of various executory contracts and unexpired leases.  An initial listing of executory contracts and unexpired leases (the "Assigned Agreement") that may be assumed and assigned to the Stalking Horse Purchaser is included on Schedule 1.1(a) to the Stalking Horse APA.  The Stalking Horse Purchaser will have until 10 days prior to the Sale Hearing elect in its sole discretion to add or delete contracts or leases to or from Schedule 1.1(a).  The Stalking Horse Purchaser may elect to delete contracts or leases from Schedule 1.1(a), (a) until the Sale Hearing if any Assigned Agreement  is subject to any dispute related to cure costs and (b) until two business days prior to the Auction with respect to any real

property lease relating to any Excluded Acquired Store.  In addition, following the Auction and

prior to the Closing, the Stalking Horse Purchaser may, in its sole discretion, elect to delete

contracts or leases listed on Schedule 2.2(d) and add them to Schedule 1.1(a).   Pursuant to

Section 2.3 of the Stalking Horse APA, the Stalking Horse Purchaser will be responsible for all

costs of curing defaults under any Assigned Agreement pursuant to section 365 of the

Bankruptcy Code.

> 54.    As set forth in Section 3.1 of the Stalking Horse APA, the aggregate

consideration the Debtors will receive under the Stalking Horse APA will be:

> a.    cash in the amount of the Cash Consideration; plus

> b.    a credit against an amount of debt under the Credit Facilities held
> by the Stalking Horse Purchaser equal to the lesser of (x) the
> Estimated Credit Bid Consideration and (y) the amount of debt
> under the Credit Facilities held by Buyer at the Closing pursuant to
> section 363(k) of the Bankruptcy Code; plus or minus

> c.    the amount, if any, of the difference between the Final Credit Bid
> Consideration and the Estimated Credit Bid Consideration, which
> amount shall be added to, or subtracted from, the purchase price in
> accordance with Section 3.3; plus

> d.    the assumption of the Assumed Liabilities (including all Cure
> Costs associated with the Assigned Agreements).

> 55.    Pursuant to the Stalking Horse APA, the Stalking Horse Purchaser will

assume only the following liabilities (the "Assumed Liabilities"):  (a) liabilities arising from the

ownership of the Acquired Assets and the operation of the Acquired Stores after the closing;

(b) all Assumed Consumer Liabilities; (c) the Cure Costs associated with any Assigned

Agreement; and (d) all liabilities under the Assigned Agreements arising after the closing.

> 56.    Local Rule 6004(b)(iv)(N) requires the disclosure of any provision that

allows credit bidding.  Pursuant to Section 3.1 of the Stalking Horse APA, the aggregate

consideration for the Acquired Assets consists of a credit against an amount of debt under the

- 30 -

Credit Facilities held by the Stalking Horse Purchaser equal to the lesser of (i) the Estimated Credit Bid Consideration and (ii) the amount of debt under the Credit Facilities held by Stalking Horse Purchaser at the closing.  In addition, Section 7.12 of the Stalking Horse APA provides that the Stalking Horse Purchaser will be entitled to credit bid L/C Reimbursement Obligations.

57.    The Stalking Horse APA contains certain provisions governing the termination rights of the parties, which are set forth in Section 11.1 of the Stalking Horse APA. In general, the parties can terminate the Stalking Horse APA:  (a) by mutual consent; (b) if this Court does not approve the Stalking Horse APA; (c) the closing of the transactions contemplated by it does not occur by March 31, 2015; (d) the Debtors file any stand-alone plan of reorganization or liquidation or consummate an Alternative Transaction; and (e) the Stalking Horse Purchaser and the Debtors have not agreed on the Projected Inventory within 10 days after entry into the Stalking Horse APA.

58.    The Stalking Horse Purchaser may terminate the Stalking Horse APA under the following circumstances:  (a) if the Debtors breaches the Stalking Horse APA; (b) if these cases are dismissed or converted to cases under chapter 7; (c)  if the Stalking Horse Purchaser is not the successful bidder at the Auction; (d) if the Bidding Procedures Order has not been entered on or before 14 days after the Petition Date; and (e) if the Sale Order has not been entered on or before 45 days after the Petition Date.

59.    The Debtors can terminate:  (a) if the Buyer breaches the Stalking Horse APA and such breach continues for a certain period following written notice from the Debtors; (b) if the Stalking Horse Purchaser is not the successful bidder at the Auction; (c) if the Debtors agree to sell any portion of the Acquired Assets to another party; or (d) if, on or before two business day before the Bidding Procedures hearing, (i) the Stalking Horse Purchaser has not

#32440711 v1

entered into the Alliance Agreements with Sprint or waived that condition or (ii) the Stalking

Horse Purchase has not obtaining a Debt Financing Commitment.

60.     The Stalking Horse Purchaser has not been required to post a deposit in

connection with the Stalking Horse APA.

61.     Local Rule 6004-1(b)(iv)(B) requires the disclosure of, among other

things, the material terms of agreements between the management of a debtor and a proposed

purchaser.  The Debtors are not aware that there have been any such arrangements implemented

as of the date of the filing of this motion.  Nevertheless, to the extent that such arrangements are

implemented in the future, the Debtors will file a disclosure with the Court with the material

terms of such arrangements.

62.     The Stalking Horse APA contains certain conditions that must be satisfied

prior to the closing of the Sale.  Among other things, the Stalking Horse Purchaser's obligation to

consummate the Sale is subject to the satisfaction at or prior to the closing date of each of the

following conditions:  (a) all representations and warranties of the Debtors are true and correct as

of the date of the Stalking Horse APA and as of the Closing Date; (b) each Debtor shall have

performed the covenants required by the Stalking Horse APA; (c) the Sale Order has been

entered by the Court, shall not be subject to any stay of effectiveness and shall have become a

Final Order, subject to certain exceptions; (d) the Stalking Horse Purchaser has enter into the

Alliance Agreement with Sprint; and (e) each Debtor has executed and delivered certain

agreements, instruments and documents to the Buyer.

63.     Finally, Local Rule 6004-1(b)(iv)(J) requires that the Debtors indicate how

they will retain access to their books and records to administer their estates after the closing date.

The Excluded Assets include the Debtors' "all minute books, corporate records (such as stock

registers) and organizational documents of Sellers and the Retained Subsidiaries, Tax Return,

other Tax work papers . . ."

### The Proposed Sale Order

64.      The proposed Sale Order attached hereto as <u>Exhibit D</u> also contains

certain provisions that require disclosure under Local Rule 6004-1.  Local Rule 6004-1(b)(iv)(C)

requires disclosure of any releases provided pursuant to the Sale.  Paragraphs X, Y, AA and 7

through 13 of the Sale Order provides the Stalking Horse Purchaser with releases relating to the

Acquired Assets, including releases of any liabilities not defined as Assumed Liabilities under

the Stalking Horse APA.  These releases are necessary to assure the Stalking Horse Purchaser

that it is assuming no liabilities other than the contractually agreed upon Assumed Liabilities.

The Debtors also submit that, as of the date of the filing of this motion, it is aware of no claim

against the Stalking Horse Purchaser that would be released by such provisions.

65.      Local Rule 6004-1(b)(iv)(L) also provides that a sale motion highlight

"anti-successor liability" provisions in a sale order.  Paragraphs Z and 14 through 17 provide

protection to the Stalking Horse Purchaser against successor liability claims.  The Debtors will

have material unpaid pre-petition unsecured claims after the closing of the Sale.  Neither the

Stalking Horse Purchaser nor any other party would likely be willing to purchase the Debtors'

assets if it were at risk of liability for those claims under principles of successor liability.  In

addition, the Debtors are providing direct notice of the sale to all known creditors of the Debtors'

estates and are also publishing notice of the sale in the national edition of *The Wall Street

Journal*.  The Debtors submit that notice of the proposed "no successor liability" findings in the

Sale Order is sufficient to bind all potentially affected parties.

66.      Finally, the Sale Order provides for a waiver of the 14-day stay period for

the effectiveness of the order under Bankruptcy Rule 6004(h), as well as the 14-day stay period

provided for in Bankruptcy Rule 6006(d).  For the reasons set forth below, the Debtors submit that cause exists for such waivers.

### Approval of the Sale Is Warranted Under Section 363 of the Bankruptcy Code

67.     Section 363(b) of the Bankruptcy Code provides that a debtor "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b).  A debtor must demonstrate a sound business justification for a sale or use of assets outside the ordinary course of business.  See, e.g., In re Martin, 91 F.3d 389 (3d Cir. 1996) (citing In re Schipper, 933 F.2d 513 (7th Cir. 1991)); In re Chateaugay Corp., 973 F.2d 141, 143 (2d Cir. 1992); Stephens Indus., Inc. v. McClung, 789 F.2d 386 (6th Cir. 1986); In re Lionel Corp., 722 F.2d 1063 (2d Cir. 1983).

68.     Courts typically consider the following factors in determining whether a proposed sale meets this standard:

  a.     whether a sound business justification exists for the sale;

  b.     whether adequate and reasonable notice of the sale was given to interested parties;

  c.     whether the sale will produce a fair and reasonable price for the property; and

  d.     whether the parties have acted in good faith.

In re Decora Indus., Inc., 2002 WL 32332749, at * 2 (D. Del. May 20, 2002) (citing Del. & Hudson Ry. Co., 124 B.R. 169, 176 (D. Del. 1991)).

69.     When a debtor demonstrates a valid business justification for a decision, a strong presumption arises "that in making [the] business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company."  Official Comm. of Subordinated Bondholders v. Integrated Res.,

Inc. (In re Integrated Res., Inc.), 147 B.R. 650, 656 (S.D.N.Y. 1990) (holding that Delaware

business judgment rule has "vitality by analogy" in chapter 11) (citations omitted).

70.     In the instant case, a strong business justification exists for the Sale.   Any

extended delay in selling the Assets could have a severe detrimental effect on the Debtors' ability

to continue operations and preserve going concern value to the fullest extent possible.

Furthermore, notice of the Sale has been reasonable and adequate.   The Debtors are providing

direct notice of the sale to all known creditors of the Debtors' estates and are also publishing

notice of the sale in the national edition of *The Wall Street Journal*.   Further, the Sale has been

proposed in good faith.   Finally, because the Sale is subject to bid procedures and an auction, the

price ultimately received as a result of the successful bid should, based on the process alone, be

deemed fair and reasonable.

### The Stalking Horse Purchaser is a Good Faith Purchaser

71.     The Debtors request that the Stalking Horse Purchaser or such other party

that is the successful bidder at the Auction receive the protections set forth in section 363(m) of

the Bankruptcy Code.   Specifically, section 363(m) of the Bankruptcy Code provides:

> The reversal or modification on appeal of an authorization under
> subsection (b) or (c) of this section of a sale or lease of property
> does not affect the validity of a sale or lease under such
> authorization to an entity that purchased or leased such property in
> good faith, whether or not such entity knew of the pendency of the
> appeal, unless such authorization and such sale or lease were
> stayed pending appeal.

11 U.S.C. § 363(m).  While the Bankruptcy Code does not define "good faith," the United States

Court of Appeals for the Third Circuit previously addressed the meaning of the term:

> The requirement that a purchaser act in good faith . . . speaks to the
> integrity of his conduct in the course of the sale proceedings.
> Typically, the misconduct that would destroy a purchaser's good
> faith status at a judicial sale involves fraud, collusion between the

#32440711 v1

> purchaser and other bidders or the trustee, or an attempt to take
> grossly unfair advantage of other bidders.

In re Abbotts Dairies of Pa., Inc., 788 F.2d 143, 147 (3d Cir. 1986).

72.     The Debtors and the Stalking Horse Purchaser have entered into the

Stalking Horse APA without collusion, in good faith and from arm's-length bargaining positions.

In this regard, each of the Stalking Horse Purchaser and the Debtors has engaged separate

counsel to represent it in its negotiation of the Stalking Horse APA.  To the Debtors' knowledge,

no party has engaged in any conduct that would cause or permit the Stalking Horse APA to be

set aside under section 363(n) of the Bankruptcy Code.  Similarly, the Debtors submit that any

sale agreement it enters into with such other party that is the successful bidder at the Auction will

also have been negotiated at arm's-length and in good faith.  Accordingly, the Debtors seek a

finding that the Stalking Horse Purchaser or such other party that is the successful bidder at the

Auction is a good faith purchaser under section 363(m) of the Bankruptcy Code and has not

violated section 363(n) of the Bankruptcy Code.

### Approval of the Sale Free and Clear of Liens, Claims and Encumbrances

73.     The Debtors request approval to sell the Assets free and clear of any and

all liens, claims, interests and encumbrances in accordance with section 363(f) of the Bankruptcy

Code.  Pursuant to section 363(f), a debtor in possession may sell estate property "free and clear

of any interest in such property of an entity other than the estate" if any one of the following

conditions is satisfied:

> a.     applicable nonbankruptcy law permits sale of such property free
>        and clear of such interest;
>
> b.     such entity consents;
>
> c.     such interest is a lien and the price at which such property is to be
>        sold is greater than the aggregate value of all liens on such
>        property;

- 36 -

      d.      such interest is in bona fide dispute; or

      e.      such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f); see Citicorp Homeowners Serv., Inc. v. Elliot (In re Elliot), 94 B.R. 343, 345 (Bankr. E.D. Pa. 1988) (because section 363(f) is written in the disjunctive, a court may approve a "free and clear" sale even if only one of the subsections is met).

74.      Furthermore, it is well established that a bankruptcy court has the power, pursuant to section 363(f) of the Bankruptcy Code, to approve the sale of a debtor's assets free and clear of any claims against the debtor.  In re TWA Airlines, Inc., 322 F.3d 283, 288-90 (3d Cir. 2003) (holding that successor liability claims are "interests in property" within the meaning of §363(f)); United Mine Workers of Am. Benefit Plan v. Leckie Smokeless Coal Co. (In re Leckie Smokeless Coal Co.), 99 F.3d 573 (4th Cir. 1996) (same).

75.      The Debtors submit that the sale of their assets free and clear of liens, claims and encumbrances will satisfy the requirements of section 363(f) of the Bankruptcy Code. The Debtors also believe that the service of the Auction and Hearing Notice in accordance with the terms set forth in this motion will afford creditors sufficient notice of the Sale and therefore provides additional justification for approval of the sale free and clear of all liens, claims and encumbrances.

### Approval of the Assumption and Assignment of Executory Contracts and Unexpired Leases

76.      Section 365(a) of the Bankruptcy Code provides, in pertinent part, that a debtor in possession "subject to the court's approval, may assume or reject any executory contract or [unexpired] lease of the debtor."  11 U.S.C. § 365(a).  The standard governing bankruptcy court approval of a debtor's decision to assume or reject an executory contract or unexpired lease is whether the debtor's reasonable business judgment supports assumption or

#32440711 v1

rejection.  See, e.g., In re HQ Global Holdings, Inc., 290 B.R. 507, 511 (Bankr. D. Del. 2003)

(finding that debtor's decision to assume or reject executory contract is governed by business

judgment standard and can only be overturned if decision was product of bad faith, whim or

caprice); see also In re Market Square Inn, Inc., 978 F.2d 116, 121 (3d Cir. 1992) (finding that

assumption or rejection of lease "will be a matter of business judgment by the bankruptcy

court").

77.     The business judgment test "requires only that the trustee [or debtor in

possession] demonstrate that [assumption] or rejection of the contract will benefit the estate."

Wheeling-Pittsburgh Steel Corp. v. West Penn Power Co., (In re Wheeling-Pittsburgh Steel

Corp.), 72 B.R. 845, 846 (Bankr. W.D. Pa. 1987).  Any more exacting scrutiny would slow the

administration of a debtor's estate and increase costs, interfere with the Bankruptcy Code's

provision for private control of administration of the estate, and threaten a court's ability to

control a case impartially.  See Richmond Leasing Co. v. Capital Bank, 762 F.2d 1303, 1311 (5th

Cir. 1985).  Moreover, pursuant to section 365(b)(1) of the Bankruptcy Code, for a debtor to

assume an executory contract, it must "cure, or provide adequate assurance that the debtor will

promptly cure," any default, including compensation for "actual pecuniary loss" relating to such

default.  11 U.S.C. 365(b)(1).

78.     Under section 365(f) of the Bankruptcy Code, a debtor, after assuming a

contract, may assign its rights under the contract to a third party.  11 U.S.C. § 365(f); see also In

re Rickel Home Center, Inc., 209 F.3d 291, 299 (3d Cir. 2000) ("The Code generally favors free

assignability as a means to maximize the value of the debtor's estate."); see also In re

Headquarters Dodge, Inc., 13 F.3d 674, 682 (3d Cir. 1994) (noting that the purpose of

section 365(f) is to assist the trustee in realizing the full value of the debtor's assets).

#32440711 v1

Section 365(f)(2)(B) requires, however, that adequate assurance of future performance by an assignee exist.  11 U.S.C. § 365(f)(2)(B).  The purpose of the adequate assurance requirement is to protect the interests of the non-debtor party to an assigned contract, as section 365(k) of the Bankruptcy Code relieves a debtor from liability for any breach of a contract that may occur after an assignment.  <u>Cinicola v. Scharffeberger</u>, 248 F.3d 110, 120 (3d Cir. 2001).  Adequate assurance of future performance is not required for every term of an executory contract or unexpired lease, but only such terms that are "material and economically" significant.  <u>In re Fleming Cos., Inc.</u>, 499 F.3d 300, 305 (3d Cir. 2007).  The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given a "practical, pragmatic construction."  <u>In re DBSI, Inc.</u>, 405 B.R. 698, 708 (Bankr. D. Del. 2009); <u>see also</u> <u>In re Decora Indus.</u>, 2002 U.S. Dist. LEXIS 27031, at *23 (D. Del. 2002) ("[A]dequate assurance falls short of an absolute guarantee of payment.").  Adequate assurance may be provided by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned.  <u>See</u>, <u>e.g.</u>, <u>In re Bygaph, Inc.</u> 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (finding that adequate assurance is present when prospective assignee of lease from debtor has financial resources and has expressed willingness to devote sufficient funding to business to give it strong likelihood of success).

79.      As set forth in the Term Sheet, the establishment of a new co-branded store-within-a-store concept is essential to the Alliance Agreements.  In order to implement this agreement, it will be necessary for Stalking Horse Purchaser or Sprint to perform alterations and remodeling of certain stores to the extent necessary to build out store-within-a-store designs and replace or modify existing signage.  To the extent any of the Assumed and Assigned Agreements contains provisions purporting to restrict or prohibit altering and dividing the space or modifying

signage, such provisions are unenforceable.  In re Rickel Home Center, Inc., 240 B.R. at 833

(D.C. Del. 1998) (holding alterations clauses to be "de facto anti-assignment clauses"); 11

U.S.C. § 365(f).  Moreover, in connection with any such built-out, applicable stores may go dark

for up to 180 days.  Id. at 835 (finding go dark period of six months to be reasonable).

80.     The Stalking Horse APA, as an integral part of the Sale, the assumption

and assignment of certain executory contracts and unexpired leases.  It is thus an appropriate

exercise of business judgment for the Debtors to agree to assume and assign the contracts and

leases as will be required by the Stalking Horse APA.  Additionally, the Debtors submit that the

notice provisions, and the objection deadline for counterparties to raise objections to the

assumption and assignment of contracts and leases, as proposed in this motion, are adequate to

protect the rights of counterparties to the Debtors' contracts and leases.  Furthermore, the Debtors

will demonstrate adequate assurance of future performance at the Sale Hearing.

### Basis for Relief For Liquidation Transaction

81.     The proposed Bidding Procedures permit going concern and liquidation

bids for the Assets.  In the event that the winning bid contemplates a liquidation transaction, the

legal basis for relief in connection with a liquidation of the Debtors' Assets is discussed below.

### A.        Waiver of Compliance With Laws Regarding Liquidation Sales

82.     Many state and local laws, statutes, rules and ordinances require special

and cumbersome licenses, waiting periods, time limits and other procedures for store closing,

liquidation or similar sales.  By virtue of section 1334 of title 28 of the United States Code,

however, this Court has exclusive jurisdiction over the Debtors' property wherever located.

28 U.S.C. § 1334 (2008).  As such, in the context of a bankruptcy case, when creditors receive

notice of a proposed sale, as well as the opportunity to be heard in court, enforcement of such

statutes and regulations is redundant and unnecessary.  As a result, the Debtors request that, in

the event that the Successful Bid is a liquidation transaction, any order approving a liquidation transaction include a provision that specifically waives the Debtors' or their future agent's obligation to comply with any state or local laws restricting store closing, going out of business or similar sales.

83.    In general, debtors must comply with 28 U.S.C. § 959(b), which provides that a debtor in possession must "manage and operate the property . . . according to the requirements of the valid laws of the state in which such property is situated . . . ."  Courts, however, have held that a debtor in possession that is liquidating estate assets does not "manage and operate" the property for the purposes of 28 U.S.C. § 959(b).  Alabama Surface Mining Comm'n v. N.P. Mining Co., Inc. (In re N.P. Mining Co., Inc.), 963 F.2d 1449, 1460-61 (11th Cir. 1992) (holding that 28 U.S.C. § 959(b) does not apply when debtor in possession is liquidating property and no longer operating its business).  In addition, the Bankruptcy Code preempts state and local laws that conflict with its underlying policies.  Belculfine v. Aloe (In re Shenango Group, Inc.), 186 B.R. 623, 628 (Bankr. W.D. Pa. 1995) ("Trustees and debtors-in-possession have unique fiduciary and legal obligations pursuant to the bankruptcy code. . . .  [A] state statute [] cannot place burdens on [a debtor] where the result would contradict the priorities established by the federal bankruptcy code."), aff'd, 112 F.3d 633 (3d Cir. 1997).[9]

**B.**    **Unenforceability of Any Restriction in the Leases**

---

[9]    See also In re Coldwater Creek, Case No. 14-10867 (BLS) (Bankr. D. Del. May 7, 2014) (stating that debtors were authorized to conduct store closing sales "without the necessity of further showing compliance" with going out of business or liquidation laws); In re Boscov's, Case No. 08-11637 (Bankr. D. Del. Aug. 15, 2008) (ordering that "[g]overnmental units shall not fine, assess or otherwise penalize Debtors or Agent (or any of the landlords of the Closing Stores) for conducting or advertising the Store Closing Sales in a manner inconsistent with Liquidation Sales Laws, provided that the Store Closing Sales are conducted and advertised in compliance with this Order").

84.     Certain of the Debtors' leases governing the premises of the stores subject to any Liquidation Transaction may contain provisions purporting to restrict or prohibit the Debtors from conducting store closing, liquidation, or similar sales.  Such provisions have been held to be unenforceable in chapter 11 cases as they constitute an impermissible restraint on a debtor's ability to properly administer its reorganization case and maximize the value of its assets under section 363 of the Bankruptcy Code.  Ames Dep't Stores, 136 B.R. at 359 (deciding that enforcement of such lease restrictions would "contravene overriding federal policy requiring debtor to maximize estate assets. . . ."); In re R. H. Macy and Co., Inc., 170 B.R. 69, 73-74 (Bankr. S.D.N.Y. 1994) (holding that the lessor could not recover damages for breach of a covenant to remain open throughout the lease term, because the debtor had a duty to maximize the value to the estate and the debtor fulfilled this obligation by holding a store closing sale and closing the store.).[10]

85.     Thus, to the extent that such provisions or restrictions exist in any of the leases of the stores subject to any Liquidation Transaction, the Debtors request that the Court authorize the Debtors and/or the Successful Bidder to conduct any liquidation sales without interference by any landlords or other persons affected, directly or indirectly, by the liquidation sales.

**C.     Any Liquidation Sales Should Be Exempt From Any "Fast Pay" Laws**

86.     Many states in which the Debtors operate also have laws and regulations that require the Debtors to pay an employee substantially contemporaneously with his or her

---

[10]     In addition, bankruptcy courts in this District have held that restrictive lease provisions affecting store liquidation sales in chapter 11 cases are unenforceable.  See, e.g., In re Coldwater Creek, Case No. 14-10867 (BLS) (Bankr. D. Del. May 7, 2014) (ordering that store closing sales be conducted without the further need for compliance with, among other things, lease provisions); In re Boscov's, Case No. 08-11637 (Bankr. D. Del. Aug. 15, 2008) (same); In re Goody's Family Clothing, Inc., Case No. 08-11133 (CSS) (Bankr. D. Del. June 13, 2008) (same); In re Linens Holding Co., Case No. 08-10832 (CSS) (Bankr. D. Del. May 30, 2008) (same).

#32440711 v1

termination (the "Fast Pay Laws").  In many cases, these laws require the payment to occur either immediately or within a period of only a few days from the date such employee is terminated. To the extent that a Liquidation Transaction results in a significant number of employees being terminated, the Debtors respectfully submit that the Debtors should be granted relief from the Fast Pay Laws.  As set forth above, the Bankruptcy Code preempts state and local laws that conflict with its underlying policies.  See, e.g., Coldwater Creek Inc., Case No. 14-10867 (BLS) (Bankr. D. Del. May 7, 2014) (waiving "fast pay" laws and regulations in connection with approval of store closing sales); Filene's Basement, LLC, Case No. 11-13511(KJC) (Bankr. D. Del. Nov. 2, 2011) (same); In re Linens Holding Co., Case No. 08-10832 (Bankr. D. Del. Oct. 28, 2008) (same).

### Waiver of Rules 6004(h) and 6006(d)

87.    The Debtors request that, upon entry of the Sale Order, the Court waive the 14 day stay requirements of Bankruptcy Rules 6004(h) and 6006(d).  The waiver of the 14 day stay imposed by Bankruptcy Rules 6004(h) and 6006(d) is a condition of the Stalking Horse APA.  The Debtors respectfully submit that the Court waive the 14 day stay requirements contained in Bankruptcy Rules 6004(h) and 6006(d).

### Consent to Jurisdiction

88.    Pursuant to Local Rule 9013-1(f), the Debtors consent to the entry of a final judgment or order with respect to this motion if it is determined that the Court would lack Article III jurisdiction to enter such final order or judgment absent consent of the parties.

### Notice

89.    Notice of this motion will be provided to:  (a) the Office of the United States Trustee for the District of Delaware; (b) the Debtors' largest unsecured creditors on a consolidated basis, as identified in their chapter 11 petitions; (c) counsel to Cantor Fitzgerald

Securities, in its capacity as prepetition and postpetition administrative agent for certain senior secured lenders; (d) counsel to Salus Capital Partners, LLC, in its capacity as administrative and collateral agent for certain senior secured lenders; (e) counsel to Wilmington Trust, N.A., in its capacity as the trustee under the indenture governing the unsecured notes; (f) all parties who are known by the Debtors to assert liens against the Assets; (g) all state attorneys general in which the Assets are located; (h) all parties to the Assumed and Assigned Agreements; (i) municipalities in which the Assets are located; and (j) all parties requesting notice.

<u>**No Prior Request**</u>

90.    No prior request for the relief sought herein has been made to this Court or any other Court.

WHEREFORE, the Debtors respectfully request that the Court (i) enter the Bidding Procedures Order, in substantially the form attached hereto as <u>Exhibit A</u>, (ii) enter the Sale Order, in a form attached hereto as <u>Exhibit D</u>, or such other order approving a sale to such other party that is the successful bidder at the Auction and (iii) grant such other and further relief to the Debtors as the Court may deem proper.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

#32440711 v1

Dated:  February 5, 2015
      Wilmington, Delaware

Respectfully submitted,

  /s/ David M. Fournier
David M. Fournier (DE 2812)
Evelyn J. Meltzer (DE 4581)
John H. Schanne, II (DE 5260)
PEPPER HAMILTON LLP
Hercules Plaza, Suite 5100
1313 N. Market Street
P.O. Box 1709
Wilmington, Delaware 19899-1709
Telephone:  (302) 777-6500
Facsimile:  (302) 421-8390

      -and-

David G. Heiman (OH 0038271)
JONES DAY
901 Lakeside Avenue
Cleveland, Ohio 44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212

Gregory M. Gordon (TX 08435300)
JONES DAY
2727 N. Harwood Street
Dallas, Texas  75201
Telephone:  (214) 220-3939
Facsimile:  (214) 969-5100

Thomas A. Howley (TX 24010115)
Paul M. Green (TX 24059854)
JONES DAY
717 Texas Suite 3300
Houston, Texas 77002
Telephone:  (832) 239-3939
Facsimile:  (832) 239-3600

PROPOSED ATTORNEYS FOR DEBTORS
AND DEBTORS IN POSSESSION

#32440711 v1