# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re | : | Chapter 11 |
|  | : |  |
| RADIOSHACK CORPORATION, *et al.*,[1] | : | Case No. 15-10197 (KJC) |
|  | : |  |
| Debtors. | : | (Joint Administration Requested) |
|  | : |  |

## MOTION FOR AN ORDER APPROVING THE DEBTORS' (A) KEY EMPLOYEE INCENTIVE PROGRAM, (B) KEY EMPLOYEE RETENTION PROGRAM AND (C) GRANTING CERTAIN RELATED RELIEF

The above-captioned debtors and debtors in possession (collectively, the "Debtors") move the Court, pursuant to sections 105(a), 363(b) and 503(c)(3) of the Bankruptcy Code, for the entry of an order approving (a) the key employee incentive program (the "KEIP"), (b) the key employee retention program ("the "KERP") and (c) granting certain related relief. In support of this motion, the Debtors incorporate the statements contained in the declaration of Douglas Friske attached hereto as Exhibit D, the declaration of Carlin Adrianopoli attached hereto as Exhibit E, and the declaration of Joseph Magnacca attached hereto as Exhibit F, and respectfully represent as follows:

---

[1] The Debtors are the following eighteen entities (the last four digits of their respective taxpayer identification numbers follow in parentheses): RadioShack Corporation (7710); Atlantic Retail Ventures, Inc. (6816); Ignition L.P. (3231); ITC Services, Inc. (1930); Merchandising Support Services, Inc. (4887); RadioShack Customer Service LLC (8866); RadioShack Global Sourcing Corporation (0233); RadioShack Global Sourcing Limited Partnership (8723); RadioShack Global Sourcing, Inc. (3960); RS Ig Holdings Incorporated (8924); RSIgnite, LLC (0543); SCK, Inc. (9220); Tandy Finance Corporation (5470); Tandy Holdings, Inc. (1789); Tandy International Corporation (9940); TE Electronics LP (9965); Trade and Save LLC (3850); and TRS Quality, Inc. (5417). The address of each of the Debtors is 300 RadioShack Circle, Fort Worth, Texas 76102.

## Background

1.      On the date hereof (the "Petition Date"), each of the Debtors commenced a case by filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code.[2]  The Debtors are continuing in possession of their properties and are managing their businesses, as debtors in possession, pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

2.      RadioShack Corporation owns directly or indirectly each of the Debtors and eight non-debtor affiliates (collectively, "RadioShack").  RadioShack, an international electronics retailer, operates more than 4,100 company-operated stores under the RadioShack brand throughout the United States and Mexico.  RadioShack stores are located in strip centers and major shopping malls across America.  RadioShack also includes a network of more than 1,100 RadioShack dealer-franchise outlets, which are located throughout the United States and in select international markets.  RadioShack generated approximately $3.4 billion in revenue for the twelve-month period ending December 31, 2013 and $2.1 billion in revenue for the thirty-nine week period ending on November 1, 2014.

3.      Additional information regarding the Debtors and these cases, including the Debtors' businesses, corporate structure, financial condition, and the reasons for and objectives of these cases, is set forth in the Declaration of Carlin Adrianopoli in Support of First Day Pleadings (the "First Day Declaration"), filed contemporaneously herewith and fully incorporated herein by reference.

---

[2]      This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue for this matter is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

**Efforts of Towers Watson to Design the KEIP and KERP**

4.      With the assistance and advice of Towers Watson Delaware Inc., trading

as Towers Watson ("Towers Watson"), the Debtors have identified eight executive employees

(the "KEIP Participants") and up to 30 non-insider employees (the "KERP Participants" and,

together with the KEIP Participants, the "Program Participants") whose institutional knowledge

and skill are essential to maximizing the value of the Debtors' estates during their bankruptcy

cases.

5.      Towers Watson has worked extensively with the Debtors in designing

incentive and retention plans since January 2003.  Further, Towers Watson was engaged

prepetition on January 20, 2015 to provide certain compensation consulting services to the

Debtors (the "Bankruptcy Consulting Engagement") both before and after the commencement of

these chapter 11 cases.  Given the length of time Towers Watson has worked with the Debtors, it

is familiar with the Debtors' operations and compensation programs.  In addition, at the

commencement of the Bankruptcy Consulting Engagement, they familiarized themselves with

the particular challenges faced by the Debtors in these cases.

6.      As further outlined in other contemporaneously filed motions, the Debtors

will engage in the liquidation of up to 2,100 stores (the "Liquidation Sale"), and these

liquidations are likely to occur in the first two months of the case.  The Debtors are also seeking

to schedule an auction in March 2015 for the remaining assets of the Debtors (the "363 Sale"

and, together with the Liquidation Sale, the "Sales").  Due to the challenges posed by these Sales,

both in terms of logistics and employee morale, the Debtors, FTI Consulting, Inc. ("FTI") and

Towers Watson designed the KEIP and the KERP with the goals of:  (i) maximizing the value of

the Debtors' assets for the benefit of the estates; (ii) incentivizing the KEIP Participants to create

value for creditors as part of the 363 Sale; and (iii) retaining KERP Participants throughout the chapter 11 process.

### Description of the KEIP

7.       In evaluating the proper participants to receive a KEIP award, the Debtors focused on executives with a clear ability to influence and execute a successful 363 Sale.  In conjunction with their advisors, the Debtors identified eight key executives who were most likely to be in the position to maximize postpetition value for creditors.  In particular, the KEIP Participants are all executive level employees who have, and will, significantly influence the outcome of the 363 Sale.  Before the Petition Date, the KEIP Participants worked tirelessly to help negotiate a stalking horse bid, and were further successful in raising the bid by more than $30 million from the initial bid.  As this case continues, the KEIP Participants will continue to provide critical support to the Debtors in their highly complex, multi-party negotiations with potential buyers and current lenders.  Therefore, leveraging the talents and corporate knowledge of the KEIP Participants will be crucial if the Debtors are to maximize the amount and price of assets purchased in any 363 Sale.

*The KEIP Terms*

8.       To provide maximum incentive to the KEIP Participants, all compensation associated with the KEIP will be solely based upon the successful conclusion of the 363 Sale. The maximum cost of the KEIP will be $2 million.  However, the ultimate incentive value paid to the KEIP Participants will vary depending upon the occurrence and success of the 363 Sale. For the KEIP Participants to even be eligible for an incentive payment, the Debtors must first receive a bid for the inventory and leases of at least 1,500 store locations (the "<u>Going Concern</u>

Bid").  Further, the Going Concern Bid must be for an amount equal to, or greater than, the stalking horse bid of General Wireless Inc. (the "Stalking Horse Bid").

9.      Under the proposed KEIP structure:  (i)  Court approval of a Going Concern Bid in an amount equal to or greater than the Stalking Horse Bid will fund a payment of 50% of the individual KEIP opportunities (the "Stage One Payment"); (ii) approval of a Going Concern Bid that exceeds the Stalking Horse Bid by $5 million to $25 million will fund an incremental payment of 25% of the individual KEIP opportunities (the "Stage Two Payment"); and (iii) approval of a Going Concern Bid that exceeds the Stalking Horse Bid by more than $25 million will fund another incremental 25% payment of the individual KEIP opportunity (the "Stage Three Payment").  The total cost of the Stage One Payment is $500,000, the incremental cost of the Stage Two Payment is $750,000, and the incremental cost of the Stage Three Payment is $750,000.  Therefore, as noted above, the maximum cost of the proposed KEIP is $2 million, which is equal to 100% of the total individual KEIP opportunities available to the eight participants.

10.      Under the KEIP, the maximum award opportunities will range from $88,000 to $650,000 for each of the eight participants, with an average maximum award opportunity of $250,000.  Awards will be forfeited if a KEIP Participant resigns voluntarily. However, awards will be paid pro-rata for an involuntary termination, not for cause, calculated from the Petition Date to the date the 363 Sale is approved by the Court.

***Reasonableness of the KEIP***

11.      In order to make a relevant market comparison of the proposed KEIP, Towers Watson undertook a review of approved insider incentive plans in 30 recent bankruptcy cases in which there was a major asset sale or liquidation event tied to the approved incentive

plans.  Of the 30 reviewed cases, approximately 65% were from a broad array of retailers,

including Alco Stores, Inc., Ashley Stewart, Borders Group, Boscov's, Circuit City Stores,

Coldwater Creek, Dots, KB Toys, Linens Holding, and Orchard Supply Stores.  The 30 reviewed

cases are reasonable benchmarks for the Debtors as they reflect recent market practices for

insider incentive plans.  The purpose of this review was to gather data with respect to (i) the

design and general construct of various insider incentive plans in other bankruptcy cases and

(ii) the disclosed plan costs and award opportunities.  Additionally, Towers Watson relied on its

general experience in the design of insider incentive plans for similarly-situated companies.

12.    Based on this analysis of recently approved insider incentive plans,

Towers Watson observed, among other things, the following key common design themes:

- Awards tend to be paid in cash;

- Prevalent performance metrics include milestones related to liquidation, sale of assets/distribution of proceeds, the recovery rate of creditors, wind-down cash flows, and postpetition financing related targets;

- Participation tends to be limited to those key employees who are actually involved in successfully executing the transaction;

- Participation generally ranges from six to 15 people at the 25th and 75th percentiles, respectively;

- The total cost of the asset-sale plans ranged from $661,000 at the 25th percentile to $2.9 million at the 75th percentile; and

- On a percentage of revenue basis, the cost of the plans ranged from 0.12% of revenue at the 25th percentile to 0.56% of revenue at the 75th percentile.  As a reference, applying the median revenue percentile to the Debtors' trailing 12-month revenue would result in a total award of $4.8 million.

13.    Based on its analysis and experience in the design of other chapter 11

approved insider incentive plans, Towers Watson found the design and cost of the proposed

KEIP to be within the range of observed practice as compared to related plans approved at

similarly-situated companies.  Each of the relevant design terms (i.e., form of payment,

performance metrics, number of participants, and payout structure) are within the range of

observed market practice.  Moreover, the maximum KEIP cost is reasonable as it (i) falls well

within the range of observed market practice in terms of absolute dollars, and (ii) when

expressed as a percentage of revenue, approximates the 25th percentile of the market.  In

summary, each of the primary design features and cost from the proposed KEIP are reasonable

versus comparable programs, the experience of Towers Watson in the design of KEIPs in similar

cases, and under the facts and circumstances of these chapter 11 cases.

### <u>Description of the KERP</u>

14.    The Debtors seek to implement the KERP to ensure that the Debtors do

not suffer significant and costly key employee turnover during the chapter 11 process.  The loss

of the KERP Participants would hamper the Debtors' ability to effectively and efficiently

administer their estates and conduct the Sales.  In particular, the circumstances of these

chapter 11 cases are likely to increase employee turnover, especially in light of the challenges

posed by the upcoming Sales.  The KERP Employees will be faced with additional pressure due

to significant staff reductions, uncertain job prospects, and the broad-reaching nature of the

proposed Sales.  As a consequence, the Debtors and their advisors have determined that a

non-insider retention program will serve as an effective program to retain key employees during

the course of these chapter 11 cases.

15.    Towers Watson worked with the Debtors' advisors to provide counsel with

respect to typical non-insider retention program designs in light of competitive data and their

experience in designing programs for similarly-situated companies.  Towers Watson sought to

balance the need for motivating employees to remain with the Debtors, the financial constraints

on the Debtors' businesses and the interests of their creditors, and the costs associated with increased employee turnover.

### KERP Participants

16.    During this process, the Debtors analyzed their workforce to determine which non-insiders were critical to successful Sales, operations and the wind-down of the Debtors and thus should be covered by the KERP.  The KERP Participants were selected based on:  (a) critical knowledge, skills, and experience in areas central to the success of the Sales; (b) possession of skills that are difficult and costly to replace; (c) individuals important to the going concern business who the Debtors and their advisors believe that potential bidders would want to retain; and (d) select individuals who were deemed important to the cost-effective wind-down of the estate.  Many of the KERP Participants have developed valuable institutional knowledge regarding the Debtors' business operations that would be very expensive and difficult to replace.  Preserving this institutional knowledge is critical to the efficient administration of the Debtors' estates and the success of the Sales.  Further, Towers Watson has advised the Debtors that it is frequently a challenge to retain critical employees in a chapter 11 sale environment. Therefore, a non-insider retention program is necessary and appropriate to mitigate the risks posed by the particular facts of the Debtors' chapter 11 cases.

### KERP Terms

17.    The Debtors propose to implement a retention program for their key, non-insider employees, providing a maximum aggregate bonus pool of approximately $1 million.  Each KERP Participant will receive a percentage of their current base salary, which is based on the Debtors' analysis of such KERP Participant's responsibilities, and in consideration of Towers Watson's market data from approved non-insider KERPs.  The table below provides the pertinent details with respect to the KERP award opportunities by tier.  The

Debtors will also reserve approximately $100,500 (the "Discretionary Pool") to: (i) provide KERP awards to additional non-insider employees that are identified during the course of the Debtors' case as being essential to the Debtors' sale efforts, or (ii) make additional distributions to other KERP Participants as judged necessary to retain such employees. The proposed KERP can be summarized as follows:

| Tier | Average Salary | Salary Percentage | Average KERP Award | Total KERP Cost |
|------|----------------|-------------------|--------------------|-----------------|
| I | $200,000 | 45% | $90,000 | $90,000 |
| II | $218,300 | 30% | $65,500 | $393,458 |
| III | $176,000 | 25% | $44,800 | $308,600 |
| IV | $108,400 | 20% | $21,700 | $108,500 |
| Initial KERP | | | | $899,500 |
| Discretionary Pool | | | | $100,500 |
| Total Proposed KERP | | | | $1,000,000 |

18.     The cash payments under the KERP will be made in three separate installments: (a) each KERP Participant will receive a payment of 30% of the total opportunity such KERP Participant is entitled to receive at the earlier of: (i) the 363 Sale or (ii) March 31, 2015; (b) each KERP Participant will receive a second payment of 30% of the total opportunity such KERP Participant is entitled to receive after the earlier of: (i) two months after the 363 Sale or (ii) May 31, 2015; and (c) each KERP Participant will receive a final payment of 40% of the total opportunity that such KERP Participant is entitled to receive at the earlier of: (i) six months after the 363 Sale or (ii) September 30, 2015 (together, the "Payment Dates"). If a KERP Participant is terminated without cause prior to the Payment Dates, they will receive their unpaid KERP award in full on the applicable Payment Dates. Unpaid KERP awards will be forfeited in the event of a voluntary separation, and the value attributed to such forfeited awards will be added to the Discretionary Pool.

19. Further, due to the fact that the Debtors may sell many of their assets as a going concern, it is possible that some of the KERP Participants may be offered employment by the buyer in a 363 Sale (a "Buyer").  If a KERP Participant chooses to accept a position with a Buyer, they will still be eligible for 50% of their total KERP awards on the schedule outlined above, so long as they agree to cooperate and assist the Debtors as necessary in the wind-down process.  The remaining 50% of such an employee's KERP award will be added to the Discretionary Pool.

### *Reasonableness of the KERP*

20. Towers Watson undertook a review of approved non-insider retention plans in 26 recent chapter 11 cases, of which approximately 40% were from a broad array of retailers, including major companies such as Borders Group, Circuit City Stores, Goody's, KB Toys, and Linens Holding.  The purpose of this review was to gather data with respect to (i) the design and general construct of various non-insider retention plans in other chapter 11 cases and (ii) disclosed plan costs and opportunities (expressed as a percent of base salary), where available.  Additionally, Towers Watson relied on its general experience in the design of non-insider retention plans for similarly-situated companies.

21. Based on this analysis of recently approved non-insider retention plans, Towers Watson observed, among other things, the following key common design themes:

- Fairly limited participation relative to the total number of employees, i.e., median of 35 non-insiders participants;

- Awards are paid in cash in all cases;

- Cash award opportunities generally range from 10% to 50% of base salary;

- Average per person cash award values range from approximately $10,000 to $40,000 at the 25th and 75th percentiles;

- Payments are typically made in two to three installments, and having some portion tied to a "wind-down" or sales event is common in cases involving large asset sales;

- Total costs range from approximately $300,000 to $2.6 million at the 25th and 75th percentiles, respectively; and

- Total costs as a percentage of revenue range from 0.1% to 0.2% at the median and 75th percentiles, respectively, or $1.5 million to approximately $4 million based on the Debtors' 12-month trailing revenue.

22.      Based on its analysis and experience in the design of other chapter 11 approved non-insider retention plans, Towers Watson found the design and structure of the proposed KERP to be within the range of observed practice as compared to related plans approved at similarly-situated companies.  Each of the relevant program terms (i.e., form of payment, number of participants, total program costs, award opportunities as a percent of salary, and payout structure) are within the range of observed market practice.  Based on this analysis, the Debtors' proposed KERP is reasonable versus comparable programs and under the facts and circumstances of these chapter 11 cases.

### Basis for the Relief Requested

23.      By this motion, the Debtors request, pursuant to sections 105(a), 363(b) and 503(c)(3) of the Bankruptcy Code, the entry of an order (a) approving the KEIP, (b) approving the KERP and (c) granting certain related relief.

24.      Filing for bankruptcy creates special challenges for companies regarding morale, retention, and productivity.  It demoralizes employees and frequently causes them to search for new employment.  These complications are particularly acute for debtors who seek to engage in broad sale processes, as a demoralized and reduced workforce can complicate the logistics of preparing for and effectuating a sale process, which in turn decreases the amount that can be earned in any sale to the detriment of the estate and interested parties.  For this reason,

bankruptcy courts have often authorized incentive and retention plans, so long as they are tailored in an effort to improve morale, incentivize job performance, and decrease the administrative burdens inherent in finding new employees.

25.     In this case, the Debtors have carefully designed the KEIP and KERP to ensure a successful sale process and to maximize the value of the estates.  Each of the Program Participants have been carefully chosen as the employees who are crucial to the success of these bankruptcy cases and the Sales.  However, as each of the Program Participants faces the possibility of a loss of employment in the near future, it is crucial that the Debtors maintain the loyalty of their employees and incentivize their key executives to exert all possible efforts to maximize the value received through the auction and sale of the Debtors' assets.  Each of the Program Participants has unique skills that are critical to the Debtors' efforts and the success of these chapter 11 cases.

### The Payment of the KEIP is Appropriate

#### *The KEIP is an Incentive Plan Permitted Under Section 503(c)(3)*

26.     The KEIP is not a retention or severance plan of the type referenced in sections 503(c)(1) and (2).  Rather, the KEIP is an incentive plan which is narrowly tailored to the key executives that can make the greatest impact on the success of the 363 Sale.  Further, the payments under the plan vary upon the occurrence and success of the 363 Sale.  The KEIP is not designed to provide the KEIP Participants with financial security in the event that they are no longer employed by the Debtors, and nor is it intended primarily as a way to retain the KEIP Participants as employees of the Debtors.  Rather, the KEIP is a narrowly tailored program for a key group of executives, and it is designed to maximize the value to be received by the 363 Sale.

27.     Further, even though a byproduct of the KEIP may be that the KEIP Participants are encouraged to continue their employment with the Debtors, that fact alone does

not convert the KEIP into a retention plan.  See In re Global Home Prods., LLC, 369 B.R. 778,

786 (Bankr. D. Del. 2007) (finding that proposed incentive plans were "primarily incentivizing

and only coincidentally retentive" and noting, "[t]he fact that . . . all compensation has a

retention element" did "not reduce the Court's conviction" that the debtors' primary goal in

approving the incentive plans was "to create value by motivating performance").  This is

underlined by the fact that the KEIP provides an initial payout only upon Court approval of a

Going Concern Bid in an amount equal to or greater than the Stalking Horse Bid, and further

amounts are directly tied to the receipt of additional value in the 363 Sale.

28.     As a consequence, the KEIP is not a retention or severance plan of the

type referenced in sections 503(c)(1) and (2) of the Bankruptcy Code .  See 11 U.S.C.

§ 503(c)(1)-(2).  Rather, the KEIP is governed by section 503(c)(3) of the Bankruptcy Code, and

should be allowed by this Court so long as it is "justified by the facts and circumstances of the

case."

### *Payment of the KEIP Is a Reasonable Exercise of the Debtors' Business Judgment*

29.     Section 503(c)(3) of the Bankruptcy Code requires that contemplated

payments to a debtor's employees outside of the ordinary course of business be "justified by the

facts and circumstances of the case."  11 U.S.C § 503(c)(3).  The majority of courts have found

that this standard is no different from the business judgment standard under section 363(b).  See

In re Velo Holdings, Inc., 472 B.R. 201, 212 (Bankr. S.D.N.Y. 2012) (collecting cases); 4 Collier

on Bankruptcy ¶ 503.17[4]; see also In re Nobex Corp., No. 05-20050 (MFW), 2006 Bankr.

LEXIS 417, at *8 (Bankr. D. Del. Jan. 19, 2006) (finding that "sale-related" incentive pay

satisfied the requirements of section 363 of the Bankruptcy Code).[3]

30.     Section 363(b) of the Bankruptcy Court provides, in relevant part, that a

trustee or debtor in possession "after notice and a hearing, may use . . . other than in the ordinary

course of business, property of the estate."  11 U.S.C. § 363(b).  Under section 363 of the

Bankruptcy Code, a debtor must establish that it has a valid business purpose for using property

of the estate outside the ordinary course of business.  See Myers v. Martin (In re Martin), 91 F.3d

389, 395 (3d Cir. 1996) ("under normal circumstances the court would defer to the trustee's

judgment so long as there is a legitimate business justification") (citations omitted); Dai-Ichi

Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding

Corp., 242 B.R. 147, 153 (D. Del. 1999) ("In determining whether to authorize the use, sale or

lease of property of the estate under this section, courts require the debtor to show that a sound

business purpose justifies such actions."); accord Stephens Indus., Inc. v. McClung, 789 F.2d

386, 389-90 (6th Cir. 1986) (holding that a trustee may sell assets outside of the ordinary course

of business where a sound business purpose exists); In re Lionel Corp., 722 F.2d 1063, 1071 (2d

Cir. 1983) (holding that motions for the use, sale or lease of property outside the ordinary course

of business should be approved where there is a "good business reason" to grant the motion).  If

the debtor puts forth such a valid business purpose, a presumption arises that the debtor's

---

[3]     Although the Debtors believe that the business judgment rule applies to the "facts and circumstances" test of section 503(c)(3), some courts have applied a slightly higher bar.  See In re Pilgrim's Pride Corp., 401 B.R. 229, 236-37 (Bankr. N.D. Tex. 2009) (finding that a proposed transfer was in the best interests of creditors and the debtor's estate in addition to the business judgment standard).  Even if this Court were to consider these additional factors, however, the Debtors believe that they are satisfied because, as further examined below, the KEIP is designed to increase the proceeds received from the 363 Sales for the benefit of all creditors and the Debtors' estates.

decision was made on an informed basis, in good faith, and in the honest belief that the action

was in the debtor's best interest.  In re Integrated Res., Inc., 147 B.R. 650, 656 (S.D.N.Y. 1992).

31.    Further, courts frequently consult a six factor test in considering whether

to approve an incentive plan.  For instance, the court in In re Global Home Products, LLC

examined the following factors:

> (a)    Whether the plan was calculated to achieve the desired
>        performance;
> (b)    Whether the costs of the plan were reasonable in the context of the
>        debtor's assets;
> (c)    Whether the plan was consistent with industry standards;
> (d)    Whether the debtor engaged in due diligence related to the need for
>        the plan, investigated which key employees needed to be
>        incentivized and what types of plans were generally available in
>        the debtor's particular industry; and
> (e)    Whether the debtor received independent counsel in performing
>        due diligence and in creating and authorizing the incentive
>        compensation.

See In re Global Home Prods., 369 B.R. 778, 786 (Bankr. D. Del. 2007).

32.    In this case, the Debtors have a clear and legitimate business purpose for

requesting the payment of the KEIP.  As discussed above, the KEIP was created with the goal of

maximizing the benefits of the 363 Sale.  In conjunction with Towers Watson, who has advised

the Debtors on their incentive plans for over 12 years, the Debtors have carefully crafted a plan

that provides a minimum payment to executives only upon the approval of a Going Concern Sale

in an amount greater than the Stalking Horse Bid, and which provides greater benefits to the

KEIP Participants in proportion to the amounts earned by the Debtors in the 363 Sale.

33.    Further, the factors examined by the court in In re Global Home Products

weigh strongly in favor of the KEIP.  As discussed above, the plan is calculated to achieve

greater income to the estates, and has been tailored to the executives who will have the greatest

influence upon the success of the 363 Sale.  The costs of the plan are reasonable, and Towers

Watson has calculated that a median award for the KEIP Participants based on the Debtors' revenue would be $4.8 million, which is well above the Debtors' proposed maximum KEIP cost of $2 million.  Towers Watson has performed an extensive review of insider incentive plans, including plans utilized in other retail bankruptcy cases, and has determined that the proposed plan meets all industry standards.  Further, the Debtors have carefully selected the KEIP Participants based upon their analysis of which executives will be critical to the success of the 363 Sale.  Finally, and as noted throughout this motion, Towers Watson has performed an independent review and analysis of the proposed plan, and has determined that it is within the range of industry practice and reasonable under the facts and circumstances of these cases.

34.     Courts in this jurisdiction frequently approve similar incentive plans that are tied to performance targets.  See Coldwater Creek Inc., Case No. 14-10867 (BLS) (Bankr. D. Del. June 6, 2014) (approving incentive payments to executives based on net cash flow from a liquidation sale); In re Longview Power, LLC, Case No. 13-12211 (BLS) (Bankr. D. Del. Dec. 19, 2013) (approving incentive payments to senior executives based upon the achievement of certain goals driven by the debtors' chapter 11 timeline and the desire to limit the costs of the cases); In re Trident Microsystems, Inc., Case No. 12-10069 (CSS) (Bankr. D. Del. July 10, 2012) (approving incentive payments to senior managers based on distributions to creditors); In re Midway Games Inc., Case No. 09-10465 (KG) (Bankr. D. Del. Apr. 22, 2009) (approving an incentive plan for insiders based on the achievement of chapter 11 restructuring milestones); In re Nortel Networks Inc., Case No. 09-10138 (KG) (Bankr. D. Del. Mar. 20, 2009) (approving an incentive plan based on the achievement of separate milestones, including a cost reduction plan, "certain parameters . . . that will result in a leaner and more focused organization" and plan confirmation); In re WCI Comtys., Inc., Case No. 08-11643 (KJC) (Bankr. D. Del. Feb. 4, 2009)

(approving an incentive plan based in part on chapter 11 milestones and in part on financial performance); In re Muzak Holdings LLC, Case No. 09-10422 (KJC) (Bankr. D. Del. Feb. 10, 2009) (approving a $1.75 million key employee incentive plan for senior managers).

## The Payment of the KERP is Appropriate

### *The Payment of the KERP is in the Ordinary Course of the Debtors' Business*

35.     Courts have routinely recognized a debtor's ability to operate its business in the ordinary course under sections 1107(a) and 1108 of the Bankruptcy Code.  See Nellson Neutraceutical, Inc., 369 B.R. 787, 796 (Bankr. D. Del. 2007).  Courts have likewise acknowledged a debtor's ability to enter into transactions pursuant to section 363(c)(1) of the Bankruptcy Code, including the use, sale or lease of estate property in the ordinary course of business, without notice and a hearing.  See id.; see also In re Mesa Air Grp., Inc., No. 10-10018, 2010 Bankr. LEXIS 3334, at *7–8, (Bankr. S.D.N.Y. Sept. 24, 2010) (citing Nellson Neutraceutical).  More specifically, the court in Nellson Neutraceutical noted that when "the Court determines that a transaction is in the ordinary course of a debtor's business, the Court will not entertain an objection to the transaction, provided that the conduct involves a business judgment made in good faith upon a reasonable basis and within the scope of authority under the Bankruptcy Code."  See Nellson Neutraceutical, 369 B.R. at 797; see also Mesa Air, 2010 Bankr. LEXIS at *8-9 ("As an ordinary course transaction, the inquiry is then whether the debtor has a valid business purpose for engaging in the particular transaction, and whether 'the conduct involves a business judgment made in good faith upon a reasonable basis and within the scope of authority under the Bankruptcy Code.'") (citing Nellson Neutraceutical, 369 B.R. at 799).

36.     Courts in this jurisdiction apply a two-part test to determine whether an action falls within the ordinary course of a debtor's business.  See In re Roth American, Inc., 975 F.2d 949, 952 (3d Cir. 1992); Nellson Neutraceutical, 369 B.R. at 788.  Under this test, courts

examine both the "horizontal" and "vertical" dimensions of the proposed transaction for the purpose of determining whether an action is taken in the ordinary course of business.  See In re Roth American, Inc., 975 F.2d at 952.  The relevant inquiry under the "horizontal" dimension test is whether the proposed "transaction is of the sort commonly undertaken by companies in that industry."  Id. at 953.  Under the "vertical" or "creditor's expectation test," courts analyze a transaction "from the vantage point of a hypothetical creditor and [the inquiry is] whether the transaction subjects a creditor to economic risk of a nature different from those he accepted when he decided to extend credit."  Id. (brackets in original).

37.     In this case, the proposed KERP satisfies both the "horizontal" and "vertical" tests expounded in Roth for three reasons.  First, the Debtors have provided retention bonuses to their employees in the past.  For instance, in March 2014, portions of the Debtors' "President's Fund" were provided to 12 of the Debtors' Vice Presidents.  However, to receive any part of the funds, the Vice Presidents had to sign an agreement to stay with the Debtors through December 31, 2014, and if any of the recipients voluntarily left the Debtors' employment before that time, all awarded funds were to be returned to the Debtors.  Of note, seven out of the 12 employees who received distributions from the President's Fund in 2014 are KERP Participants.  Like the President's Fund initiative, the purpose of the KERP is to retain employees that are critical to the operations of the Debtors and the success of the Sales.  Second, Towers Watson has advised the Debtors that the KERP is similar to retention plans that are utilized by companies in the retail industry.  Third, Towers Watson has also performed an extensive review of non-insider retention plans in bankruptcy cases, and has determined that the Debtors' proposed plan is well within the median, and in many cases is below the median, of other plans typically utilized by distressed retailers.

***The KERP Applies Only to Non-Insiders and Therefore Is Not Prohibited by Sections
503(c)(1) or (2)***

38.     Section 503(c)(1) and (2) of the Bankruptcy Code provide restrictions on

retention and severance plans for "insiders."  The Bankruptcy Code defines an insider of a

corporation as a:  "(i) director of the debtor; (ii) officer of the debtor; (iii) person in control of the

debtor; (iv) partnership in which the debtor is a general partner; (v) general partner of the debtor;

or (vi) relative of a general partner, director, officer, or person in control of the debtor."  11

U.S.C. § 101(31)(B)

39.     Further, although a person holding an officer's title is presumptively an

officer and thus an insider, that presumption may be rebutted with "evidence sufficient to

establish that the person holds the title of an officer in name only and, in fact, does not meet the

substantive definition of the same, *i.e.*, he or she is not taking part in the management of the

debtor."  In re Foothills Texas, Inc., 408 B.R. 573, 574-75 (Bankr. D. Del. 2009).

40.     Although some of the KERP Participants hold titles such as "Vice

President," "Manager" or "Director," they do not take part in the management of the Debtors and

they hold these titles in name only.  The KERP Participants do not attend senior management

meetings, and they generally do not participate in board meetings or corporate governance.[4]

Further, many of the KERP Participants' duties are limited to particular divisions, which further

constricts their scope of authority.  Therefore, while the titles of the KERP Participants reflect

their individual roles and functions, they do not confer officer status upon the KERP Participants.

As a consequence, the KERP Participants are not "insiders" as defined in the Bankruptcy Code.

Rather, the KERP Participants are critical employees of the Debtors who have the knowledge

---

[4]     One KERP Participant provides updates to the board of directors, but these updates are informational only,
and the participant does not set corporate policy or participate in management discussions.

and experience to carry out the decisions of the management in an efficient and cost-effective manner.[5]

41.     As the KERP Participants are not "insiders" as defined in the Bankruptcy Code, the restrictions in sections 503(c)(1) and (2) do not apply in this case.

***Payment of the KERP Is a Reasonable Exercise of the Debtors' Business Judgment***

42.     As noted above, section 503(c)(3) of the Bankruptcy Code requires that contemplated payments to a debtor's employees outside of the ordinary course of business be "justified by the facts and circumstances of the case." <u>See</u> 11 U.S.C. § 503(c)(3).  The majority of courts have held that this standard is no different from the business judgment standard under section 363(b).  <u>See</u> <u>In re Velo Holdings, Inc.</u>, 472 B.R. 201, 212 (Bankr. S.D.N.Y. 2012) (collecting cases).

43.     Although the Debtors believe that the proposed KERP is entered into in the ordinary course of the Debtors' business, to the extent that the proposed KERP is an action outside the ordinary course of the Debtors' business, the proposed payments to the KERP Participants are a sound exercise of the Debtors' business judgment and are justified by the facts and circumstances of these cases.  The loss to the Debtors of the skills and institutional knowledge possessed by the KERP Participants would jeopardize the Debtors' ability to engage in the Sales for the benefit of the estates.  As noted above, the KERP Participants are critical employees of the Debtors, and the Debtors need their knowledge and expertise to efficiently administer the estates and complete the proposed Sales.

---

[5]     The Debtors are prepared to submit at the hearing on this motion additional evidence necessary to rebut any presumption of insider status conferred by the KERP Participants' titles.  Should the Court find that any participation of insider status has not been overcome, the Debtors reserve the right to move any such KERP Participant from the KERP to the KEIP.

44.     However, the constrained liquidity of the Debtors and the proposed Sales raise the risk that these critical employees may leave the employment of the Debtors before the completion of the Sales and the administration of the estates.  In fact, several employees who would have been included as one of the KERP Participants have already left the employment of the Debtors, and it is crucial that the Debtors retain the current KERP Participants through the course of these cases.  Therefore, the KERP is in the best interests of the Debtors' estates and will help ensure the success of these cases and the Sales.

45.     Courts have approved similar incentive plans that contemplate retention payments to non-insiders.  See In re Coldwater Creek Inc.,  Case No. 14-10867 (BLS) (Bankr. D. Del. June 6, 2014); In re Furniture Brands Int'l, Inc., Case No. 13-12329 (CSS) (Bankr. D. Del. Oct. 11 2013); In re KB Toys, Inc., Case No. 08-13269 (KJC) (Bankr. D. Del. Jan. 6, 2009);  In re Mervyn's Holdings, LLC, Case No. 08-11586 (KG) (Bankr. D. Del. Oct. 30, 2009); In re Linens Holding Co., Case No. 08-10832 (CSS) (Bankr. D. Del. Oct. 21, 2008).

## The KEIP and KERP are Administrative Expenses

46.     The Debtors request that their obligations to pay the KEIP and the KERP, once earned, be deemed to be administrative expenses pursuant to section 503(b) of the Bankruptcy Code, entitled to priority under section 507(a)(2) of the Bankruptcy Code.

## Consent to Jurisdiction

47.     Pursuant to Local Rule 9013-1(f), the Debtors consent to the entry of a final judgment or order with respect to this motion if it is determined that the Court would lack Article III jurisdiction to enter such final order or judgment absent consent of the parties.

## Notice

48.     Notice of this motion will be provided to:  (a) the Office of the United States Trustee for the District of Delaware; (b) the Debtors' largest unsecured creditors on a

consolidated basis, as identified in their chapter 11 petitions; (c) counsel to Cantor Fitzgerald

Securities LLC, in its capacity as prepetition and postpetition administrative agent for certain

senior secured lenders; (d) counsel to Salus Capital Partners, LLC, in its capacity as

administrative and collateral agent for certain senior secured lenders; (e) counsel to Wilmington

Trust, N.A., in its capacity as the trustee under the indenture governing the unsecured notes; and

(f) all parties entitled to notice pursuant to Bankruptcy Rule 2002.

### No Prior Request

49.    No prior request for the relief sought herein has been made to this Court or

any other court.

WHEREFORE, the Debtors respectfully request that the Court enter an order,

substantially in the form attached hereto as Exhibit A, granting (i) the relief requested herein and

(ii) such other and further relief to the Debtors as the Court may deem proper.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

Dated:  February 6, 2015
        Wilmington, Delaware

Respectfully submitted,


 /s/ Evelyn J. Meltzer
David M. Fournier (DE 2812)
Evelyn J. Meltzer (DE 4581)
John H. Schanne, II (DE 5260)
PEPPER HAMILTON LLP
Hercules Plaza, Suite 5100
1313 N. Market Street
P.O. Box 1709
Wilmington, Delaware 19899-1709
Telephone:  (302) 777-6500
Facsimile:  (302) 421-8390

          -and-

David G. Heiman (OH 0038271)
JONES DAY
901 Lakeside Avenue
Cleveland, Ohio 44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212


Gregory M. Gordon (TX 08435300)
JONES DAY
2727 N. Harwood Street
Dallas, Texas  75201
Telephone:  (214) 220-3939
Facsimile:  (214) 969-5100


Thomas A. Howley (TX 24010115)
Paul M. Green (TX 24059854)
JONES DAY
717 Texas Suite 3300
Houston, Texas 77002
Telephone:  (832) 239-3939
Facsimile:  (832) 239-3600


PROPOSED ATTORNEYS FOR DEBTORS
AND DEBTORS IN POSSESSION