UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| RADIOSHACK CORPORATION, et al.,[1] | Case No. 15-10197 (KJC) |
| Debtors. | (Joint Administration Requested)<br>**Ref. No. 52** |

### PRELIMINARY OBJECTION OF CERTAIN SCP LENDERS
### TO DEBTORS' DIP FINANCING MOTION

Cerberus Levered Loan Opportunities Fund II, L.P., Cerberus NJ Credit Opportunities Fund, L.P., and Cerberus ASRS Holdings LLC (collectively, "Cerberus"), in their capacity as SCP Lenders (as defined below) holding $100 million in aggregate principal of secured term loans under the SCP Credit Agreement (as defined below), hereby submits this preliminary objection[2] to the "Motion for Entry of Interim and Final Orders Pursuant to 11 U.S.C. §105, 107, 361, 362, 363, 364 and 507 and Rules 2002, 4001, 9014 and 9018 of the Federal Rules Of Bankruptcy Procedure (I) Authorizing the Debtors to (A) Obtain Post-Petition Financing, (B) Use Cash Collateral (II) Granting Liens and Super-Priority Claims; (III) Scheduling a Final Hearing; (IV) Approving Entry Into DIP Financing Support Agreement and (V) Granting Related Relief,"

---

[1] The Debtors are the following eighteen entities (the last four digits of their respective taxpayer identification numbers follow in parentheses): RadioShack Corporation (7710); Atlantic Retail Ventures, Inc. (6816); Ignition L.P. (3231); ITC Services, Inc. (1930); Merchandising Support Services, Inc. (4887); RadioShack Customer Service LLC (8866); RadioShack Global Sourcing Corporation (0233); RadioShack Global Sourcing Limited Partnership (8723); RadioShack Global Sourcing, Inc. (3960); RS Ig Holdings Incorporated (8924); RSIgnite, LLC (0543); SCK, Inc. (9220); Tandy Finance Corporation (5470); Tandy Holdings, Inc. (1789); Tandy International Corporation (9940); TE Electronics LP (9965); Trade and Save LLC (3850); TRS Quality, Inc. (5417). The address of each of the Debtors is 300 RadioShack Circle, Fort Worth, Texas 76102.

[2] The DIP Motion (defined below) – a 58 page document, attaching a 50-page Interim Order that would approve a 155-page credit agreement – was filed after 11:00 p.m. on February 5, 2015 in connection with an Interim Hearing scheduled 12 hours later. While drafts of some (but not all) of the documents were circulated to Cerberus earlier in the day, those drafts are materially different from the filed versions. Other documents were not shared at all. Should the Court determine that, notwithstanding serious due process concerns, the DIP Motion will go forward on February 5th, Cerberus reserves the right to supplement the objections set forth herein and/or raise additional arguments at the hearing.

dated February 5, 2015 [Dkt. No. 52] (the "DIP Motion"), and in support thereof respectfully represent as follows:

### Preliminary Statement[3]

1. The Debtors do not need a single dollar of new financing because they can rely solely on Cash Collateral to meet their working capital needs at least until the date of the Final Hearing. Yet, in an extraordinary and highly aggressive maneuver, the Debtors ask this Court to approve a DIP facility to be provided by their Pre-Petition ABL Lenders (as defined below), including certain insiders (collectively, the "DIP Lenders"). The DIP facility contemplates what amounts to a 55-day loan in the form of: (i) New Money Loan in an amount "up to $20 million"; (ii) up to $15 million for the issuance of new letters of credit and (iii) a "roll-up" of approximately $250 million of pre-petition debt outstanding under the Pre-Petition ABL Credit Agreement (as defined below). In return, the Debtors' estates will incur the obligation to pay more than $6.1 million in fees and will get, at most, $13 million of incremental liquidity that they do not need and which will effectively be used to (i) pay a portion of the estimated professional fees and (ii) repay pre-petition debt owed to the Pre-Petition ABL Lenders.

2. The DIP Motion cannot be approved, at least on an interim basis, because the Debtors have failed to carry their burden to show that approval of the proposed DIP Facility is "necessary to avoid immediate and irreparable harm to the estate" as required by Bankruptcy Rule 4001(c)(2) and Local Delaware Rule 4001-2(b). Denial of the DIP Motion on this basis is not a close call. The Debtors' cash flow projections show that they have sufficient Cash Collateral to fund their projected working capital needs not only until the date of the Final

---

[3] All capitalized terms used herein and not defined have the meanings set forth in the proposed Interim Order.

{1044.001-W0034323.}    2

Hearing, but through the *entire forecasted 13 week period*. The Debtors have a current Cash Collateral balance of more than $44 million and project the Cash Collateral will increase to more than **$82 million** (as of the week ending February 21, 2015)—and then to more than **$118 million** by the week ending February 28, 2015—after taking into account projected cash receipts and disbursements. Thus, the DIP Motion must be denied because there is sufficient Cash Collateral to avoid any immediate and irreparable harm to the estates. Cerberus will consent to the use of Cash Collateral, subject to a reasonable adequate protection package and an acceptable budget, to fund the Debtors' business pending a Final Hearing. To date, however, the Debtors and the Pre-Petition ABL Lenders have steadfastly refused to negotiate any cash collateral stipulation.[4]

3. Despite ample Cash Collateral, the Debtors nevertheless seek approval of the proposed DIP facility. As explained below, the DIP facility provides no meaningful benefit to the Debtors and only saddles the estates with the obligation to pay more than $6.1 million in fees. The DIP Facility purports to provide New Money Loans of up to $20 million but availability is subject to: (i) a borrowing base formula in the DIP Facility, and (ii) a limitation in the Intercreditor Agreement (as defined below) that requires any "carve-out amount for professionals" to be reserved in the borrowing base. Once these limitations are applied, the Debtors can only borrow a maximum amount of approximately $13 million of New Money Loans. The entirety of that amount will be used to fund a $6 million "Professional Fee Carve-Out Account" and to satisfy the debt under the Pre-Petition ABL Credit Agreement to stay within

---

[4] Approval of a DIP facility is not necessary to provide comfort to trade vendors to provide trade credit because (i) the Debtors are liquidating, (ii) many trade vendors have already moved to cash in advance/cash on delivery terms, and (iii) the Debtors anticipate purchasing minimal amounts of additional inventory. *See Declaration of Carlin Adrianopoli in Support of First Day Pleadings* filed February 5, 2015 [D.I. 17], at ¶¶ 42-44 ("First Day Declaration").

the borrowing base formula. No proceeds of the New Money Loans will be used for working capital or to otherwise invest in the business. Although the Debtors state that the roll-up will be "sought only on a final basis," the Debtors' cash flow forecast shows that on Day 1 the Debtors will borrow $14 million and repay more than $23 million of Pre-Petition ABL Debt. In aggregate, the Debtors will pay-down more than $38 million of Pre-Petition ABL Debt during the Interim Period.

4. In exchange for illusory incremental liquidity, the Debtors will incur approximately $6.13 million in fees, consisting of a $3,129,175.39 loan origination fee payable to the DIP Lenders, and an additional $3 million "financing fee" payable to the Debtors' investment banker. The payment of more than $6.1 million in fees in exchange for a 55-day loan that the Debtors do not need, and that provides no incremental liquidity for working capital needs, is both shocking and commercially unreasonable. As a result, the DIP Motion must be denied.[5]

5. If the Motion is not denied in its entirety, the Court should nevertheless deny (i) the request for a non-consensual priming DIP lien on the SCP Collateral (as defined below), (ii) any request for non-consensual Cash Collateral use to fund a Wind-Down Reserve (as defined below) with up to $39 million of proceeds of SCP Collateral (as defined below) and (iii) any request to subordinate the existing liens of the SCP Lenders on the SCP Collateral to payment of a $6 million break-up fee and expenses reimbursement for Standard General as the proposed stalking horse bidder, because the Debtors have failed to meet their burden to provide adequate

---

[5] Standard General is one of the DIP Lenders and is an insider. Its strategy to augment its investment return by extracting fees for an unnecessary DIP Facility is entirely consistent with its prior behavior. Less than four months ago, in October 2014, it extracted a $31.8 million fee from the Debtors for a transaction that enabled the Debtors to realize, at most, $100 million in incremental liquidity, all of which has since been consumed by funding operating losses.

protection to Cerberus. Moreover, the Interim Order should be revised to expressly prohibit the Debtors from making any payments to the Pre-Petition ABL Lenders on account of the debt under the Pre-Petition ABL Credit Agreement prior to entry of a Final Order.

## Facts

### A. Pre-Petition ABL Debt and Collateral

6. The Pre-Petition ABL Lenders under the Pre-Petition ABL Credit Agreement are allegedly owed approximately $250 million (the "ABL Claim"), consisting of (i) revolving loans, (ii) term loans, and (iii) outstanding letters of credit. *See* Proposed Order at ¶D(ii). The ABL Claim is secured by liens on the following collateral: (a) first priority liens on the Debtors' current assets, primarily consisting of accounts receivable and inventory (collectively, the "ABL Priority Collateral"); and (b) second priority liens on non-current assets, primarily consisting of real estate, fixtures, furniture and equipment, intellectual property, certain contracts with Sprint Solutions, Inc. and certain equity interests (collectively, the "SCP Priority Collateral"). *See* DIP Motion at ¶ 10.

### B. SCP Debt and Collateral

7. As of the Petition Date, the Debtors were indebted to the SCP Lenders (as defined below) under the SCP Credit Agreement in the aggregate principal amount of $250 million, exclusive of fees, cost and expenses as provided for under the operative documents (the "SCP Claim"). *See* DIP Motion at ¶ 12. The SCP Claim is comprised of: (i) $100 million, exclusive of fees, costs and expenses due and owing to Cerberus, and (ii) $150 million exclusive of fees, costs and expenses due and owing to Salus Capital Partners, LLC and Salus CLO 2012-1, LTD (together "Salus" together with Cerberus, the "SCP Lenders"). *Id.* The SCP Claim is secured by liens on the following collateral (collectively, the "SCP Collateral"): (i) first priority liens on

SCP Priority Collateral, and (ii) second priority liens on ABL Priority Collateral. *Id.*

8. As a result of the first and second lien held by the agents for the Pre-Petition ABL Lenders and the SCP Lenders on the ABL Priority Collateral, including the Debtors' working capital assets, all of the cash presently held by the Debtors, and all cash to be generated by the Debtors' collection of accounts receivable and inventory constitutes "cash collateral" within the meaning of Section 363(a) of the Bankruptcy Code.

C. <u>**Intercreditor Agreement**</u>

9. The agents for the ABL Lenders and SCP Lenders executed an "Intercreditor Agreement," dated December 10, 2013 ("<u>Intercreditor Agreement</u>"). The Intercreditor Agreement provides that the SCP Lenders shall not object to post-petition financing provided by the Pre-Petition ABL Lenders "so long as" the proposed DIP Facility complies with six specific conditions set forth in section 5.3(a)(i) through (vi) of the Intercreditor Agreement (a DIP Facility that complies with such limitations is referred to as "<u>Conforming DIP Facility</u>"). One of the conditions is that the "interest rate, fees and other material terms" of the proposed DIP must be "commercially reasonable under the circumstances." *Id.* §5.3(a)(v). The proposed DIP Facility is not a Conforming DIP Facility because the interest rate, fees and other material terms are not commercially reasonable under the circumstances.[6] Contrary to a proposed finding in the form of Interim Order, Cerberus has not consented to, and is free to object to, the proposed DIP Facility. *See* Proposed Order at ¶ F ("by virtue of section 5.3 and the other provisions of the Intercreditor Agreement, the SCP Lenders have consented to ... the priming liens...").

D. <u>**Standard General is an Insider**</u>

10. Standard General L.P. (together with its affiliates, "<u>Standard General</u>") is an

---

[6] Cerberus reserves the right to object to the DIP Facility on the basis that it fails to comply with one or more the limitations set forth in Section 5.3(a) of the Intercreditor Agreement.

"insider" of the Debtors, as such term is used in 11 U.S.C. § 101(31), because Standard General (i) holds a significant amount of the ABL Claim; (ii) holds approximately 10% of the Debtors' common stock (*See* First Day Decl. of Carlin Adrianopoli at ¶ 26); and (iii) has *de facto* control over the Debtors by virtue of the broad range of powers granted to Standard General pursuant to the "Recapitalization and Investment Agreement," dated as of October 3, 2014. Standard General is one of the proposed DIP Lenders. *See* DIP Motion at ¶ 22. Upon information and belief, Standard General is also the issuer of the outstanding Letters of Credit under the Pre-Petition ABL Credit Agreement.

11. As detailed in the First Day Declaration, in October 2014, Standard General orchestrated a buy-out of the then-existing lenders under the ABL Credit Agreement and is now the stalking-horse bidder for the purchase of between 1,500 and 2,400 stores and certain of the Debtors' assets (partially through a "credit bid") in connection with the Debtors' proposed sale. *See* First Day Decl. at ¶¶ 41, 56. As a result of the foregoing, Standard General's conduct relative to the Debtors, including the negotiation of the DIP Facility, warrants close scrutiny.

E. **Proposed DIP Facility**

12. The proposed DIP Facility in an amount of up to $285,334,009 is comprised of (i) up to $20 million in respect of new money funding (the "New Money Loans"); (ii) up to $15 million for the issuance of new letter of credit; and (iii) a dollar-for-dollar roll-up of $250,334,009 million of loans and letter of credit obligations outstanding under the Pre-Petition ABL Credit Agreement, subject to entry of the Final Order (the "Roll-Up Loans"). *See* DIP Motion at ¶ 22. The Debtors' obligations under the DIP Facility would be secured by a priming lien pursuant to section 364(d)(1) on the ABL Priority Collateral, which would subordinate the existing liens on the ABL Priority Collateral, including the SCP Lenders' existing second priority

lien. *Id.*[7] Effective upon entry of the Interim Order, the estates will be obligated to pay a non-refundable fee of $3,129,175. *See* Credit Agreement at § 1.9(a). This fee is in addition to an unused commitment fee, a letter of credit fee and an undisclosed agent fee. *See* Credit Agreement at § 1.9(b), (c) and (d). Additionally, the Debtors will be required to pay a $3 million "financing fee" to their investment banker. This fact is not disclosed in the DIP Motion.[8] According to the Debtors' projections, the New Money Loan proceeds will be used to pay down the existing ABL Claim and fund $6 million into the Professional Fee Carve-Out Account. *See* Proposed Order at Ex. 1; DIP Motion at 11.

F.  **Debtors' Cash Flow Projections**

13. The Debtors' Cash Collateral balance is approximately $44 million as of February 7, 2015.[9] *See* Proposed DIP Order at Ex. 1. That balance will substantially increase to more than **$118 million** through the period ending February 28, 2015 (the "Interim Period"). *Id.* A summary of the Debtors' projected cash position for the period through Interim Period is set forth below:

| CASH COLLATERAL FORECAST* | $ in 000's |
|---|---:|
| Starting Cash Balance (as of 2/7/15) | $ 44,283 |
| Plus Week 2 Net Operating Cash Flows | $ 24,132 |
| Cash Balance (as of 2/14/15) | $ 68,415 |
| Plus Week 3 Net Operating Cash Flows | $ 13,637 |
| Cash Balance (as of 2/21/15) | $ 82,052 |
| Plus Week 4 Net Operating Cash Flows | $ 36,890 |
| **Cash Balance (as of 2/28/15)** | **$ 118,942** |

---

[7] The DIP Facility would not be secured by the SCP Priority Collateral.

[8] Surprisingly, the investment banker's "financing fee" may have been paid prior to the filing.

[9] The starting cash balance on the Petition Date would have been higher by at least $12.4 million had the Debtors not paid (i) approximately $8.4 million in professional fees/retainers and (ii) $4 million for D&O insurance, in the week preceding the chapter 11 filing.

{1044.001-W0034323.}    8

*Assumes no roll-up, no corresponding pay-down of ABL debt and no incremental financing

## I.

## THE DIP MOTION MUST BE DENIED BECAUSE AN INTERIM DIP FACILITY IS UNNECESSARY TO AVOID IMMEDIATE AND IRREPARABLE HARM

14. The proposed DIP Facility is not necessary to avoid immediate and irreparable harm because the estates have sufficient Cash Collateral to operate their business and meet their working capital needs on an interim basis. As a result, the Debtors have failed to meet their burden of demonstrating that the DIP Facility is necessary to avoid "immediate and irreparable harm" to the estate as required by Bankruptcy Rule 4001(c)(2) and Delaware Bankruptcy Court Local Rule 4001-2(b). *See In re The Colad Group, Inc.*, 324 B.R. 208, 218 (Bankr. W.D.N.Y. 2005) (refusing to grant an order to obtain the proposed financing, in part because the debtor's proposed order "failed to reflect any effort to limit the conditions of credit only to those which would be absolutely necessary to avoid immediate and irreparable harm").

15. The Debtors' cash needs, at least during the Interim Period, can be satisfied through use of Cash Collateral. Cerberus remains willing to negotiate a Cash Collateral stipulation. In the absence of a negotiated compromise, the Court should consider entering a *sua sponte* order permitting the Debtors to use Cash Collateral with an "adequate protection" package for the ABL Lenders and SCP Lenders consisting of (i) replacement liens on unencumbered assets; (ii) junior liens on the ABL Priority Collateral and SCP Priority Collateral; (iii) payment of reasonable professional fees; and (iv) payment of interest at the non-default rate. Moreover, Cash Collateral use would be limited to those expenses in the Budget (already approved by the Pre-Petition ABL Lenders), which would allow the Debtors to preserve and maintain the value of the ABL Priority Collateral and SCP Priority Collateral. This type of order would permit the

Debtors to avoid any irreparable harm and would protect those secured parties with an interest in Cash Collateral. While such an order would be unusual, the circumstances here are extraordinary. *See* 11 U.S.C. § 105(a) ("The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules...."); *see also In re Kaiser Aluminum Corp.*, 456 F.3d 328, 340 (3d Cir. 2006) ("bankruptcy courts have broad authority to act in a manner that will prevent injustice or unfairness in the administration of bankruptcy estates" and citing 11 U.S.C. § 105(a)).

## II.

## NO ADEQUATE PROTECTION FOR PRIMING DIP LIEN

16.    As noted above, the proposed DIP Facility contemplates a New Money Loan secured by a priming lien pursuant to 11 U.S.C. § 364(d)(1) that would rank senior to the existing second priority lien on the ABL Priority Collateral granted for the benefit of the SCP Lenders. *See* DIP Motion at ¶¶22, 34. The DIP Motion further provides that the SCP Lenders' second priority lien on the ABL Priority Collateral will be subordinated to the payment of a $6 million break-up fee and expense reimbursement obligation to Standard General. *See* DIP Motion at ¶ 22; Proposed DIP Order at §2.3.1; Sale Motion at ¶ 16. The Bankruptcy Code expressly prohibits a debtor from obtaining post-petition financing secured by a priming lien unless the Court finds that "there is adequate protection of the interest of the holder of the lien on the property of the estate on which the senior or equal lien is proposed to be granted." 11 U.S.C. § 364(d)(1)(B). The granting of a priming lien is extraordinary relief and the debtor has the

burden of proving that the subordinated lien holder is adequately protected. 11 U.S.C. § 364(d)(2); *In re Swedeland Dev. Grp., Inc.*, 16 F.3d 552, 564 (3d Cir. 1994) (*en banc*) (holding, in context of granting a priming lien under section 364(d)(1), that the "debtor has the burden to establish that the holder of the lien to be subordinated has adequate protection") (citations omitted); *In re LTAP US, LLLP*, 2011 Bankr. LEXIS 667, at *9 (Bankr. D. Del. Feb. 18, 2011) ("Priming is extraordinary relief requiring a strong showing that the loan to be subordinated is adequately protected.").

17. Adequate protection is intended to protect an existing secured creditor against any erosion of collateral value resulting from the grant of a priming lien. As Congress explained, the purpose of the adequate protection requirement is to ensure that secured creditors are not "deprived of the benefit of their bargain." *See* H.R. Rep. No. 95-595, at 339; S. Rep. No. 95-989, at 53 (1977). The Bankruptcy Code does not define adequate protection, but section 361(e) of the Code provides three nonexclusive means of providing adequate protection: (i) periodic cash payments to the extent of any decrease in collateral value; (ii) an additional or replacement lien to the extent of any decrease in collateral value; or (iii) any other relief that will result in the secured lender receiving the "indubitable equivalent" of its interest in the collateral. The Third Circuit Court of Appeals has held that adequate protection, regardless of its form, "should as nearly as possible under the circumstances of the case provide the creditor with the value of his bargained for rights…. In other words, the proposal should provide the pre-petition secured creditor with the same level of protection it would have had if there had not been post-petition superpriority financing." *In re Swedeland Development Group*, 16 F.3d at 564 (internal quotations omitted). The Debtors have failed to provide any adequate protection to offset the diminution of the SCP Lenders' second lien in the ABL Priority Collateral resulting from the

proposed grant of a priming lien on that collateral to secure the New Money Loan or for the subordination of the SCP Lenders' lien to the payment of the break-up fee and expense reimbursement. In the absence of adequate protection to offset the diminution described above, the DIP Motion must be denied.

### III.

### NO ADEQUATE PROTECTION FOR NON-CONSENSUAL CASH COLLATERAL USE TO FUND WIND-DOWN RESERVE

18. The DIP Motion also seeks approval of a "DIP Financing Support Agreement," dated February 5, 2015 (the "DIP Support Agreement"). *See* DIP Motion at ¶ 50 and Ex. C thereto. Cerberus is not a party to this agreement. The DIP Support Agreement describes a "separate carve-out reserve of up to $39 million" to fund "professional fees and expenses that are accrued and unpaid immediately following the completion of the contemplated 'going concern' sale or if no such 'going concern sale, liquidation of substantially all of the assets…" (the "Wind-Down Reserve"). *See* DIP Motion at Ex. C at § 1(b). The Debtors apparently propose to subordinate the "SCP Agent lien" to the Wind-Down Reserve and to fund such reserve with up to $39 million of SCP Collateral proceeds that would otherwise be distributed to the SCP Lenders, including Cerberus. *Id.* Cerberus does not consent to these provisions.

19. Proceeds of the SCP Collateral constitute "Cash Collateral" as defined in section 363(a)(1) of the Bankruptcy Code. The Bankruptcy Code expressly prohibits a debtor from using Cash Collateral without the secured creditor's consent unless the Court finds that the secured creditor's interest is adequately protected. *See* 11 U.S.C. § 363(e). The Debtors have the burden of proving adequate protection. *See* 11 U.S.C. § 363(p)(1). As a threshold matter, it is entirely premature to address a post-sale Wind-Down Reserve at the Interim Hearing scheduled on 12 hours' notice. Moreover, Cerberus does not consent to the use of its Cash

Collateral to fund the Wind-Down Reserve and will not agree to subordinate any liens securing the SCP Claim, especially for expenses that are unnecessary to preserve and/or maintain the SCP Collateral. Payment of these expenses (and others) will result in a dollar-for-dollar diminution in the amount of Cash Collateral for which the Debtors have not (and cannot) provide adequate protection as offsetting compensation. For these reasons, the Court should strike section 1(b) of the DIP Support Agreement to the extent it in any way affects or impairs the rights of Cerberus as an SCP Lender and deny the request to use Cash Collateral to fund the Wind-Down Reserve.

**WHEREFORE**, Cerberus requests that the Court enter an order:

(i) denying the DIP Motion in its entirety;

(ii) alternatively,

    (a) denying the priming DIP Lien;

    (b) denying subordination of the SCP Lenders' second lien on ABL Priority Collateral to payment of the break-up fee and expense reimbursement;

    (c) striking section 1(b) of the DIP Support Agreement to the extent it in any way affects or impairs the rights of Cerberus as an SCP Lender;

    (d) denying the request for non-consensual Cash Collateral use to fund the Wind-Down Reserve;

    (e) prohibiting the Debtors from making any payments on account of the existing debt under the Pre-Petition ABL Credit Agreement prior to entry of a Final Order; and

(iii) granting such other relief as is just and proper.[10]

Dated: February 6, 2015

LANDIS RATH & COBB LLP

*/s/ [signature]*

Adam G. Landis (No. 3407)
Kerri K. Mumford (No. 4186)
919 North Market Street, Suite 1800
Wilmington, Delaware 19801
Phone: 302.467.4400
Email: landis@lrclaw.com
       mumford@lrclaw.com

– and –

Adam C. Harris
David M. Hillman
Brian C. Tong
SCHULTE ROTH & ZABEL LLP
919 Third Avenue
New York, New York 10022
Phone: 212.756.2000
Facsimile: 212.593.5955
Email: adam.harris@srz.com
Email: david.hillman@srz.com
Email: brian.tong@srz.com

ATTORNEYS FOR CERBERUS LEVERED LOAN OPPORTUNITIES FUND II, L.P.; CERBERUS NJ CREDIT OPPORTUNITIES FUND, L.P.; AND CERBERUS ASRS HOLDINGS LLC

---

[10] Cerberus reserves the right to raise additional objections to the DIP Motion.