IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| RADIOSHACK CORPORATION, *et al.*,[1] | Case No. 15-10197 (BLS) |
| | Jointly Administered |
| *Debtors*. | RE: Docket No. 52 |

**OBJECTION OF WILMINGTON TRUST, NATIONAL ASSOCIATION, AS TRUSTEE, TO DEBTORS' DIP FINANCING MOTION**

Wilmington Trust, National Association, as successor trustee (the "Trustee") under the indenture, dated as of May 3, 2011, between RadioShack Corporation ("RadioShack"), as Issuer, and Wells Fargo Bank, National Association, as initial trustee, pursuant to which RadioShack issued $325 million in aggregate principal amount of 6.75% Senior Unsecured Notes due 2019, hereby submits this objection (the "Objection")[2] to the *Motion for Entry of Interim and Final Orders Pursuant to 11 U.S.C. § 105, 107, 361, 362, 363, 364 and 507 and Rules 2002, 4001, 9014 and 9018 of the Federal Rules of Bankruptcy Procedure (I) Authorizing the Debtors to (A) Obtain Post-Petition Financing, (B) Use Cash Collateral, (II) Granting Liens and Super-Priority*

---

[1] The Debtors are the following eighteen entities (the last four digits of their respective taxpayer identification numbers follow in parentheses): RadioShack Corporation (7110); Atlantic Retail Ventures, Inc. (6816); Ignition L.P. (3231); ITC Services, Inc. (1930); Merchandising Support Services, Inc. (4887); RadioShack Customer Service LLC (8866); RadioShack Global Sourcing Corporation (0233); RadioShack Global Sourcing Limited Partnership (8723); RadioShack Global Sourcing, Inc. (3960); RS Ig Holdings Incorporated (8924); RSIgnite, LLC (0543); SCK, Inc. (9220); Tandy Finance Corporation (5470); Tandy Holdings, Inc. (1789); Tandy International Corporation (9940); TE Electronics LP (9965); Trade and Save LLC (3850); TRS Quality, Inc. (5417). The address of each of the Debtors is 300 RadioShack Circle, Fort Worth, Texas 76102.

[2] The Trustee reserves the right to supplement this Objection based on facts or circumstances that come to light prior to the hearing on this matter.

49689288.1

*Claims; (III) Scheduling a Final Hearing; (IV) Approving Entry into DIP Financing Support Agreement and (V) Granting Related Relief* [ECF No. 52] (the "<u>DIP Motion</u>").[3]

## GROUNDS FOR OBJECTION

1. The DIP Motion seeks to implement—on an unjustifiably expedited basis—several questionable measures that may irreparably harm the interests of unsecured creditors before an unsecured creditors' committee has even been formed. While news of the Debtors' impending bankruptcy has been well-documented in the press, there has, to date, been absolutely **no** transparency to unsecured creditors on any aspect of these cases or the Debtors' restructuring plans.[4] It is therefore critical that an unsecured creditors' committee be given a meaningful opportunity to evaluate the proposed DIP Facility before any prepetition indebtedness is paid down and before any case milestones are implemented.

2. This objective can easily be achieved without prejudicing the Debtors, because the Debtors have sufficient Cash Collateral to meet their liquidity needs through the Final Hearing without incurring any new indebtedness. As set forth in the *Preliminary Objection of Certain SCP Lenders to Debtors' DIP Financing Motion* [ECF No. 65], with which the Trustee concurs, the Debtors' cash flow projections show that they have sufficient Cash Collateral to meet their working capital needs well beyond the Final Hearing. The Debtors therefore are plainly unable to demonstrate, as they must,

---

[3] The facts set forth in the DIP Motion are incorporated herein by reference, familiarity with which is assumed. Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the DIP Motion and exhibits thereto.

[4] Indeed, the Trustee did not learn of the proposed DIP Facility or terms thereof until the DIP Motion was filed at nearly midnight on the eve of the first day hearing.

that interim approval of the DIP Motion is "necessary to avoid immediate and irreparable harm to the estate pending a final hearing." Fed. R. Bankr. P. 4001(c)(2); Local Rule 4001-2(b). To the contrary, interim approval of the DIP Motion may well cause immediate and irreparable harm to unsecured creditors while providing no tangible benefit to the Debtors' estates.

3. The Court should not allow the Debtors needlessly to force unsecured creditors into such a precarious position. Instead, it should reserve judgment until the Final Hearing and allow an unsecured creditors' committee to be formed and have a meaningful opportunity to evaluate the proposed DIP Facility. Doing so will not prejudice the Debtors—let alone cause them immediate and irreparable harm—and will protect the interests of unsecured creditors who have not yet been given a voice in these cases.

4. Significantly, there are several troubling aspects of the proposed DIP Facility that warrant careful scrutiny and highlight the need for an unsecured creditors' committee to duly investigate, evaluate and be heard with respect to the proposed terms thereof. In particular:

A. <u>Pay-Down of Prepetition Debt.</u>

- Although the DIP Motion indicates that the roll-up of the Roll-Up Loans will not occur until entry of the Final Order, the cash flow forecast annexed as Exhibit 1 to the Debtors' proposed Interim Order shows that the Debtors intend to borrow $14 million upon interim approval of the DIP Facility and, contemporaneously therewith, repay over $23 million of Pre-Petition ABL Obligations. The cash flow forecast further contemplates the repayment of an additional roughly $14.5 million of Pre-Petition ABL Obligations thereafter during the Interim Period.

- The Debtors thus intend to pay down over $38 million in Pre-Petition ABL Obligations before an unsecured creditors' committee can even be heard at the Final Hearing. The Trustee is concerned that these repayments will irreparably harm unsecured creditors by depleting assets of the Debtors estates before an unsecured creditors' committee can weigh in on the propriety of the DIP Facility and the validity, extent and priority of the alleged liens securing the Pre-Petition ABL Obligations. Accordingly, no payments in respect of Pre-Petition ABL Obligations should be made until the Final Hearing.

B. <u>Establishment of Milestones at Outset of Case.</u>

- The DIP Motion seeks approval of aggressive Milestones in relation to the Debtors' proposed sale process which, if not met, will trigger an Event of Default under the DIP Facility. The Trustee is concerned that part of the goal of the DIP Motion is to immediately implement draconian Milestones in furtherance of engraining upon the Debtors' estates an expedited sale process that could prove to be too rushed and potentially erode value to unsecured creditors.

- Moreover, the implementation of the Milestones pursuant to the Interim Order no doubt will provided repeated basis for the Debtors to effectively dictate the process and timing of these cases under continual threat of default and foreclosure. Already, the Debtors obtained an expedited hearing on bidding procedures because, according to the Debtors, an expedited hearing was required under the DIP Facility. Given the substantial implications that the Milestones will have throughout these cases, an unsecured creditors' committee must have a meaningful opportunity to consider and provide input on them before they become a permanent part of the restructuring timeline as defaults under the DIP Facility.

C. <u>Position of Standard General.</u>

- Standard General (together with its affiliates) is one of the DIP Lenders and appears to be, at least for all practical purposes, an insider of the Debtors, with positions throughout the Debtors' capital structure.[5] Specifically, Standard General and/or its affiliates: (a) are a lender with respect to the Debtors'

---

[5] The Trustee has reviewed the *Limited Response of Standard General L.P. to Preliminary Objection of Certain SCP Lenders to Debtors' Dip Financing Motion* [ECF No. 136] (the "<u>Limited Response</u>"). While Standard General attempts to summarily refute its control/insider status with this conclusory, four-page pleading, the Limited Response is clearly insufficient to obviate the need for thorough investigation by an unsecured creditors' committee. There continues to be no question that Standard General has played a central role in guiding the Debtors' direction for quite some time, which undoubtedly should be the subject of extensive investigation by an unsecured creditors' committee and may very well bear on the validity, extent and priority of the alleged liens securing the Pre-Petition ABL Obligations and the priority of Standard General's claims (among other matters).

49689288.1

prepetition Roll-Up Loans, which are to be paid down under the DIP Facility; (b) are the largest holder of RadioShack's common stock; (c) are the stalking horse bidder for thousands of the Debtors' stores and other assets; and (d) have had access to confidential information and the Debtors' board of directors, management and advisors for an extended period of time.  In addition, upon information and belief, Standard General and the Debtors share advisors with respect to key aspects of the Debtors' restructuring, Standard General or its affiliates may have the power to appoint members to the Debtors' board of directors, and Standard General or its affiliates may have members on (or the ability to appoint members to) the Debtors' transaction committee charged with overseeing and coordinating discussions regarding potential recapitalization transactions.

- Consequently, the Trustee is reasonably concerned that the proposed terms of the DIP Facility—particularly the pay-down of Standard General's prepetition loans and imposition of aggressive milestones in furtherance of its stalking horse bid—may be the product of undue influence by Standard General.  The terms of the DIP Facility thus warrant close scrutiny to ensure that they are legal, fair and in the best interest of the Debtors' estates.

5.      While interim approval of a financing order prior to the formation of an unsecured creditors' committee may be routine on the first day in most cases, this is only so where the applicable DIP facility is warranted and on appropriate "interim" terms, which is clearly not the case here.  Where, as here, the Debtors have ample Cash Collateral (which could be accessed upon appropriate adequate protection such as replacement liens) to meet liquidity needs through the Final Hearing, and cannot carry their burden of establishing that interim approval of the DIP Motion is necessary to avoid immediate and irreparable harm to the estates, interim approval is neither warranted nor appropriate.

6.      In contrast, unsecured creditors may, in fact, be immediately and irreparably harmed if an Interim Order is entered before an unsecured creditors' committee can meaningfully weigh in.  There is simply no credible justification for

subjecting unsecured creditors to such risk under these circumstances. Accordingly, the Court should deny the DIP Motion insofar as it seeks relief on an interim basis and reserve judgment until the Final Hearing.

7. To be clear, the Trustee does not now, by this Objection, take issue with granting the DIP Motion on a final basis (though it reserves the right to do so at an appropriate juncture). Rather, the Trustee merely objects to the approval of the DIP Motion on an interim basis before an unsecured creditors' committee has had a fair and meaningful opportunity to evaluate the proposed terms of the DIP Facility and be heard with respect to any objections.

WHEREFORE, for all the foregoing reasons, the Trustee respectfully requests that this Court (i) deny the DIP Motion insofar as it seeks relief on an interim basis, (ii) reserve judgment on the DIP Motion until the Final Hearing, (iii) authorize the Debtors to use Cash Collateral on appropriate terms pending the Final Hearing; and (iv) grant such other and further relief as this Court deems just and proper.

| | |
|---|---|
| Dated: February 8, 2015<br>Wilmington, Delaware | Respectfully submitted,<br><br>/s/ Mark R. Somerstein<br>ROPES & GRAY LLP<br>Mark R. Somerstein<br>mark.somerstein@ropesgray.com<br>1211 Avenue of the Americas<br>New York, NY 10036-8704<br>Tel:    212.596.9000<br>Fax:    212.596.9090<br><br>-and-<br><br>/s/ Christopher A. Ward<br>Christopher A. Ward (Del. Bar No. 3877)<br>Justin K. Edelson (Del. Bar No. 5002)<br>POLSINELLI PC<br>222 Delaware Avenue, Suite 1101<br>Wilmington, Delaware 19801<br>Telephone: (302) 252-0920<br>Facsimile:  (302) 252-0921<br>E-mail:  cward@polsinelli.com<br>            jedelson@polsinelli.com<br><br>*Counsel to Wilmington Trust,*<br>*National Association, as Trustee* |