**quinn emanuel** trial lawyers | new york

51 Madison Avenue, 22nd Floor, New York, New York 10010-1601 | TEL (212) 849-7000 FAX (212) 849-7100

WRITER'S DIRECT DIAL NO.
**(212) 849-7200**

WRITER'S INTERNET ADDRESS
**susheelkirpalani@quinnemanuel.com**

March 13, 2015

The Honorable Brendan Linehan Shannon
United States Bankruptcy Court, District of Delaware
824 N. Market Street
Wilmington, DE 19801

     RE:    <u>In re RadioShack Corporation, *et al.* (the "Debtors")</u>*,* Case No. 15-10197 (BLS)

Dear Chief Judge Shannon:

We write on behalf of the Official Committee of Unsecured Creditors (the "Committee") to address a dispute arising from the Committee's ongoing investigation under 11 U.S.C. § 1103(c)(2) and Fed. R. Bankr. P. 2004. As discussed at the hearing held on March 4 and the Section 105(d) conference held on March 11, 2014, the Debtors have redacted critical materials produced to the Committee on the basis of the attorney-client privilege. The Debtors have also instructed their former Chief Financial Officer, Holly Etlin of AlixPartners, LLP, not to disclose any debtor-privileged communications to the Committee.[1] The Committee specifically requests the Court order the following, narrowly tailored relief: (A) production of unredacted versions of (i) all board packages and board minutes during the time period September 1, 2014 to November 30, 2014 (the "Critical Period"), (ii) communications among the Debtors' directors, officers, and counsel concerning the October 3, 2014 Recapitalization and Investment Transaction (the "October 2014 Transaction") made during the Critical Period, and (iii) the board package and minutes for the June 20, 2014 board meeting when Standard General, LP was formally announced to the board (one paragraph has been redacted); and (B) the authority to question witnesses about events during the Critical Period regardless of privilege, in each case under the protections of Fed. R. Evid. 502(d).

***The Debtors' Insiders Are Frustrating the Statutory Framework and Bankruptcy Policy***

Section 1103(c)(2) charges a statutory committee with "investigat[ing] the acts, conduct, assets, liabilities, and financial condition of the debtor . . . and any other matter relevant to the case or to the formulation of the plan." Section 1106(a)(3) provides the identical charge to a trustee or examiner. In addition to focusing on "whether there are assets such as avoidance actions against third parties,

---

[1] On March 10, 2014, at 1:02 p.m., counsel for Ms. Etlin wrote to the Committee and the Debtors: "Your disagreements and lack of clarity on how to proceed puts us in an impossible position. AlixPartners and Holly are willing to work with you but proceeding like this, with no agreement between the UCC and the Debtors', incomplete production of documents, and difficult issues of privilege (which we cannot make an informed call on) make this unworkable. We will not proceed with an interview tomorrow given matters out of our control."

quinn emanuel urquhart & sullivan, llp

LOS ANGELES | SAN FRANCISCO | SILICON VALLEY | CHICAGO | WASHINGTON, DC | LONDON | TOKYO | MANNHEIM | MOSCOW | HAMBURG | PARIS | MUNICH | SYDNEY | HONG KONG | BRUSSELS

[as well as] the reasons for the debtor's financial problems or other claims, that could be brought into the estate," the Committee's investigation "should also focus on the officers and management of the debtor. Have there been serious defalcations, such as fraud, gross mismanagement, or insider dealings? Has management responded appropriately to the difficulties that have beset the debtor?" 7 COLLIER ON BANKRUPTCY ¶ 1103.05[1][c] (16th ed.).

Unlike trustees, committees, and examiners, Section 1107(a) *carves out* from the duties of a debtor in possession the duty to investigate the debtor. The reason is obvious and has been cited by the Third Circuit *en banc*. While a debtor in possession might be the best-suited party to exercise most of the powers vested in a trustee, it is particularly *ill-suited* to serve all aspects of "the trustee's fiduciary duty to maximize the value of the bankruptcy estate." *In re Cybergenics Corp.*, 330 F.3d 548, 573 (3d Cir. 2003) (*en banc*) (noting the debtor in possession is "the fox guarding the henhouse. If no trustee is appointed, the debtor—really, the debtor's *management*—bears a fiduciary duty to avoid fraudulent transfers that *it itself made*. One suspects that if managers can devise *any opportunity to avoid bringing a claim* that would amount to reputational self-immolation, they will seize it.") (emphasis added). Of course, a debtor remaining in possession "does not mean that these matters will go unscrutinized." 7 COLLIER ON BANKRUPTCY ¶ 1107.02[2][b] (16th ed.). That fiduciary task is statutorily allocated to the Committee in the absence of a trustee or examiner.

In declaring that the trustee controls the debtor's privilege, the Supreme Court held that the statutory investigation to be conducted by a trustee trumps attorney-client privilege concerns. *See CFTC v. Weintraub*, 471 U.S. 343, 354 (1985) (allowing a debtor's insiders to control the privilege "would frustrate an important goal of the bankruptcy laws[:] the trustee must investigate the conduct of prior management to uncover and assert causes of action against the debtor's officers and directors"); *see also In re Mirant Corp.*, 326 B.R. 646, 654-55 (Bankr. N.D. Tex. 2005) ("In a bankruptcy case, the need for investigation is far more acute than is any concern for attorney-client communications."). The Supreme Court continued:

> It would often be extremely difficult to conduct this inquiry if the former management were allowed to control the corporation's attorney-client privilege and therefore to control access to the corporation's legal files. To the extent that management had wrongfully diverted or appropriated corporate assets, it could use the privilege as a shield against the trustee's efforts to identify those assets. The Code's goal of uncovering insider fraud would be substantially defeated if the debtor's directors were to retain the one management power that might effectively thwart an investigation into their own conduct. Respondents contend that the trustee can adequately investigate fraud without controlling the corporation's attorney-client privilege…. Without control over the privilege, the trustee might not be able to discover hidden assets or looting schemes, and therefore might not be able to make the necessary showing.

*Id.* at 354 (internal citation omitted; emphasis added).

In *Weintraub's* wake, courts have rejected assertions of privilege to further the goals and policies of federal bankruptcy law. *See In re Ginn-LA St. Lucie Ltd., LLP*, 439 B.R. 801 (Bankr. S.D. Fla. 2010) (trustee not barred by privilege so as not to "frustrate[e] the Trustee's statutory duty to investigate the financial affairs of the Debtors"); *Mirant*, 326 B.R. at 654-55 (granting joint motion to compel noting "[t]hat debtors sought chapter 11 relief less than two and one half years after [targeted transaction] is reason enough to raise concern that all might not have been right").

In line with the foregoing, courts have instructed debtors to turn over privileged materials to examiners in furtherance of the statutory right afforded the Committee. *E.g., In re Dynegy Holdings, LLC*, Case No. 11-38111 (CGM) (Bankr. S.D.N.Y. (Doc. No. 276) (ordering that the examiner's investigation be "*unfettered,*" and that "the Debtors shall not claim or assert …. that any privilege … precludes the production"). The Bankruptcy Code's critical investigatory charge should not be undermined by management's assertions of privilege, leaving the Court with the Hobson's choice between either conflicted debtor in possession or trustee.

***Courts Have Repeatedly Found That Debtors And Official Committees Share A Community Of Interest With Respect to Investigating Estate Claims And Causes Of Action***

The Debtors cannot seriously dispute that they share a community of interest with the Committee to maximize value of the estates, including through potential claims and causes of action. The matter can only be described as well-settled.² Indeed, we are aware of no bankruptcy court ever failing to recognize a common interest with respect to potential estate claims and causes of action.³ Thus,

---

² *See, e.g., In re SemCrude*, LP, No. 08-11525 (BLS) (D. Del. Oct. 20, 2008) (Shannon, J.) [Dkt. 1837] ("The Debtors and the Committee are separate fiduciaries of these estates with distinct fiduciary duties that share a common interest with respect to the subject matter of [the acts, conduct, assets, liabilities, and financial condition of SemGroup … certain contested matters, adversary proceedings, and other litigation, potential litigation, and investigations]"); *see also Litig. Trust for the Trust Beneficiaries of SNTL Corp. v. JP Morgan Chase (In re Superior Nat'l Ins. GR)*, 518 B.R. 562, 577-78 (Bankr. C.D. Cal. 2014) ("Several courts have applied the common interest doctrine on the theory that the Committee's role *requires* that debtor be able to share information without waiving privilege and that the Debtor and the Committee share the common obligation of maximizing the estate") (emphasis added); *In re Cherokee Simeon Venture I, LLC*, 2013 Bankr. LEXIS 4839, 8-9 (Bankr. D. Del. May 31, 2013) ("In the context of a bankruptcy, the common-interest privilege has been applied between a debtor and (1) an ad hoc committee; (2) a prepetition future asbestos claims representative; (3) a creditors [sic] committee; and (4) an affiliate company."); *In re Leslie Controls, Inc.*, 437 B.R. 493, 502 (Bankr. D. Del. 2010) ("However, the [Debtor, Ad Hoc Committee of asbestos claimants, and Debtor's proposed future claimants' representative] shared a common interest in maximizing the asset pool…the size of the pie and the size of the pieces are two separate questions"); *Osherow v. Vann (In re Hardwood P-G, Inc.),* 403 B.R. 445, 461 (Bankr. W.D. Tex. 2009) ("The common legal goal of investigating and recovering the debtors' assets existed between the debtors, the Committee, and the Banks—the only parties whom saw the A & M Report—the common interest doctrine applies in this case."); *In re Linens Holding Co.*, No. 08-10832 (CSS) (Bankr. D. Del. Nov. 5, 2008) (Dkt. No. 2071) ("The Debtors and the OCUC, as the statutory fiduciaries of these estates, share a community of interest with respect to the subject matter of the Review [pursuant to Bankruptcy Rule 2004 concerning the acts and omissions of, and any transfers to, the Debtors' equity holders, officers and directors, consultants and outside professionals] because the Review concerns the investigation of potential claims and causes of action of the Debtors' estates."); *In re Mortgage & Realty Trust*, 212 B.R. 649, 652-53 (C.D. Cal. 1997) ("In order to permit the committee to carry out [its] duties, the debtor must be able to provide information to the committee free of the risk that the committee may be forced to disgorge such information to adverse third parties."); *Kaiser Steel Corp. v. Frates*, 84 B.R. 202, 205 (Bankr. D. Colo. 1988) ("[with respect to prepetition fraudulent transfers,] the Committee and the Debtor have common interests. Each has an obligation to seek to maximize the assets in the Debtor's estate.").

³ A district court in *Official Committee of Asbestos Claimants of G-I Holding, Inc. v. Heyman*, 342 B.R. 416 (S.D.N.Y. 2006) held that a committee of asbestos claimants was not entitled to privileged materials under *Weintraub* "because the interests of a trustee and a creditors' committee are not *in this*
(footnote continued)

there is no concern of waiver if the Debtors share privileged materials with the Committee, as has been done consensually in the many cases cited in footnote 2.

*Alternatively, The Court Should Compel Production Under The Garner Doctrine*

The Court should order the materials produced under the so-called "fiduciary exception." *See Teleglobe Commc'ns Corp. v. BCE, Inc. (In re Teleglobe Commc'ns Corp.)*, 493 F.3d 345, 386 (3d Cir. 2007); *Garner v. Wolfinbarger*, 430 F.2d 1093, 1101 (5th Cir. 1970). "To satisfy the requirements of *Garner* as interpreted by the Third Circuit," one "must establish that [debtors] were insolvent at the time of the communications in question and that there is 'good cause' for the production." *In re Teleglobe Communications Corp.*, 392 B.R. 561, 598 (Bankr. D. Del. 2008). However, where there are other relevant important policy considerations at issue—as there are here—courts actually place the burden to show "cause" on the party asserting the privilege.[4]

It is undisputed that the Debtors were insolvent during the Critical Period. An October 2, 2014 liquidation analysis prepared by RadioShack's own advisor projected unsecured creditors recovering significantly less than the full amount owed to them. Acknowledging insolvency, the credit agreement that was amended as part of the October 2014 Transaction deleted the "solvency rep."[5]

Good cause is analyzed under four categories. *G-I Holding*, 342 B.R. at 424. First, the Committee must have a stake in the fiduciary relationship. The Committee is conducting its investigation for the benefit of, and would pursue claims derivatively on behalf of, the estates *as a whole*. Where the discovering party is acting to benefit the *entire estate* and not an individual constituency, this factor weighs heavily in favor of abrogating the privilege. Indeed, where the party will seek recovery on behalf of the corporation itself, "courts bring a lesser degree of scrutiny to bear in determining whether 'good cause' exists." *Id.* at 424-25.

With respect to the apparent merit of the claim, the Committee's investigation is just underway. And courts do not place much weight on this prong in view of the fact that it is often the sought-after materials that will further bolster the claim. *Id.* at 424-25 (ordering production notwithstanding fact that "[a]t this early stage the merit of the claims … remain contested"); *cf. Weintraub*, 471 U.S. at 354 (recognizing the "problem" in forcing discovering party to "mak[e] the threshold showing of fraud necessary to defeat the privilege").

---

*instance* entirely congruent." *Id*. at 423 (emphasis added). There, the committee had a "hostility of interests" with the reorganizing debtor exemplified by "the Committee's pursuit of 11,000 phony claims against G-I based on fabricated medical evidence." *Id*. at 423. Here, there will be no reorganized debtor, and the interests of the Committee are wholly aligned with the *liquidating* estates. Notably, in *G-I Holding*, the court ultimately concluded that the committee *was* nevertheless entitled to the debtor's privileged documents under the "fiduciary exception" (*see* discussion starting in the next section).

[4] *See Matter of Baldwin-United Corp.*, 38 B.R. 802, 805 (Bankr. S.D. Ohio 1984) (placing burden on creditors' committee to show cause for not disclosing privileged information to its constituents *citing Valente v. Pepsico, Inc*., 68 F.R.D. 361, 367 (D. Del. 1975) (minority shareholders seeking information from majority shareholder)).

[5] *See* Form 8-k (Oct. 7, 2014), Exhibit 10.2 Annex I to First Amendment to Credit Agreement, Blacklined Credit Agreement at former § 3.14.

Third, the Committee's need for the information is established by the Chapter 11 statutory scheme. At a minimum, the October 2014 Transaction—in which RadioShack burned at least $40 million, was completed four months before bankruptcy, and was all but declared a failure within weeks— must be investigated. The Committee's need has become *the estates' need*, particularly in light of the Debtors' stipulations and waivers regarding the October 2014 Transaction and the Committee's 60-day deadline to commence "any challenge" or assert "any claims" relating to that transaction.

Fourth, the nature of the communications sought directly relate to potential breach of fiduciary duty (and aiding and abetting) claims against the Debtors' directors, officers, and advisors, as well as potential fraudulent transfer and equitable subordination claims. The requested communications are focused like a laser on the October 2014 Transaction. It is imperative to understand the extent of the analysis done by the directors and officers, what financial and legal advice they relied upon, what alternatives they had, and whether any of them were influenced by any significant shareholders.

### *The Committee's Requested Relief Is In The Best Interests Of These Chapter 11 Cases*

The estates have insurance policies with $90 million of coverage. Critically, only an estate representative *other than the debtor in possession* can seek to realize this asset. Those policies are subject to an "Entity v. Insured" exclusion, carving out from coverage any claim brought by the "debtor-in-possession," but not by a creditors' committee. Thus, allowing the Committee to conduct an unfettered investigation not only furthers the goals of Congress without posing any risk to any reorganized debtor, it allows for potential realization of an asset that otherwise would be abandoned.

The Debtors "must exercise the privilege in a manner consistent with their fiduciary duty to act in the best interests of the corporation and not of themselves as individuals." *Weintraub*, 471 U.S. 348-49. By refusing to allow the Committee access to privileged materials, the Debtors are not serving that duty. They have not conducted any investigation into estate claims.[6] They are effectively wasting estate assets post-petition. And they are advancing a sale transaction with an asset purchase agreement that includes, as a condition to closing, a requirement that this Court enter a final order allowing claims arising from the October 2014 Transaction and providing that such claims are "not subject to any challenge, avoidance, reduction (except on account of satisfaction), disallowance, recharacterization, impairment or subordination." APA §9.7 (Dkt. No. 871).

The Debtors' refusal to share privileged materials (without any risk of waiver at all) with the *only fiduciary* Congressionally-charged with investigative duty in the absence of a trustee or examiner is improper. The Debtors should be compelled to produce such materials as carefully limited in the first paragraph of this letter—to enable an appropriate and "workable" investigation.

---

[6] 2/25/15 Hrg. Tr. at 123:12-24 (interim CFO testifed that company has done no analysis of claims against Standard General nor any valuation of release provided in connection with sale transaction.)

Respectfully submitted,

Susheel Kirpalani

cc: Gregory M. Gordon, Esq.
Robert W. Gaffey, Esq.