**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

|  |  |  |
|---|---|---|
| In re: | : | Chapter 11 |
|  | : |  |
| RADIOSHACK CORPORATION, *et al.*, | : | Case No. 15-10197 (BLS) |
|  | : |  |
| Debtors. | : | (Jointly Administered) |
|  | : |  |

**OBJECTION OF SALUS CAPITAL PARTNERS, LLC**
**TO DEBTORS' SALE MOTION**

Salus Capital Partners, LLC ("Salus"), one of the SCP Lenders[1] (and agent) under a Credit Agreement, dated as of December 10, 2013 (the "SCP Credit Agreement"), with RadioShack Corporation and certain of its subsidiaries (collectively, the "Debtors"), hereby objects to the Debtors' request for approval of the sale of certain of their assets described in the Debtors' Combined Motion for Entry of Orders (I) Establishing Bidding and Sales Procedures; (II) Approving the Sale of Assets; and (III) Granting Related Relief, dated February 5, 2015 [Dkt. No. 36] (the "Motion"), and in support thereof represents as follows:

**PRELIMINARY STATEMENT**

1. The Debtors' sale and auction process, including the proposal to sell certain assets as a going concern to General Wireless, Inc., a new acquisition entity formed by Standard General, L.P. ("Standard General"), is fundamentally flawed and unfair. As described further below, Standard General, which is owned and controlled by significant shareholders and insiders of the Debtors, submitted a series of bids over recent weeks that became progressively worse as time passed. Moreover, Standard General's final bid is contingent on litigation outcomes, yet was

---

[1] The SCP Lenders are Salus Capital Partners, LLC, Salus CLO 2012-1, Ltd., Cerberus Levered Loan Opportunities Fund II, L.P., Cerberus NJ Credit Opportunities Fund, L.P., and Cerberus ASRS Holdings LLC ("Cerberus").

1

not discounted by the Debtors to reflect litigation risks even though a competing bid developed in part by Salus that contains a mirror-image condition *was* discounted by the Debtors.

2.     Indeed, Standard General's most recent bid includes a cash contribution of only $16.4 million, whereas the bid developed by Salus and certain liquidation agents provides $271 million in cash.  The latter bid will, if successful, pay all secured claims in full, whereas the Standard General bid leaves a portion of the DIP financing facility unpaid and leaves Salus with a significant deficiency claim.  The Debtors nonetheless continue to support the bid of Standard General and its insider-owners.  Based on these fundamental flaws and the other objections outlined below, the Debtors' motion should be denied and the proposed sale to Standard General should not be approved.

## I.     THE PROCESS IS FUNDAMENTALLY FLAWED AND UNFAIR.

3.     The Debtors came to this Court alleging an emergent need to promptly engage in a process that would conclude with a sale of substantially all of their assets.  The SCP Lenders did not dispute – and generally supported – the Debtors' efforts to dispose of their business operations, through liquidations and/or "going concern" transactions, as promptly as possible. The SCP Lenders insisted, as the law demands, that the process be fair and transparent in order to foster a competitive bidding process and thus maximize the value of the assets.  However, the actual sale process, as Salus feared, was anything but transparent.  Standard General submitted *seriatim* conditional credit bids that, while impossible to precisely value, materially decreased in amount each and every time, yet the Debtors continued to declare their support for these bids. Standard General's opaque bids, and the Debtors' embrace of them, dissuaded prospective bidders from devoting the time and resources necessary to conduct diligence and submit

competitive bids.  The process was neither fair nor transparent, and there was never a level playing field for potential bidders.

4.      At the outset, the market was given the impression that Standard General was committed to buying a substantial portion of the estates' assets.  However, Standard General's bid was vague and indecipherable as to critical terms, including the purchase price and the scope of the acquired assets.  Indeed, this was true of each of four, successive asset purchase agreements submitted by Standard General on February 5, 2015, March 6, 2015, March 16, 2015, and March 23, 2013, respectively.  Standard General nonetheless was anointed with "stalking horse" status on March 6, 2015, but it was not until after the bid deadline expired on March 16, 2015 – when the field of potential bidders had dramatically narrowed – that many of the critical elements of Standard General's offer were finalized.

5.      Moreover, Standard General's bids became progressively worse as time passed. For example, the Debtors' investment banker testified that an analysis of the first bid, on February 5, 2015, which assumed a sale of 1,941 stores and a closing on March 28, 2015, showed that the bid had an "implied value" of approximately "$200 million."[2]  The bidding procedures approved by this Court required the Debtor to file, the day before the bid deadline, a statement "setting forth an analysis in reasonable detail of the value of the [Standard General Bid].…"  Bid Procedures at ¶ 7.  Instead, the Debtors filed a notice stating that due to certain last-minute changes by Standard General in its second bid, on March 6, 2015, that affected the value of the bid, they would not be filing the statement until *after* the bid deadline.  *See* Dkt. No. 1193.  On March 19, 2015, after the bid deadline, the Debtors filed a "preliminary" valuation of the Standard General bid of $145.5 million – a drop of $55.5 million.  *See* Dkt. No. 1268.

---

[2]      <u>See</u> David Kurtz Dep. Tr., February 24, 2015, at 144.

6.      Parties-in-interest did not receive copies of Standard General's most recent bid, dated March 23, 2014, until early morning that day – the first day of the auction.  That bid is comprised of a purported bid of $112 million of the debt evidenced by the Credit Agreement, dated as of December 10, 2013, among Cantor Fitzgerald Securities, as agent, and the Debtors (the "ABL Credit Agreement").  The bid cash consideration from Standard General is only $16.4 million.  The facial value of Standard General's March 23 bid is some $70+ million *less* than its February 5 bid, which the Debtors valued at $200 million.

7.      Moreover, Standard General's bid is highly conditional and contingent.  In particular, pursuant to § 9.7 of Standard General's most recent asset purchase agreement (the "SG APA"), its credit bid is conditioned on entry of a ***final order*** less than one week from today – by March 31, 2015 – that allows in full the debt that is the subject of the credit bid under the ABL Credit Agreement.  In particular, Standard General requires that this Court enter a final order providing that:

> (i) all Claims under the Credit Facilities outstanding at or after the Filing constitute allowed, legal, valid, binding and enforceable obligations of the Sellers, and ***the liens securing such Claims constitute*** valid, binding, enforceable and ***perfected first priority liens on property of the [Debtors]***, in each case ***not subject to any challenge, avoidance, reduction (except on account of satisfaction), disallowance, recharacterization, impairment or subordination***, (ii) ***all payments by [Debtors] with respect to such Claims on and after the Filing shall not be subject to disgorgement*** and (iii) [Standard General] is entitled to apply the full amount of such Claims held by [Standard General] or subject to participations in favor of [Standard General] against the purchase price pursuant to section 3.1(b).

See SG APA §§ 9.7, 11.1(a)(iii) (emphasis added) (the "Release Condition").

8.      However, the claims under the ABL Credit Agreement are, in fact, subject to significant investigation and challenges.  Pursuant to Section 5.1 of the final DIP financing order, the period during which parties-in-interest may bring challenges to the liens and claims under the

ABL Credit Agreement does not expire until mid-April.  The Official Committee of Unsecured Creditors (the "Committee") is actively investigating these matters.  Moreover, Salus, as agent for the SCP Lenders, has filed an adversary proceeding captioned *Salus Capital Partners, LLC, as Agent v. Standard Wireless, Inc., et al.* (Adv. Proc. Case No. 15-50239 (BLS)) (the "SCP Adversary Proceeding"), which, among other things, challenges the priority of the liens securing the claims under the ABL Credit Agreement and seeks disgorgement of $129 million in payments made by the Debtors with respect to such claims.

9.      The same issues also are raised in the Motion of Salus Capital Partners, LLC, as Agent for SCP Lenders, for Entry of an Order Restricting Credit Bidding Rights Pursuant to Bankruptcy Code Sections 105(a) and 363(k), filed March 18, 2015 [Dkt. No. 1231] (the "363(k) Motion").  Salus's 363(k) Motion mirrors the allegations raised in the SCP Adversary Proceeding and seeks entry of an order limiting the amount of any credit bid by Standard General to less than its current credit bid.

10.     Finally, Standard General's purchase agreement provides that it shall be entitled to credit bid contingent reimbursement claims with respect to undrawn letters of credit under the ABL Credit Agreement ("LCs").  *See* SG APA § 7.12.  In the event the LCs expire without being drawn, Standard General proposes to reimburse the estates with cash.  The aggregate amount of undrawn LCs is approximately $45.3 million and some of those letters of credit expire as late as next year.  The Motion fails to cite any authority for this highly unusual and extraordinary request, which would force the estates and their stakeholders to assume the credit risk that Standard General will reimburse the estates with cash at some future point.

11.     In sum, the current Standard General bid is the culmination of a series of bids, controlled by insiders of the Debtors, that have been steadily walked backwards, resulting in less

and less value for the estates.  The latest bid includes a mere $16.4 million in cash from Standard General, and is comprised largely of a credit bid that is improperly based on contingent, undrawn LC claims and conditioned on entry of a final order by March 31 that insulates the credit bid and the related claims under the ABL Credit Agreement from any attack, despite the pending Committee investigation, SCP Adversary Proceeding and 363(k) Motion.

12.     In light of these facts, and in an effort to create more value for these estates in the days before the auction, Salus explored other possible options for the disposition of the Debtors' assets.  As a result of these efforts, a contractual joint venture composed of certain liquidation agents, including Hilco Merchant Resources, LLC, Gordon Brothers Retail Partners, LLC, and Tiger Capital Group, LLC (the "Liquidation Agents"), submitted a bid for the liquidation of substantially all of the Debtors' inventory and equipment.  One difference in the bids is that the Liquidation Agents' bid contemplated disposition of the inventory and equipment at virtually all of the Debtors' stores and distribution centers, whereas Standard General's was only for a subset of those stores and, hence, necessitated piecemeal liquidations of the remaining assets.  Both bids excluded certain assets, such as accounts receivable and certain intellectual property.

13.     In any event, at the first day of the auction, the Debtors advised participants that (a) the collective, estimated value of (i) the Liquidation Agents' bid plus (ii) assets not covered by such bid, on the one hand, was less than (b) the collective, estimated value of (i) Standard General's most recent bid plus (ii) the assets not covered by such bid.  While Salus and the Liquidation Agents dispute certain of the assumptions underlying the Debtors' assessment, during the afternoon and late into the evening on the first day of the auction, Salus worked with the Liquidation Agents to develop an enhanced bid for the Debtors' assets.  That bid would be

comprised of cash provided by the Liquidation Agents and from proceeds of store liquidations, plus a credit bid, as necessary, of debt held by Salus under the SCP Credit Agreement.

14.     Salus and the Liquidation Agents ultimately developed and delivered to the Debtors a bid for substantially all the Debtors' inventory and equipment for *cash* in the total estimated amount of $271.74 million – compared to the $16.4 million in cash included in the Standard General bid.  Indeed, the $271.74 million vastly exceeded the Debtors' estimated value of the Standard General bid of $158.3 million, which amount included the credit bid, the cash from Standard General, cash from a settlement with Sprint, and other matters.   A short comparison of the two bids is depicted in the table below:

| Summary of Preliminary Purchase Price Calculation | | | |
|---|---|---|---|
| **Salus Bid** | | **Standard General Bid** | |
| (a) Total Cash Consideration | 271,740 | (a) Total Cash Consideration | 40,400 |
| (b) Credit Bid Consideration | - | (b) Credit Bid Consideration + Wind-Down Savings Costs | 117,900 |
| (c)    Total Bid (a + b) | 271,740 | (c)    Total Bid (a + b) | 158,300 |
| Bid Paid to Estate (c) | 271,740 | Bid Paid to Estate (c) | 158,300 |
| (d) GW Bid | 158,300 | (d) SCP Bid | 271,740 |
| *Overbid / (Underbid) (c -d)* | 113,440 | *Overbid / (Underbid) (c -d)* | (113,440) |

15.     The bid developed by Salus and the Liquidation Agents (the "Salus Cash Bid") is, like the Standard General bid, conditioned on the outcome of the SCP Adversary Proceeding and the 363(k) Motion.  In particular, the Salus Cash Bid is conditioned on entry of an order limiting the amount of senior debt under the ABL Credit Agreement and, therefore, the amount of sale proceeds that are necessary to pay such amount.  Moreover, the Salus Cash Bid is conditioned on disgorgement of $129 million on account of amounts improperly paid to holders of the debt under the ABL Credit Agreement in violation of the Intercreditor Agreement.  The $129 million is included within the $271.74 million cash bid submitted by Salus and the Liquidation Agent.

16.     While both the Standard General bid and the Salus Cash Bid have essentially the same condition, ***both*** contemplate sufficient proceeds from dispositions of the Debtors' assets, not including any recoveries on Salus's disgorgement action, to pay in full the claims under the ABL Credit Agreement ***plus*** the $98 million first-in, first-out ("FIFO") tranche of debt under the SCP Credit Agreement held by Cerberus.  But whereas the Salus Cash Bid should afford cash sufficient to ***also*** pay in full the $150 million first-in, last-out ("FILO") tranche of debt under the SCP Credit Agreement held by Salus, the bid submitted by Standard General will leave Salus with a significant deficiency of tens of millions of dollars.

17.     Despite these facts, the Debtors have discounted the value of the Salus Cash Bid because it is conditioned on Salus's receipt of $129 million in the SCP Adversary Proceeding. The Debtors have not advised Salus of the amount of this discount.  And the Debtors have ***not*** discounted the value of the Standard General bid – even though it contains the ***same*** conditionality (the outcome of the SCP Adversary Proceeding) and is comprised of ***only*** $16.4 million in cash, whereas the Salus Cash Bid is comprised ***entirely*** of cash and could, even without consideration of the $129 million in disgorgement proceeds, pay in ***full*** the claims under the ABL Credit Agreement ***and*** the FIFO debt held by Cerberus under the SCP Credit Agreement.

18.     While the Debtors did not discount the Standard General bid on account of the very same condition as that contained in the Salus Cash Bid, Salus nonetheless offered to pay for any discount applied to its bid with an amount of its FIFO debt under the SCP Credit Agreement. As noted above, the total amount of that debt is $150 million – far more than $129 million, and clearly sufficient to cover any discount applied to the $129 million.  Yet the Debtors refused to entertain any such credit bid by Salus, because Cerberus purportedly has advised the Debtors

that, under an agreement between Salus and Cerberus, Salus could not credit bid without Cerberus's consent.

19.     If, indeed, this is Cerberus and the Debtors' position, it is baseless and grossly unfair.  As noted above, the Salus Cash Bid will generate sufficient cash to pay off Cerberus *in full*.  In fact, the Debtors estimate that the Standard General bid *also* will generate sufficient cash to pay off Cerberus in full.  Because Cerberus will be paid off in cash, in full, the FIFO debt it holds need not be part of any credit bid by Salus.  Any such credit bid properly would be limited only to the FILO debt held by Salus.  Accordingly, there is no basis for either Cerberus or the Debtors to preclude Salus from offering to bid its FILO debt in order to address the Debtors' efforts to discount the value of the Salus Cash Bid.

20.     An objective review of this record leads to the inescapable conclusion that the sale process pursued by the Debtors has been confusing and grossly unfair and served to entrench an insider-controlled stalking horse purchaser and chill bidding at the expense of maximizing value for the benefit of all stakeholders.  There is no rational basis for entertaining a bid that (i) was so confusing that parties in interest were unable to assess its value, (ii) deteriorated dramatically over time, (iii) generates minimal cash for the estates, and (iv) has not been discounted to reflect litigation risk, even though the Salus Cash Bid was so discounted.  There also is no rational basis to preclude Salus from bidding its FILO debt under the SCP Credit Agreement when Cerberus will be paid in full in cash under all relevant scenarios.

21.     The Debtors and Standard General tout its bid as preserving a going concern and related jobs.  While a laudable goal, achieving it cannot come at the expense of an unfair process that grossly undermines estate value.  As a result of this fundamental unfairness, the Court should

9

deny the Debtors' motion to approve the sale. *See In re Times Sales Finance Corp.*, 445 F.2d

385, 387 (3d Cir. 1971) (setting aside sale confirmation order because sale process was

"fundamentally defective and unfair"); *In re Stanley Engineering Corp.*, 164 F.2d 316, 318 (3d

Cir. 1947) ("[J]udicial sales [in bankruptcy], made upon due notice and in accordance with law,

will be confirmed unless there was . . . unfairness . . . in the conduct of the sale").

## II.    THE PROPOSED SALE MATERIALLY IMPAIRS
## THE VALUE OF THE DEBTORS' INTELLECTUAL PROPERTY.

22.    Under the terms of its bid, Standard General is acquiring the Debtors' non-

trademark intellectual property, including all patents, non-trademark domain names, software

and websites, IP addresses, trade secrets, model and technical specifications, copyrights, product

specifications, vendor and pricing information, customer lists, marketing materials and know-

how.  The total consideration for these assets – all of which constitute "SCP Priority Collateral",

*i.e.*, collateral as to which the SCP Lenders holds a priority lien – is $0.  The proposed sale not

only allows Standard General to acquire a significant portion of the Debtors' intellectual property

for free, but also materially impairs the value of the intellectual property left behind (*i.e.*, the

trademarks) because the items Standard General proposes to acquire are integral to the value of

the trademarks.

23.    Nonetheless, the Debtors' recovery analysis assumes $20 million in additional

recoverable value on account of a sale of the trademarks in both sale scenarios.  This assumption

is simply unrealistic in a sale to Standard General.  According to the Debtors' analysis, the non-

trademark intellectual property, including customer lists, is of no value to a potential buyer of the

trademarks.  However, bids for the Debtors' intellectual property portfolio suggest otherwise.  By

contrast, the Salus bid preserves the full value of all of the Debtors' intellectual property assets.

Standard General should not be able to structure its bid in a manner that allows it to acquire

certain valuable intellectual property for free, while substantially impairing the remaining intellectual property. Rather, the trademarks and non-trademark intellectual property should be marketed and sold together to maximize the value of the Debtors' assets and, consequently, the value of the SCP Priority Collateral.

### III.    SALE CANNOT BE APPROVED "FREE AND CLEAR" OF THE LIENS ON SCP PRIORITY COLLATERAL.

24.    The Debtors seek to sell certain SCP Priority Collateral "free and clear" of the first priority liens of the SCP Lenders without complying with section 363(f) of the Bankruptcy Code. The "Acquired Assets" (as defined in SG APA §2.1) includes the following assets, all of which constitute part of the SCP Priority Collateral:

a.    "all patents, patent applications, patent disclosures and invention disclosure statements, together with all provisionals, reissuances, continuations, continuations-in-part, divisions, revisions, extensions and reexaminations thereof;"

b.    "internet domain names (excluding those containing Trademarks) and internet rights (including IP addresses and AS numbers), and all applications, registrations, and renewals in connection therewith;"

c.    "all copyrights and all applications, registrations, renewals and extensions in connection therewith;"

d.    "all trade secrets and confidential and proprietary information, including confidential technology, know-how, inventions, processes, formulae, specifications, models and methodologies;"

e.    "computer software, including websites and computer programs, any and all software implementations of algorithms, models and methodologies whether in source code or object code form, and all documentation, including user manuals and training materials, related to the foregoing;"

f.    "all copies and tangible embodiments of the foregoing (in whatever form or medium);"

g.    "all rights to sue for past, present and future infringement of any of the foregoing and all other remedies against past, present and future infringement of any of the foregoing;"

     h.    "all rights to protection of interests in the foregoing under the laws of all jurisdictions, in each case excluding the Trademarks;"

     i.    "all books, records, files, invoices, product specifications, customer lists and other customer-related information, cost and pricing information, supplier lists, business plans, personnel records, catalogs, customer literature, quality control records and manuals and credit records of customers" relating to the foregoing; and

     j.    goodwill relating to any of foregoing.

25.     The Debtors cannot sell SCP Priority Collateral free and clear of the SCP Lenders' liens because the Debtors have not demonstrated, and cannot demonstrate, that any of the conditions set forth in section 363(f)(1) through (5) of the Bankruptcy Code are present here.[3]  *In re Prime Properties of NY, Inc.*, 2010 WL 4026380, at *1-3 (Bankr. E.D.N.Y. Oct. 13, 2010) (denying debtor's sale motion because none of the provisions of section 363(f) could be satisfied).  To support this relief, "the Debtors submit that the sale of their assets free and clear of liens … will satisfy the requirements of section 363(f) of the Bankruptcy Code", but they offer no explanation whatsoever.  *See* Motion at ¶ 75.  Conclusory assertions are plainly insufficient to strip the SCP Lenders of their liens.

26.     Moreover, the Debtors cannot meet their burden under section 363(f) because: (1) applicable non-bankruptcy law does not permit the sale of property free and clear of the SCP Lenders' first priority liens on the SCP Priority Collateral; (2) the SCP Lenders have not consented to release their liens; (3) the purchase price is not allocated to the SCP Priority Collateral and, in any event, is not greater than the aggregate value of all liens on such property;

---

[3]     Section 363(f) provides that a debtor may sell free and clear only if "(1) applicable nonbankruptcy law permits the sale of such property free and clear of such interest; (2) the holder of such interest consents; (3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property; (4) such interest is in bona fide dispute; or (5) the holder of such interest could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest."

(4) the SCP Lenders' lien on the SCP Priority Collateral is not in bona fide dispute, nor is there any dispute regarding the SCP claim; and (5) the SCP Lenders could not be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest in the context when, as here, they are not being offered cash in the full amount of the SCP Claim in satisfaction thereof. *See* 11 U.S.C. § 363(f).

27.    For the foregoing reasons, the sale cannot be approved because the Debtors cannot sell any SCP Priority Collateral to Standard General "free and clear" of the liens of the SCP Lenders.

## IV.    DEBTORS CANNOT PROVIDE A ROYALTY-FREE LICENSE TO USE SCP PRIORITY COLLATERAL.

28.    The proposed sale to Standard General also is conditioned on the Debtors providing Standard General with a royalty-free license to use the trademarks for a 90-day period. *See* SG APA § 7.13.    Salus objects to the grant of a royalty-free license of the trademarks because the Debtors have failed to provide the SCP Lenders with "adequate protection" for the use of their collateral as is required by 11 U.S.C. § 363(e).    Section 363(e) provides, in relevant part, that "upon a request of an entity that has an interest in property … proposed to be used … or leased …. by the [debtor], the Court … shall prohibit or condition such use … or lease as is necessary to provide adequate protection of such interest."    The Debtors have the burden of proof on the issue of adequate protection and have failed to make (or attempt to make) any showing. Because the Debtors have not provided adequate protection, the royalty-free license cannot be granted and the sale cannot be approved.

## V.       SALE CANNOT BE APPROVED AS IT CONTEMPLATES NON-CONSENSUAL CASH COLLATERAL USE.

29.     The Standard General bid also contemplates that post-closing purchase price adjustments on account of inventory, petty cash, and assumed consumer liability adjustments will be funded using the cash portion of the purchase price.  *See* SG APA § 3.3.  The cash portion of the purchase price is based on $3,000 per store on account of furniture, fixtures and equipment ("FF&E") plus $3 million for store fixtures and spare pool inventory for store technology equipment located at the distribution centers or RadioShack's headquarters ('Store Fixtures and Spare Pool Inventory") plus $250,000 for artwork, memorabilia and other similar items located at the distribution centers or RadioShack's headquarters ("Donation Items").  *See* SG APA § 1.1.  FF&E, Store Fixtures and Spare Pool Inventory and Donation Items constitute SCP Priority Collateral, and the proceeds of such collateral are cash collateral of the SCP Lenders.  Salus will not consent to allow this cash collateral to fund post-closing purchase price adjustments on account of inventory, petty cash and assumed consumer liabilities.  The Standard General bid must make clear that the proceeds of the FF&E, Store Fixtures and Spare Pool Inventory and Donation Items should be paid to the SCP Lenders and cannot be used for post-closing adjustments relating to ABL Priority Collateral.   Without this change, the Standard General sale cannot be approved.

**WHEREFORE**, Salus requests that the Court enter an order (i) denying the Motion, and (ii) granting such other relief as is just and proper.

Dated:  March 25, 2015

SKADDEN, ARPS, SLATE,  MEAGHER & FLOM LLP

*/s/ Anthony W. Clark*

Anthony W. Clark (I.D. No. 2051)
Jason M. Liberi (I.D. No. 4425)
One Rodney Square
920 N. King Street
Wilmington, Delaware 19801
Phone: (302) 651-3000
Email:  Anthony.Clark@skadden.com
Email:  Jason.Liberi@skadden.com

-and-

Jay M. Goffman
Mark A. McDermott
4 Times Square
New York, New York 10036
Phone: (212) 735-2000
Email:  Jay.Goffman@skadden.com
Email:  Mark.McDermott@skadden.com

*ATTORNEYS FOR SALUS CAPITAL PARTNERS, LLC*